# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

Camelot Banquet Rooms, Inc.; Downtown Juneau Investments, LLC; Midrad, LLC; PPH Properties I, LLC; Heritage Management Services, Inc.; Vonch, LLC; East Coast Restaurant & Nightclubs, LLC; Benelux Corporation; Filosadelfia LLC; MAG Pitt LP; MAG Enterprises Inc.; 2740 Corporation; MAG Entertainment LLC; Oasis On Essington LLC; Burch Management Company, Inc.; BDS Restaurant, Inc.; DB Entertainment, Inc.; T and N Inc.; Millennium Restaurants Group, Inc.; Club Sinrock, LLC (Alaska); Club Sinrock, LLC (Washington); Club Sinrock, LLC (Oregon); Club Sinrock DT, LLC; Kimmico, Inc.; Polmour, Inc.; Sisyphian, LLC; 689 Eatery Corp.; Syzygy, LLC; Brookhurst Venture, LLC; City of Industry Hospitality Venture, Inc.; Farmdale Hospitality Services, Inc.; High Expectations Hospitality, LLC; Inland Restaurant Venture I, Inc.; Kentucky Hospitality Venture, LLC; L.C.M., LLC; Midnight Sun Enterprises, Inc.; Nitelife, Inc.; Olympic Ave Venture, Inc.; The Oxnard Hospitality Services, Inc.; Penn Ave Hospitality, LLC; Platinum SJ Enterprise; PNM Enterprises, Inc.; Rialto Pockets, Inc.; Rouge Gentlemen's Club, Inc.; Santa Barbra Hospitality Services, Inc.; Santa Maria Restaurant Enterprises, Inc.; Saries Lounge, LLC; Spearmint Rhino Companies Worldwide, Inc.; Spearmint Rhino Consulting Worldwide, Inc.; Washington Management, LLC; W.P.B. Hospitality, LLC; and K-Kel, Inc.,

        Plaintiffs,

                v.

United States Small Business Administration; Isabel Casillas Guzman, in her Official Capacity as Administrator of the Small Business Administration; United States Of America; and Janet Yellen, in her Official Capacity as United States Secretary of Treasury,

        Defendants.

## PLAINTIFFS' VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

The Plaintiffs allege:

## INTRODUCTION

1.    This is a civil action wherein Plaintiffs seek injunctive relief to restrain Defendants from violating their constitutional rights by discriminating against businesses and workers who are entitled to the benefits from the Paycheck Protection

1

Program Second Draw Loans provisions (the "Second Draw PPP"), Title III, of the recently-enacted Consolidated Appropriations Act, 2021, Pub. L. 117-2 § 311 (2020) (the "2021 Appropriations Act"), now, primarily, codified as 15 U.S.C. § 636(a)(37). The Second Draw PPP is, largely, a continuation of the Paycheck Protection Program ("PPP") established by Congress in response to the COVID-19 Pandemic (the "Pandemic," or "COVID") following the President declaring a national emergency in March of 2020. Congress created the PPP through the Coronavirus, Aid, Relief, and Economic Security Act, Pub. L. 116-136 (2020) (the "CARES Act"), which is largely codified in 15 U.S.C. § 636(a)(36). Both the Second Draw PPP and the PPP were later amended by the American Rescue Plan Act of 2021, Pub. L. 117-2 § 5001 (2021) (the "ARPA"). The Second Draw PPP is designed to quickly provide additional emergency relief to businesses and workers affected by the Pandemic, which has now eclipsed a year in duration. The SBA has enacted numerous Interim Final Rules to implement both the PPP and the Second Draw PPP. However, as to both programs, the SBA has incorporated previously existing regulations and applied previously existing standard operating procedures formulated to implement narrower existing loan programs of the SBA which, particularly in the emergency circumstances here resulting from the Pandemic, improperly and unconstitutionally limit benefits to businesses and workers unquestionably engaged in First Amendment-protected activities. The regulations and operating procedures, defined more specifically below, have been previously enjoined by no fewer than three different federal courts, including this Court; they conflict with the text of the SBA's enabling act and the purpose of the Second Draw PPP; and they violate businesses' and workers' fundamental rights under the First and Fifth Amendments of the United States Constitution.

2. Plaintiffs have contacted the SBA, through counsel, and the SBA has agreed to set aside guaranteed funds for all Plaintiffs in this action equal to the

2

amount of Second Draw PPP funds Plaintiffs applied for; therefore, this action is not brought on an emergency basis; however, Plaintiffs seek an expedited preliminary injunction in order to prevent irreparable injury to Plaintiffs, their employees, the entertainers who perform at their premises, and all of their constitutional rights.

## JURISDICTION AND VENUE

3.      Jurisdiction is conferred on this Court for the resolution of the substantial constitutional questions presented here by virtue of 28 U.S.C. § 1331; 28 U.S.C. § 1343(a)(1), (3), (4); 28 U.S.C. § 1346(a)(2); 28 U.S.C. § 1361; and 28 U.S.C. § 2201.

4.      Authority for judicial review of agency action is further provided by 5 U.S.C. § 702, which states:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5.      The prayer for declaratory relief is founded in part on Rule 57 of the Federal Rules of Civil Procedure as well as in 28 U.S.C. § 2201, the latter of which provides that:

> . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. . . .

3

6.     No other action, civil or criminal, is pending in any state court involving the Plaintiffs regarding the activities and events here.

7.     This suit is authorized by law to redress deprivations of rights, privileges, and immunities secured by the First and Fifth Amendments to the United States Constitution, and for declaratory and injunctive relief.

8.     Pursuant to 28 U.S.C. § 1391(e), venue in this Court is appropriate as Plaintiffs Camelot Banquet Rooms, Inc., Downtown Juneau Investments, LLC, and PPH Properties I, LLC are located in the Eastern District of Wisconsin; the Small Business Administration and the Treasury Department operate in the Eastern District of Wisconsin; and the injury complained of and acts causing that injury have occurred and will continue to occur in the Eastern District of Wisconsin.

9.     Venue is appropriate as to all plaintiffs because Plaintiffs Camelot Banquet Rooms, Inc., Downtown Juneau Investments, LLC, and PPH Properties I, LLC reside in the Eastern District of Wisconsin. Further, because of financial hardships caused by the Pandemic, many of the Plaintiffs would not be financially able to assert these claims if required to litigate individually in multiple jurisdictions.

## PARTIES

### *Plaintiffs*

10.     Plaintiff Camelot Banquet Rooms, Inc. is a Wisconsin Corporation duly organized and authorized to do business in the State of Wisconsin. Camelot Banquet Rooms, Inc. does business as Silk Exotic Gentlemen's Club at 11400 Silver Spring Road in Milwaukee, Wisconsin.

11.     Plaintiff Downtown Juneau Investments, LLC is a Wisconsin Limited Liability Company duly organized and authorized to do business in the State of Wisconsin. Downtown Juneau Investments, LLC does business as Silk Exotic Gentlemen's Club on Water at 144 East Juneau Ave. in Milwaukee, Wisconsin.

4

12. Plaintiff Midrad, LLC is a Wisconsin Limited Liability Company duly organized and authorized to do business in the State of Wisconsin. Midrad, LLC does business as Silk Exotic Gentlemen's Club Madison at 7302 U.S. Hwy 14 in Middleton, Wisconsin.

13. Plaintiff PPH Properties I, LLC is a Wisconsin Limited Liability Company duly organized and authorized to do business in the State of Wisconsin. PPH Properties I, LLC does business as Silk Exotic Gentlemen's Club Downtown Milwaukee at 730 North Old World Third Street in Milwaukee, Wisconsin.

14. Plaintiff Heritage Management Services, Inc. is a California Corporation duly organized and authorized to do business in the State of California. Heritage Management Services, Inc. does business as Crazy Horse at 980 Market Street in San Francisco, California.

15. Plaintiff Vonch, LLC is an Illinois Limited Liability Company duly organized and authorized to do business in the State of Illinois. Vonch, LLC is the holder of the liquor license and sole member of Polekatz Gentlemen's Club, LLC, which does business as Polekatz Gentlemen's Club at 7337 W. 100th Place in Bridgeview, Illinois.

16. Plaintiff East Coast Restaurant & Nightclubs, LLC is a New Hampshire Limited Liability Company duly organized and authorized to do business in the State of New Hampshire. East Coast Restaurant & Nightclubs, LLC does business as Millennium Cabaret at 390 South River Road in Bedford, New Hampshire.

17. Plaintiff Benelux Corporation is a Texas Corporation duly organized and authorized to do business in the State of Texas. Benelux Corporation does business as The Palazio at 501 Ben White Blvd. in Austin, Texas.

18. Plaintiff Filosadelfia, LLC is a Pennsylvania Limited Liability Company duly organized and authorized to do business in the Commonwealth of Philadelphia.

5

Filosadelfia, LLC does business as Sin City at 6130 West Passyunk Ave. in Philadelphia, Pennsylvania.

19. Plaintiff MAG Pitt LP is a Pennsylvania Limited Partnership duly organized and authorized to do business in the Commonwealth of Pennsylvania. MAG Pitt LP does business as Cheerleaders Gentlemen's Club at 3100 Liberty Ave in Pittsburgh, Pennsylvania.

20. Plaintiff MAG Enterprises Inc. is a Pennsylvania Corporation duly organized and authorized to do business in the Commonwealth of Pennsylvania. MAG Enterprises Inc. does business as Cheerleaders Gentlemen's Club at 2740 South Fort Street in Philadelphia, Pennsylvania.

21. Plaintiff 2740 Corporation is a Pennsylvania Corporation duly organized and authorized to do business in the Commonwealth of Pennsylvania. 2740 Corporation does business as Cheerleaders Gentlemen's Club at 2740 South Fort Street in Philadelphia, Pennsylvania.

22. Plaintiff MAG Entertainment, LLC is a New Jersey Limited Liability Company duly organized and authorized to do business in the State of New Jersey. MAG Entertainment, LLC does business as Cheerleaders Gentlemen's Club at 54 Crescent Blvd. in Gloucester City, New Jersey.

23. Plaintiff Oasis On Essington, Limited, LLC is a Pennsylvania Limited Liability Company duly organized and authorized to do business in the Commonwealth of Pennsylvania. Oasis On Essington, Limited, LLC does business as Cheerleaders Gentlemen's Club at 6800 Essington Ave. in Philadelphia, Pennsylvania.

24. Plaintiff Burch Management Company, Inc. is a Texas corporation duly organized and authorized to do business in the State of Texas. Burch Management Company, Inc. is located at 10723 Composite Drive in Dallas, Texas.

6

25.     Plaintiff BDS Restaurant, Inc. is a Texas Corporation duly organized and authorized to do business in the State of Texas. BDS Restaurant, Inc. does business as Baby Dolls Topless Saloon at 10250 Shady Trail in Dallas, Texas.

26.     Plaintiff DB Entertainment, Inc. is a Texas Corporation duly organized and authorized to do business in the State of Texas. DB Entertainment, Inc. does business as Baby Dolls – Fort Worth at 3601 Highway 157 in Fort Worth, Texas.

27.     Plaintiff T and N Incorporated is a Texas Corporation duly organized and authorized to do business in the State of Texas. T and N Incorporated does business as Fare Arlington or Chicas Locas at 2711 Majesty Drive in Arlington, Texas.

28.     Plaintiff Millennium Restaurant Group, Inc. is a Texas Corporation duly organized and authorized to do business in the State of Texas. Millennium Restaurant Group, Inc. does business as Cabaret Royal or Chicas Locas at 10723 Composite Drive in Dallas, Texas.

29.     Plaintiff Club Sinrock, LLC ("Sinrock Alaska") is an Alaska Limited Liability Company duly organized and authorized to do business in the State of Alaska. Sinrock Alaska does business as Club Sinrock Anchorage at 301 West 64th Ave. in Anchorage, Alaska.

30.     Plaintiff Club Sinrock, LLC ("Sinrock Washington") is a Washington Limited Liability Company duly organized and authorized to do business in the State of Washington. Sinrock Washington does business as Club Sinrock Washington at 208 SW 16th Street in Renton, Washington

31.     Plaintiff Club Sinrock, LLC ("Sinrock Oregon") is an Oregon Limited Liability Company duly organized and authorized to do business in the State of Oregon. Sinrock Oregon does business as Club Sinrock Oregon at 12035 NE Glisan Street in Portland, Oregon.

7

32.     Plaintiff Club Sinrock DT, LLC is an Oregon Limited Liability Company duly organized and authorized to do business in the State of Oregon. Club Sinrock DT, LLC does business as Club Sinrock Downtown at 215 West Burnside Street in Portland, Oregon.

33.     Plaintiff Kimmico, Inc. is a Maryland Corporation duly organized and authorized to do business in the State of Maryland. Kimmico, Inc. does business as Fantasies Nightclub & Sports Bar at 5520 Pennington Ave. in Baltimore, Maryland.

34.     Plaintiff Polmour, Inc. is a Texas Corporation duly organized and authorized to do business in the State of Texas. Polmour, Inc. does business as The Landing Strip at 745 U.S. Highway 183 South in Austin, Texas.

35.     Plaintiff Sisyphian, LLC is a California Limited Liability Company duly organized and authorized to do business in the State of California. Sisyphian, LLC does business as Xposed Gentlemen's Club at 8229 Canoga Ave in Canoga Park, California.

36.     Plaintiff 689 Eatery Corp. is a New York Corporation duly organized and authorized to do business in the State of New York. 689 Eatery Corp. does business as Satin Dolls at 689 8th Ave. in the Times Square district of New York City, New York.

37.     Plaintiff Syzygy, LLC is a California Limited Liability Company duly organized and authorized to do business in the State of California. Syzygy, LLC does business as the Wet Spot at 8237 Canoga Ave in Canoga Park, California.

38.     Plaintiff Brookhurst Venture, LLC is a California Limited Liability Company duly organized and authorized to do business in the State of California. Brookhurst Venture, LLC does business as California Girls at 815 Brookhurst Street in Anaheim, California.

39.     Plaintiff City of Industry Hospitality Venture, Inc. is a California Corporation duly organized and authorized to do business in the State of California.

8

City of Industry Hospitality Venture, Inc. does business as Spearmint Rhino Gentlemen's Club at 15411 E. Valley Blvd in City of Industry, California.

40.     Plaintiff Farmdale Hospitality Services, Inc. is a California Corporation duly organized to do business in the State of California. Farmdale Hospitality Services, Inc. does business as Blue Zebra at 6872 Farmdale Ave in North Hollywood, California.

41.     Plaintiff High Expectations Hospitality, LLC is a Texas Limited Liability Company duly organized and authorized to do business in the State of Texas. High Expectations Hospitality, LLC does business as Spearmint Rhino Gentlemen's Club at 10965 Composite Drive in Dallas, Texas.

42.     Plaintiff Inland Restaurant Venture I, Inc. is a California Corporation duly organized and authorized to do business in the State of California. Inland Restaurant Venture I, Inc. does business as Spearmint Rhino Gentlemen's Club at 15004 Oxnard Street in Van Nuys, California.

43.     Plaintiff Kentucky Hospitality Venture, LLC is a Delaware Limited Liability Company duly organized and authorized to do business in the State of Kentucky. Kentucky Hospitality Venture, LLC does business as Spearmint Rhino Gentlemen's Club at 5539 Athens Boonesboro Road in Lexington, Kentucky.

44.     Plaintiff L.C.M., LLC is an Idaho Limited Liability Company duly organized and authorized to do business in the State of Idaho. L.C.M., LLC does business Spearmint Rhino Gentlemen's Club at 1500 W. Grove Street in Boise, Idaho.

45.     Plaintiff Midnight Sun Enterprises, Inc. is a California Corporation duly organized and authorized to do business in the State of California. Midnight Sun Enterprises, Inc. does business as Spearmint Rhino Gentlemen's Club at 19900 S. Normandie Blvd in Torrance, California.

9

46.     Plaintiff Nitelife, Inc. is a Minnesota Corporation duly organized to do business in the State of Minnesota. Nitelife, Inc. does business as Spearmint Rhino Gentlemen's Club at 725 S. Hennepin Ave in Minneapolis, Minnesota.

47.     Plaintiff Olympic Avenue Venture, Inc. is a California Corporation duly organized and authorized to do business in the State of California. Olympic Avenue Venture, Inc. does business as Spearmint Rhino Gentlemen's Club at 2020 E. Olympic Blvd in Los Angeles, California.

48.     Plaintiff The Oxnard Hospitality Services, Inc. is a California Corporation duly organized and authorized to do business in the State of California. The Oxnard Hospitality Services, Inc. does business as Spearmint Rhino Gentlemen's Club at 630 Maulhardt Ave in Oxnard, California.

49.     Plaintiff Penn Ave Hospitality, LLC is a Delaware Limited Liability Company duly organized to do business in the State of Pennsylvania. Penn Ave Hospitality, LLC does business as Spearmint Rhino Gentlemen's Club at 1620 Pennsylvania Ave in Pittsburgh, Pennsylvania.

50.     Plaintiff Platinum SJ Enterprise is a California Limited Liability Company duly organized and authorized to do business in the State of California. Platinum SJ Enterprise does business as Spearmint Rhino Gentlemen's Club at 81 W. Santa Clara Street in San Jose, California.

51.     Plaintiff PNM Enterprises, Inc. is a California Corporation duly organized to do business in the State of California. PNM Enterprises, Inc. does business as California Girls at 1109 N. Harbor Blvd in Santa Ana, California.

52.     Plaintiff Rialto Pockets, Inc. is a California Corporation duly organized to do business in the State of California. Rialto Pockets, Inc. does business as Spearmint Rhino Gentlemen's Club at 312 S. Riverside Ave in Rialto, California.

53.     Plaintiff Rouge Gentlemen's Club, Inc. is a California Corporation duly organized and authorized to do business in the State of California. Rouge Gentlemen's

10

Club, Inc. does business as Dames N' Games Topless Sports Bar at 14626 Ramer Street in Van Nuys, California.

54. Plaintiff Santa Barbara Hospitality Services, Inc. is a California Corporation duly organized to do business in the State of California. Santa Barbara Hospitality Services, Inc. does business as Spearmint Rhino Gentlemen's Club at 22 E. Montecito Street in Santa Barbara California.

55. Plaintiff Santa Maria Restaurant Enterprises, Inc. is a California Corporation duly organized to do business in the State of California. Santa Maria Restaurant Enterprises, Inc. does business as Spearmint Rhino Gentlemen's Club at 505 S. Broadway in Santa Maria, California.

56. Plaintiff Saries Lounge, LLC is an Iowa Limited Liability Company duly organized and authorized to do business in the State of Iowa. Saries Lounge, LLC does business as Spearmint Rhino Gentlemen's Club at 2449 North 13th Street in Carter Lake, Iowa.

57. Plaintiff The Spearmint Rhino Companies Worldwide, Inc. is a Nevada Corporation duly organized and authorized to do business in the State of California. The Spearmint Rhino Companies Worldwide, Inc. is located at 1875 Tandem Way in Norco, California.

58. Plaintiff Spearmint Rhino Consulting Worldwide, Inc. is a Delaware Corporation duly organized and authorized to do business in the State of California. Spearmint Rhino Consulting Worldwide, Inc.is located at 1875 Tandem Way in Norco, California.

59. Plaintiff Washington Management, LLC is a California Limited Liability Company duly organized and authorized to do business in the State of California. Washington Management, LLC does business as Dames N' Games at 2319 E. Washington Blvd in Los Angeles California.

60. Plaintiff W.P.B. Hospitality, LLC is a Florida Limited Liability Company duly organized to do business in the State of Florida. W.P.B. Hospitality, LLC does business as Spearmint Rhino Gentlemen's Club at 2145 Zip Code Place in West Palm Beach, Florida.

61. Plaintiff K-Kel, Inc. is a Nevada Corporation duly organized and authorized to do business in the State of Nevada. K-Kel, Inc. does business as The Spearmint Rhino Adult Cabaret at 3340 S. Highland Drive in Las Vegas, Nevada.

### *Defendants*

62. Defendant United States Small Business Administration (the "SBA") is an independent federal agency created and authorized pursuant to 15 U.S.C. § 633, *et seq*. The SBA maintains a branch office at 310 West Wisconsin Ave. in Milwaukee, Wisconsin, which is within the Eastern District of Wisconsin.

63. Defendant Isabel Casillas Guzman ("Guzman," or the "Administrator") is the Administrator of the SBA, a Cabinet-level position, and is sued in her official capacity only, as the Administrator of the SBA.

64. Authority to sue the Administrator is granted by 15 U.S.C. § 634(b), which states, in part:

> In the performance of, and with respect to, the functions, powers, and duties vested in him by this chapter the Administrator may—(1) sue and be sued in any court of record of a State having general jurisdiction, or in any United States district court, and jurisdiction is conferred upon such district court to determine such controversies without regard to the amount in controversy . . . .

65. Defendant Janet Yellen ("Yellen," or the "Secretary") is the Secretary of the Treasury Department (the "Treasury") of the United States of America, and is sued in her official capacity only as the Secretary of the Treasury Department.

66. Defendant United States of America is a sovereign nation dedicated to the protection of life, liberty, and property as set forth in the Bill of Rights and other provisions and amendments to the Constitution of the United States.

12

67.     Plaintiffs do not seek damages and pray only for declaratory and injunctive relief under 5 U.S.C. § 701, *et seq.* in order to restrain the actions of the SBA, the Administrator, and the Secretary in each of their official capacities.

## RELEVANT STATUTORY PROVISIONS
## AND ADMINISTRATIVE REGULATIONS

68.     Congress created the SBA on July 30, 1953. Small Business Act of 1953, Pub. L. 83-163, tit. II, 67 Stat. 232, *et seq.*, (1953); *see also* https://www.sba.gov/document/policy-guidance--small-business-act (last visited Mar. 24, 2021).

69.     In 1953, the SBA promulgated a rule known as the "Opinion Molder Rule," which, with few exceptions, provided that "no business loan may be made to an applicant engaged in the 'creation, origination, expression, dissemination, propagation or distribution of ideas, values, thoughts, opinions or similar intellectual property regardless of medium, form or content.'" Business Loan Policy—Media Policy Rule, 59 Fed. Reg. 15872 (Proposed, Apr. 5, 1994), 1994 WL 109887 (quoting 13 C.F.R. § 120.101-2(b) (1993)). The reasoning behind for this rule was threefold:

> First, the prohibition is based upon SBA's desire to avoid any possible accusation that the Government is attempting to control editorial freedom by subsidizing media or communication for political or propaganda purposes. Second, the Agency has generally sought to avoid Government identification through its business assistance programs with concerns which might publish or produce matters of a religious or controversial nature. Third, SBA recognizes that the constitutionally protected rights of freedom of speech and press ought not to be compromised either by the fear of Government reprisal or by the expectation of Government financial assistance.

59 Fed. Reg. 15872, 1994 WL 109887.

70.     On April 5, 1994, the SBA promulgated a Proposed Rule to repeal the Opinion Molder Rule "primarily in order to make assistance available to a larger universe of small businesses" because the SBA "considered whether the policy determinations which where [sic] the underpinnings of the former rule should be

13

maintained" and, "[a]fter careful review, [the] SBA is persuaded that repeal is appropriate." Policy Rule, 59 Fed. Reg. 15873 (Proposed, Apr. 5, 1994), 1994 WL 109887. About three months later, the SBA promulgated a final rule repealing its Opinion Molder Rule.

71. On July 15, 1994, the SBA repealed its "Opinion Molder Rule." The Opinion Molder Rule, in broad terms, had precluded communication-related businesses from receiving SBA aid. *See* Media Policy Rule, 59 Fed. Reg. 36042 (Final, Jul. 15, 1994), 1994 WL 364161.

72. A true and accurate copy of Business Loan Policy—Media Policy Rule, 59 Fed. Reg. 15872-73 (Proposed, Apr. 5, 1994) is attached hereto as **Exhibit A** and is hereby incorporated by reference as though fully set forth herein.

73. A true and accurate copy of Media Policy Rule, 59 Fed. Reg. 36042-45 (Final, Jul. 15, 1994), 1994 WL 364161 which repealed the Opinion Molder Rule, is attached hereto as **Exhibit B** and is hereby incorporated by reference as though fully set forth herein.

74. In response to the SBA's repeal of the Opinion Molder Rule, Congress undertook to revise the Small Business Administration's enabling Act by, among other things, adding Subsection (e) to Section 633 of Title 15 of the United States Code (hereafter, the "Statutory Obscenity Loan Ban"), which the President of the United States of America signed into law on October 22, 1994, via the Small Business Reauthorization and Amendments Act of 1994, Pub. L. 103-403 (1994). The Statutory Obscenity Loan Ban, in its entirety, reads:

(e) Prohibition on provision of assistance

Notwithstanding any other provision of law, the Administration is prohibited from providing any financial or other assistance to any business concern or other person engaged in the production or distribution of any product or service that has been determined to be obscene by a court of competent jurisdiction.

15 U.S.C. § 633(e).

14

75.    The legislative history of the Small Business Reauthorization and Amendments Act of 1994, Pub. L. 103,403 (1994), as it pertains to the Statutory Obscenity Loan Ban, states, in relevant part:

> During Committee markup of the bill, Senator Pressler offered an amendment, that was unanimously accepted by the Committee, to prohibit the Administration from providing assistance to businesses engaged in the production and distribution of obscene products or services. The amendment was offered in response to the Administration's recent repeal of its "opinion molder rule" promulgated in 1953. Under that rule, the Administration, with few exceptions, could not provide assistance to small businesses engaged in the "creation, origination, expression, dissemination, propagation or distribution of ideas, values, thought, opinions or similar intellectual property, regardless of medium, form, or content" (13 CFR 120.101–2(b)). With the repeal of the rule, businesses such as newspapers, movie theaters, radio stations and bookstores now are eligible for Administration assistance. However, members of the Committee were concerned a blanket repeal of the rule would allow businesses involved in the production and distribution of obscene products and services to seek Administration support and that the agency would have no means by which to deny such loans or other assistance. Senator Pressler's amendment makes it clear the Administration is not authorized to provide any assistance to those engaged in "obscene" businesses (and thus not entitled to First Amendment protection) as defined by the U.S. Supreme Court.

S. Rep. No. 103-332 § 612, at 3430-31 (1994); and

> Sec. 611. Prohibition on the provision of assistance
>
> The Senate bill prohibits the Administration from providing assistance to businesses engaged in the production and distribution of obscene products and services. This section was written in response to the recent repeal of SBA's "opinion molder rule". With the repeal of the rule, businesses such as newspapers, movie theaters, radio stations and bookstores now are eligible for SBA assistance. This means businesses involved in the production and distribution of obscene products and services also could seek Administration support. This section makes clear that the Administration is not authorized to provide any assistance to those engaged in any class of "obscene" business as defined by the U.S. Supreme Court (and thus not entitled to First Amendment protection).
>
> *       *       *
>
> The House bill had no similar provision.
>
> The conferees adopted the Senate provision with a clarification that any materials in question must have been judicially determined, in either a

15

civil or criminal action, to be legally obscene under prevailing constitutional standards in order for the ban to apply.

H.R. Rep. No. 103-824 § 611, at 3455 (1994).

76. Attached hereto as **Exhibit C** is a true and accurate copy of the relevant portions of S. Rep. No. 103-332, § 612, at 3430-31 (1994), which is incorporated herein by reference as though fully set forth herein.

77. Attached hereto as **Exhibit D** is a true and accurate copy of the relevant portions of H.R. Rep. No. 103-824, § 611, at 3455 (1994), which is incorporated herein by reference as though fully set forth herein.

78. On December 15, 1995, the SBA promulgated a Proposed Rule entitled "Business Loan Programs," 60 Fed. Reg. 64356, 60, 75 (Proposed Dec. 15, 1995; to be codified at 13 C.F.R. § 120.110) to revise its current regulatory scheme (a true and accurate copy being attached hereto as **Exhibit E** and is incorporated herein by reference as though fully set forth herein), which reads, in relevant part:

SBA field office personnel and others also have sought guidance on the eligibility of small businesses which sell sexually oriented products or services, or engage in sexually oriented activities. The present regulation is silent regarding obscene, pornographic, or sexually oriented activities. A business engaging in any such activity that is illegal is ineligible under § 120.110(h) of this regulation. However, SBA receives inquiries regarding businesses engaged in activities which, while not illegal, may be considered by the average person to be obscene or pornographic.

"Obscene" material is not protected by the First Amendment. It has been defined by the United States Supreme Court in the context of a criminal case, *Miller v. California*, 413 U.S. 15, 24 (1973), as follows: "* * * whether a work which depicts or describes sexual conduct is obscene is [determined by] whether the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest, whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law, and whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value."

Under Supreme Court precedent, "[w]hen the government appropriates funds to establish a program, it is entitled to define the limits of that program." *Rust v. Sullivan*, 114 L.Ed.2d 233, 256 (1991). In implementing its programs, SBA must also follow the Congressional mandate set forth in Section 4(d) of the Small Business Act (15 U.S.C.

16

633(d)) ("the Act") to consider the public interest in granting or denying an application for SBA financial assistance.

Having considered the legal precedent and the Congressional mandate, SBA has determined that it may exclude small businesses engaging in lawful activities of an obscene, pornographic, or prurient sexual nature. Under the proposed rule, SBA would not provide financial assistance to small businesses which present live performances of a prurient sexual nature or which derive significant gross revenue from the sale, on a regular basis, of products or services, or the presentation of depictions or displays, of a pornographic, obscene, or prurient sexual nature. Thus, an establishment featuring nude dancing, or a book, magazine or video store containing merchandise of a prurient sexual nature would not be eligible for SBA financial assistance if the obscene, pornographic, or prurient activity contributed to the generation of a significant portion of the gross revenue of the business.

SBA considers this proposed rule to be consistent with its obligation to direct its limited resources and financial assistance to small businesses in ways which will best accomplish SBA's mission, serve its constituency, and serve the public interest. Applicants' First Amendment freedoms are in no way abridged. They may still express their views, exercise their freedoms, operate their businesses, and obtain any other aid available to them.

60 Fed. Reg. 64360.

79.     The SBA adopted its December 15, 1995, proposed rule entitled "Business Loan Programs" as a Final Rule, after a notice and comment period, on January 31, 1996, through its Final Rule, Business Loan Program, 61 Fed. Reg. 3226, *et seq.* (Jan. 31, 1996) (to be codified at 13 C.F.R. §§ 108, 116, 120, 122, 131); a copy being attached hereto as **Exhibit F** and incorporated herein by reference as though fully set forth herein.

80.     A true and accurate copy of the current SBA Business Loan Ineligible Businesses Rule, 13 C.F.R. § 120.110 (2021), is attached hereto as **Exhibit G** is herein by reference as though fully set forth herein, and reads, in relevant part:

13 C.F.R. § 120.110 provides, in part:

What businesses are ineligible for SBA business loans?

The following type of businesses are ineligible:

*       *       *

17

(p) Businesses which:

(1) Present live performances of a prurient sexual nature; or

2) Derive directly or indirectly more than *de minimis* gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature;

13 C.F.R. § 120.110 (2021). These provisions are hereafter referred to simply as the "Regulation."

81.     A true and accurate copy of relevant excerpts of the SBA Standard Operating Procedure 50 10 5(K) – Lender and Development Company Loan Programs (Apr. 1, 2019), are attached hereto as **Exhibit H** and are incorporated herein by reference as though fully set forth herein.

82.     The SBA Standard Operating Procedure 50 10 5(K) – Lender and Development Company Loan Programs (Apr. 1, 2019) provides, in part, at Ch.2 (III)(A):

15. Businesses Providing Prurient Sexual Material (13 CFR § 120.110 (p))

a. A business is not eligible for SBA assistance if:

i. It presents live or recorded performances of a prurient sexual nature; or

ii. It derives more than 5% of its gross revenue, directly or indirectly, through the sale of products, services or the presentation of any depictions or displays of a prurient sexual nature.

b. SBA has determined that financing lawful activities of a prurient sexual nature is not in the public interest. The Lender must consider whether the nature and extent of the sexual component causes the business activity to be prurient.

c. If a Lender finds that the Applicant may have a business aspect of a prurient sexual nature, prior to submitting an application to the LGPC (non-delegated) or requesting a loan number (delegated), the Lender must document and submit the analysis and supporting documentation to the Associate General Counsel for Litigation at PSMReview@sba.gov for a final Agency decision on eligibility. Upon approval by SBA, the Lender may submit the application to the LGPC or may proceed to process the loan under

18

its delegated authority. A non-delegated Lender must submit a copy of SBA's approval with the application to the LGPC. A delegated Lender must retain its analysis, supporting documentation, and evidence of SBA's approval in its loan file and must submit the analysis and supporting documentation to SBA with any request for guaranty purchase. SBA also may review such documentation when conducting Lender oversight activities.

These provisions are hereinafter referred to simply as the "SOP."

83.    On March 28, 2020, the President signed the CARES Act into law which, among other things, created the PPP.

84.    The PPP instructs the SBA to promulgate rules as follows:

SEC. 1114. EMERGENCY RULEMAKING AUTHORITY.

Not later than 15 days after the date of the enactment of this Act, the Administrator shall issue regulations to carry out this title and the amendments made by this title without regard to the notice requirements under section 553(b) of title 5, Unites States Code.

Pub. L. 116-136 § 1114; codified as 15 U.S.C. § 9012.

85.    The CARES Act specifically tasked the SBA with administering the PPP. The PPP further provides:

(I) In general

For purposes of making covered loans for the purposes described in clause (i), a lender approved to make loans under this subsection shall be deemed to have been delegated authority by the Administrator to make and approve covered loans, subject to the provisions of this paragraph.

(II) Considerations

In evaluating the eligibility of a borrower for a covered loan with the terms described in this paragraph, a lender shall consider whether the borrower—

(aa) was in operation on February 15, 2020; and

(bb)(AA) had employees for whom the borrower paid salaries and payroll taxes; or

(BB) paid independent contractors, as reported on a Form 1099-MISC.

(iii) Additional lenders

19

The authority to make loans under this paragraph shall be extended to additional lenders determined by the Administrator and the Secretary of the Treasury to have the necessary qualifications to process, close, disburse and service loans made with the guarantee of the Administration.

15 U.S.C. § 636(a)(36)(F)(ii).

86.     Pursuant to the PPP, the SBA did, in fact, promulgate numerous regulations.

87.     On April 15, 2020, the SBA published, in the Federal Register, 85 Fed. Reg. 20811-17 (Interim Final Rule, Apr. 15, 2020), an Interim Final Rule titled "Business Loan Program Temporary Changes; Paycheck Protection Program," which is attached hereto as **Exhibit I** and incorporated herein by reference as though fully set forth herein, and which reads, in relevant part:

> Businesses that are not eligible for PPP loans are identified in 13 CFR 120.110 and described further in SBA's Standard Operating Procedure (SOP) 50 10, Subpart B, Chapter 2, except that nonprofit organizations authorized under the Act are eligible. (SOP 50 10 can be found at https://www.sba.gov/          document/sop-50-10-5-lenderdevelopment-company-loan-programs.).

85 Fed. Reg. 20812 (Apr. 15, 2020).

88.     On April 15, 2020, the SBA published, in the Federal Register, 85 Fed. Reg. 20817-21 (Interim Final Rule, Apr. 15, 2020), an Interim Final Rule titled "Business Loan Program Temporary Changes; Paycheck Protection Program," which is attached hereto as **Exhibit J** and incorporated herein by reference as though fully set forth herein, and which reads, in relevant part:

> This rule exempts otherwise qualified faith-based organizations from the SBA's affiliation rules, including those set forth in 13 CFR part 121, where the application of the affiliation rules would substantially burden those organizations' religious exercise.
>
> *     *     *
>
> The Administrator has also concluded that she does not have a compelling interest in denying emergency assistance to faith-based organizations that are facing the same economic hardship to which the

20

CARES Act responded and who would be eligible for PPP but for their faith-based organizational and associational decisions.

*    *    *

In light of these exemptions, it is difficult to maintain that denying relief to these faith-based organizations is necessary to further a compelling government interest, let alone the least restrictive means of doing so.

85 Fed. Reg. 20819.

89.    In its April 15, 2020, Interim Final Rule (85 Fed. Reg. 20817-21) (**Exhibit J**), the SBA classified the PPP as a benefit program:

The affiliation rules would deny an important benefit (participation in a program for which they would otherwise be eligible under the CARES Act) because of the exercise of sincere religious belief (affiliation with other religious entities).

85 Fed. Reg. 20819 (all clarifications in original).

90.    On April 20, 2020, the SBA published, in the Federal Register, 85 Fed. Reg. 21747-52 (Interim Final Rule, Apr. 20, 2020), an Interim Final Rule titled "Business Loan Program Temporary Changes; Paycheck Protection Program—Additional Eligibility Criteria and Requirements for Certain Pledges of Loans," which is attached hereto as **Exhibit K** and incorporated herein by reference as though fully set forth herein, and which reads, in relevant part:

*b. Are businesses that receive revenue from legal gaming eligible for a PPP Loan?*

A business that is otherwise eligible for a PPP Loan is not rendered ineligible due to its receipt of legal gaming revenues if the existing standard in 13 CFR 120.110(g) is met or the following two conditions are satisfied: (a) The business's legal gaming revenue (net of payouts but not other expenses) did not exceed $1 million in 2019; and (b) legal gaming revenue (net of payouts but not other expenses) comprised less than 50 percent of the business's total revenue in 2019. Businesses that received illegal gaming revenue are categorically ineligible. The Administrator, in consultation with the Secretary, believes this test appropriately balances the longstanding policy reasons for limiting lending to businesses primarily and substantially engaged in gaming activity with the policy aim of making the PPP Loan available to a broad segment of U.S. businesses and their employees.

21

85 Fed. Reg. 21751 (all clarifications in original).

91.     A few days later, on April 28, 2020, the SBA published, in the Federal Register, 85 Fed. Reg. 23450-52 (Interim Final Rule, Apr. 28, 2020), an Interim Final Rule titled "Business Loan Program Temporary Changes; Paycheck Protection Program—Requirements—Promissory Notes, Authorizations, Affiliation, and Eligibility," which is attached hereto as **Exhibit L** and incorporated herein by reference as though fully set forth herein, and which expanded gambling establishments' eligibility and reads, in relevant part:

> d. Part III.2.b. of the Third PPP Interim Final Rule (85 FR 21747, 21751) is revised to read as follows:
>
> Are businesses that receive revenue from legal gaming eligible for a PPP Loan?
>
> A business that is otherwise eligible for a PPP Loan is not rendered ineligible due to its receipt of legal gaming revenues, and 13 CFR 120.110(g) is inapplicable to PPP loans. Businesses that received illegal gaming revenue remain categorically ineligible. On further consideration, the Administrator, in consultation with the Secretary, believes this approach is more consistent with the policy aim of making PPP loans available to a broad segment of U.S. businesses.

85 Fed. Reg. 23451.

92.     On June 30, 2020, the SBA published, in the Federal Register, 85 Fed. Reg. 39066-68 (Interim Final Rule, Jun. 30, 2020), an Interim Final Rule titled "Business Loan Program Temporary Changes; Paycheck Protection Program—Certain Eligible Payroll Costs," Which is attached hereto as **Exhibit M** and incorporated herein by reference as though fully set forth herein.

93.     Prior to the June 30, 2020, Interim Final Rule (85 Fed. Reg. 39066-68), crewmembers of commercial fishing boats were "treated as independent contractors or otherwise self-employed" and "because independent contractors have the ability to apply for a PPP loan on their own, they [the crewmembers] do not count for purposes of another applicant's PPP loan calculation." 85 Fed. Reg. 39066 (clarification added).

22

In other words, prior to this Interim Final Rule, boat owners could not count the payments made to their crewmembers as payroll costs for the PPP because the crewmembers were themselves eligible for a PPP. The SBA's June 30, 2020, Interim Final Rule revised that:

> The Administrator, in consultation with the Secretary, has determined that the relationship of a fishing boat owner and a crewmember described in Section 3121(b)(20) of the Code is analogous to a joint venture or partnership.
>
> \*       \*       \*
>
> Accordingly, as described below, this interim final rule (1) provides that a fishing boat owner may include compensation reported on Box 5 of Form 1099–MISC and paid to a crewmember described in Section 3121(b)(20) as a payroll cost in its PPP loan application, and (2) addresses a fishing boat owner's eligibility to obtain loan forgiveness of payroll costs paid to a crewmember who has obtained his or her own PPP loan.

85 Fed. Reg. 39066-67.

94.     On January 27, 2021, the President signed the 2021 Appropriations Act into law, which, among other things, created the Second Draw PPP and which is largely codified at 15 U.S.C. § 636(a)(37).

95.     The Second Draw PPP provisions of the 2021 Appropriation Act states:

> Except as otherwise provided in this paragraph, the Administrator may guarantee covered loans to eligible entities under the same terms, conditions, and processes as a loan made under paragraph [15 U.S.C. § 636(a)](36).

15 U.S.C. § 636(a)(37)(B) (clarification added).

96.     The 2021 Appropriation Act provides, in regard to Second Draw PPP eligibility:

> (iv) the term "eligible entity"—
>
> (III) does not include—
>
> (aa) any entity that is a type of business concern (or would be, if such entity were a business concern) described in section 120.110 of title 13, Code of Federal Regulations (or in any successor regulation or other

23

related guidance or rule that may be issued by the Administrator) other than a business concern described in subsection (a) or (k) of such section; or

(bb) any business concern or entity primarily engaged in political or lobbying activities, which shall include any entity that is organized for research or for engaging in advocacy in areas such as public policy or political strategy or otherwise describes itself as a think tank in any public documents;

(cc) any business concern or entity—

(AA) for which an entity created in or organized under the laws of the People's Republic of China or the Special Administrative Region of Hong Kong, or that has significant operations in the People's Republic of China or the Special Administrative Region of Hong Kong, owns or holds, directly or indirectly, not less than 20 percent of the economic interest of the business concern or entity, including as equity shares or a capital or profit interest in a limited liability company or partnership; or

(BB) that retains, as a member of the board of directors of the business concern, a person who is a resident of the People's Republic of China;

(dd) any person required to submit a registration statement under section 612 of Title 22; or

(ee) an eligible person or entity (as defined under section 24 of the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act) that receives a grant under such section 24;

15 U.S.C. § 636(a)(37)(A)(iv)(III). Hereafter, 15 U.S.C. § 636(37)(A)(iv)(III)(aa) shall be referred to as the "Incorporating Statute."

97.    The 2021 Appropriation Act expanded eligibility for the Second Draw PPP to include, as eligible businesses, churches and religious organizations:

(c) ELIGIBLE CHURCHES AND RELIGIOUS ORGANIZATIONS.—

(1) SENSE OF CONGRESS.—It is the sense of Congress that the interim final rule of the Administration entitled "Business Loan Program Temporary Changes; Paycheck Protection Program" (85 Fed. Reg. 20817 (April 15, 2020)) properly clarified the eligibility of churches and religious organizations for loans made under paragraph (36) of section 7(a) of the Small Business Act (15 U.S.C. 636(a)).

2021 Appropriations Act, § 311(c), which would be ineligible under 13 C.F.R. § 120.110(k).

24

98.     The 2021 Appropriation Act expanded eligibility for the Second Draw PPP, by amending the PPP to include, as eligible businesses, certain news businesses:

(II) Eligibility of news organizations

(aa) Definition

In this subclause, the term "included business concern" means a business concern, including any station which broadcasts pursuant to a license granted by the Federal Communications Commission under title III of the Communications Act of 1934 (47 U.S.C. 301 et seq.) without regard for whether such a station is a concern as defined in section 121.105 of title 13, Code of Federal Regulations, or any successor thereto—

(AA) that employs not more than 500 employees, or the size standard established by the Administrator for the North American Industry Classification System code applicable to the business concern, per physical location of such business concern; or

(BB) any nonprofit organization or any organization otherwise subject to section 511(a)(2)(B) of the Internal Revenue Code of 1986 that is a public broadcasting entity (as defined in section 397(11) of the Communications Act of 1934 (47 U.S.C. 397(11))).

(bb) Eligibility

During the covered period, an included business concern shall be eligible to receive a covered loan if—

(AA) the included business concern is majority owned or controlled by a business concern that is assigned a North American Industry Classification System code beginning with 511110 or 5151 or, with respect to a public broadcasting entity (as defined in section 397(11) of the Communications Act of 1934 (47 U.S.C. 397(11))), has a trade or business that falls under such a code; and

(BB) the included business concern makes a good faith certification that proceeds of the loan will be used to support expenses at the component of the included business concern that produces or distributes locally focused or emergency information.

15 U.S.C. § 636(a)(36)(D)(iii)(II) (previously, 2021 Appropriations Act, § 317 (a)(2)), which would have been ineligible under 13 C.F.R. § 120.110.

25

99.    The 2021 Appropriations Act expanded eligibility for the Second Draw PPP, by amending the PPP to include, as eligible businesses, certain lobbying and destination marketing businesses:

(vii) Eligibility for certain 501(c)(6) organizations

(I) In general

Any organization that is described in section 501(c)(6) of the Internal Revenue Code and that is exempt from taxation under section 501(a) of such Code (excluding professional sports leagues and organizations with the purpose of promoting or participating in a political campaign or other activity) shall be eligible to receive a covered loan if—

(aa) the organization does not receive more than 15 percent of its receipts from lobbying activities;

(bb) the lobbying activities of the organization do not comprise more than 15 percent of the total activities of the organization;

(cc) the cost of the lobbying activities of the organization did not exceed $1,000,000 during the most recent tax year of the organization that ended prior to February 15, 2020; and

(dd) the organization employs not more than 300 employees.

(II) Destination marketing organizations

Any destination marketing organization shall be eligible to receive a covered loan if—

(aa) the destination marketing organization does not receive more than 15 percent of its receipts from lobbying activities;

(bb) the lobbying activities of the destination marketing organization do not comprise more than 15 percent of the total activities of the organization;

(cc) the cost of the lobbying activities of the destination marketing organization did not exceed $1,000,000 during the most recent tax year of the destination marketing organization that ended prior to February 15, 2020; and

(dd) the destination marketing organization employs not more than 300 employees; and

(ee) the destination marketing organization—

(AA) is described in section 501(c) of the Internal Revenue Code and is exempt from taxation under section 501(a) of such Code; or

(BB) is a quasi-governmental entity or is a political subdivision of a State or local government, including any instrumentality of those entities.

15 U.S.C. § 636(a)(36)(D)(vii) (previously, 2021 Appropriations Act, § 318(2)(C), which would not have been eligible under 13 C.F.R. § 120.110.

100.　The 2021 Appropriations Act expanded eligibility for the Second Draw PPP, by amending 11 U.S.C. § 364 to include, as eligible businesses, businesses in bankruptcy:

'(g)(1) The court, after notice and a hearing, may authorize a debtor in possession or a trustee that is authorized to operate the business of the debtor under section 1183, 1184, 1203, 1204, or 1304 of this title to obtain a loan under paragraph (36) or (37) of section 7(a) of the Small Business Act (15 U.S.C. 636(a)), and such loan shall be treated as a debt to the extent the loan is not forgiven in accordance with section 7A of the Small Business Act or subparagraph (J) of such paragraph (37), as applicable, with priority equal to a claim of the kind specified in subsection (c)(1) of this section.

'(2) The trustee may incur debt described in paragraph (1) notwithstanding any provision in a contract, prior order authorizing the trustee to incur debt under this section, prior order authorizing the trustee to use cash collateral under section 363, or applicable law that prohibits the debtor from incurring additional debt.

'(3) The court shall hold a hearing within 7 days after the filing and service of the motion to obtain a loan described in paragraph (1). Notwithstanding the Federal Rules of Bankruptcy Procedure, at such hearing, the court may grant relief on a final basis.'

2021 Appropriations Act, § 320(a).

101.　The Second Draw PPP provisions of the 2021 Appropriations Act also expanded the uses to which PPP funds may be applied, and forgiven, by adding, among other provisions:

(9) the term "covered worker protection expenditure"—

(A) means an operating or a capital expenditure to facilitate the adaptation of the business activities of an entity to comply with requirements established or guidance issued by the Department of Health and Human Services, the Centers for Disease Control, or the Occupational Safety and Health Administration, or any equivalent requirements established or guidance issued by a State or local

27

government, during the period beginning on March 1, 2020 and ending the date on which the national emergency declared by the President under the National Emergencies Act (50 U.S.C. 1601 et seq.) with respect to the Coronavirus Disease 2019 (COVID-19) expires related to the maintenance of standards for sanitation, social distancing, or any other worker or customer safety requirement related to COVID-19;

(B) may include—

(i) the purchase, maintenance, or renovation of assets that create or expand—

(I) a drive-through window facility;

(II) an indoor, outdoor, or combined air or air pressure ventilation or filtration system;

(III) a physical barrier such as a sneeze guard;

(IV) an expansion of additional indoor, outdoor, or combined business space;

(V) an onsite or offsite health screening capability; or

(VI) other assets relating to the compliance with the requirements or guidance described in subparagraph (A), as determined by the Administrator in consultation with the Secretary of Health and Human Services and the Secretary of Labor; and

(ii) the purchase of—

(I) covered materials described in section 328.103(a) of title 44, Code of Federal Regulations, or any successor regulation;

(II) particulate filtering facepiece respirators approved by the National Institute for Occupational Safety and Health, including those approved only for emergency use authorization; or

(III) other kinds of personal protective equipment, as determined by the Administrator in consultation with the Secretary of Health and Human Services and the Secretary of Labor;

\*      \*      \*

(11) the term "expected forgiveness amount" means the amount of principal that a lender reasonably expects a borrower to expend during the covered period on the sum of any—

(A) payroll costs; [and]

\*      \*      \*

(H) covered worker protection expenditures;

28

2021 Appropriations Act § 304(a) (now codified as 15 U.S.C. § 633m(a)(9) & (11).

102. Attached hereto as **Exhibit N** is a true and accurate copy of the relevant portions of Congressperson Maxine Waters' comments related to the Second Draw PPP, 166 Cong. Rec. E1202-02 (Dec. 24, 2020), which are incorporated herein by reference as though fully set forth herein, wherein she states, in relevant part:

> I also strongly advocated for . . . a restart of the Paycheck Protection Program (PPP) to ensure our small businesses are able to remain open. In total, small businesses will receive $284 billion through the PPP, with an additional $20 billion reserved for businesses operating in low-income communities and $15 billion for live music venues, movie theaters, and museums. These businesses are the lifeblood of our communities, and this support is long overdue.
>
> \*      \*      \*
>
> The Paycheck Protection Program was a lifeline for so many small businesses through the beginning of the pandemic. It provided largely forgivable loans to businesses that used the funds to keep their employees on payroll and to keep the lights on at work. . . . In the first round of PPP, more than $525 billion of forgivable loans helped over 5.2 million businesses, with more than 81 percent of those loans being for less than $100,000, and more than 68 percent of those loans being for less than $50,000, this program.
>
> Building on those efforts, I am pleased that today's bill reauthorizes and provides over $284 billion to this program. Specifically, the legislation provides for first draw and second draw forgivable PPP loans, expanded eligibility for nonprofits and local newspapers, TV and radio broadcasters, and key modifications to PPP to serve the smallest businesses and struggling non-profits. I am also pleased the legislation will help independent restaurants, and includes $15 billion in dedicated funding for live venues, independent movie theaters, and cultural institutions.
>
> Additionally, the bill expands the expenses to which PPP funds can be applied to include life- and enterprise-saving protective equipment for staff and businesses.

166 Cong. Rec. E1202, 05 (Dec. 24, 2020).

103. Attached hereto as **Exhibit O** is a true and accurate copy of the relevant portions of Congressperson Chabot's comments related to the Second Draw PPP, 166 Cong. Rec. H7293 (Dec. 21, 2020), which are incorporated herein by reference as though fully set forth herein, wherein he states, in relevant part:

29

> The Paycheck Protection Program, which has supported over 50 million employees, will be reopened for new and second-time applicants. Funds will be reserved for very small businesses and community lenders. The list of eligible expenses will be expanded so that small business owners can purchase PPE, for example, to keep employees and their loved ones safe.

166 Cong. Rec. H7293 (Dec. 21, 2020).

104.    The Second Draw PPP provisions of the 2021 Appropriation Act instruct the SBA to promulgate rules as follows:

> (M) Publication of guidance
>
> Not later than 10 days after December 27, 2020, the Administrator shall issue guidance addressing barriers to accessing capital for minority, underserved, veteran, and women-owned business concerns for the purpose of ensuring equitable access to covered loans.

15 U.S.C. § 636(a)(37)(M).

105.    Title III, Section 303 of the 2021 Appropriations Act (also known by the "Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act"), instructs the SBA to promulgate rules as follows:

> Not later than 10 days after the date of enactment of this Act, the Administrator shall issue regulations to carry out this Act and the amendments made by this Act without regard to the notice requirements under section 553(b) of title 5, United States Code.

2021 Appropriations Act, § 303 (now codified as 15 U.S.C. § 9012).

106.    Pursuant to the Second Draw PPP provisions of the 2021 Appropriations Act, the SBA did, in fact, promulgate numerous regulations.

107.    On March 8, 2021, the SBA published, in the Federal Register, 86 Fed. Reg. 13149-56 (Interim Final Rule, Mar. 8, 2021), an Interim Final Rule titled "Business Loan Program Temporary Changes; Paycheck Protection Program—Revisions to Loan Amount Calculation and Eligibility," a true and accurate copy of which is attached hereto as **Exhibit P** and incorporated herein by reference as though fully set forth herein, and which:

30

remove[s] the eligibility restriction that prevents businesses with owners who have non-financial fraud felony convictions in the last year from obtaining PPP loans and remove[s] the eligibility restriction that prevents businesses with owners who are delinquent or in default on their Federal student loans from obtaining PPP loans. The changes apply to both First Draw PPP Loans and Second Draw PPP Loans.

86 Fed. Reg. 13149 (clarification added). The SBA reasoned removing these eligibility

restrictions were:

appropriate to ensure consistency with Congressional intent to provide relief to small businesses and their employees, expand access to the PPP, and remove barriers people with prior convictions face when working to restart their lives and contribute to our economy. SBA has determined that the one-year lookback restriction related to non-financial fraud felonies should be removed and only the five-year lookback restriction for those felonies involving fraud, bribery, embezzlement, or a false statement in a loan application or an application for federal financial assistance will limit an applicant's eligibility for the PPP. Removing the one-year lookback restriction related to non-financial fraud felonies is consistent with Congressional support for reducing criminal background checks in the PPP and the important policies underlying recent criminal justice reforms in Congress, such as last year's Fair Chance to Compete for Jobs Act of 2019 (Pub. L. 116–92, Div. A, Tit. XI, Subtit. B,) and the First Step Act of 2018 (Pub. L. 115–391).

\*      \*      \*

By removing barriers for applicants with non-financial fraud felonies, this interim final rule balances the need to increase access to the PPP and remove barriers for people with prior convictions while still ensuring basic guardrails against fraud exist for this emergency program. Preserving the five-year lookback for financial fraudrelated [*sic*] felonies is one of these guardrails.

\*      \*      \*

SBA has determined that eliminating consideration of delinquent or defaulted Federal student loans is appropriate to ensure consistency with Congressional intent to provide relief to small businesses and their employees and expand access to the PPP. This change will make PPP loans available to more borrowers with financial need and is consistent with Congress's intent that PPP loans be prioritized for small business concerns owned and controlled by socially and economically disadvantaged individuals as defined in section 8(d)(3)(c) of the Small Business Act.13 According to the Department of Eduction [*sic*], "Black and Brown students rely more heavily on student loan debt than their peers and experience delinquency at disproportionately high rates. As a result prohibiting delinquent student loan borrowers from obtaining PPP loans is more likely to exclude business owners of color from access to the loans they need." In addition, this change is consistent with the

31

policy set in section 3513 of the CARES Act and the Department of Education's ongoing actions to provide economic relief to student loan borrowers whose loans are held by the agency by suspending Federal student loan payments and collections during the pandemic and keeping the interest rate at 0 percent.

At the request of the Department of Education by letter dated February 27, 2021, Treasury also has granted an exemption from the bar in 31 U.S.C. 3720B and 31 CFR 285.13, with respect to PPP borrowers with Federal student loans in delinquent status.

The change in PPP regulations relating to Federal student loans and the Treasury exemption apply to new PPP applicants as well as those borrowers who have already received a PPP loan. In this way, PPP borrowers with delinquent or defaulted student loan debts are treated equally, without regard to when they submitted their PPP application.

86 Fed. Reg. 13154-55.

108.    On March 22, 2021, the SBA published, in the Federal Register, an Interim Final Rule titled "Business Loan Program Temporary Changes; Paycheck Protection Program as Amended by American Rescue Plan Act." A true and accurate copy of the Business Loan Program Temporary Changes; Paycheck Protection Program as Amended by American Rescue Plan Act, 86 Fed. Reg. 15083-89 (Interim Final Rule, Mar. 22, 2021) is attached hereto as **Exhibit Q** and is hereby incorporated by reference as though fully set forth herein, and which provides that "[t]he intent of the CARES Act, the Economic Aid Act, and the American Rescue Plan Act (again, "ARPA") is that SBA provide relief to America's small businesses and nonprofit organizations expeditiously." 86 Fed. Reg. 15084.

109.    On March 11, 2021, the President signed ARPA into law, which, among other things, modified the PPP and Second Draw PPP via Section 5001 thereof.

110.    A true and accurate copy of Section 5001 of ARPA is attached hereto as **Exhibit R** and is incorporated herein by reference as though fully set forth herein.

111.    Generally, Section 5001 of ARPA amended the PPP and Second Draw PPP to increase eligibility for certain non-profit organizations, including non-profit

organizations that conduct lobbying activities and internet publishing organizations.

Specifically, ARPA added the following to 15 U.S.C. § 36(a):

"(xvii) the term 'additional covered nonprofit entity'—

"(I) means an organization described in any paragraph of section 501(c) of the Internal Revenue Code of 1986, other than paragraph (3), (4), (6), or (19), and exempt from tax under section 501(a) of such Code; and

"(II) does not include any entity that, if the entity were a business concern, would be described in section 120.110 of title 13, Code of Federal Regulations (or in any successor regulation or other related guidance or rule that may be issued by the Administrator) other than a business concern described in paragraph (a) or (k) of such section."; and

(B) in subparagraph (D)—

(i) in clause (iii), by adding at the end the following:

"(III) ELIGIBILITY OF CERTAIN ORGANIZATIONS.—
Subject to the provisions in this subparagraph, during the covered period—

"(aa) a nonprofit organization shall be eligible to receive a covered loan if the nonprofit organization employs not more than 500 employees per physical location of the organization; and

"(bb) an additional covered nonprofit entity and an organization that, but for subclauses (I)(dd) and (II)(dd) of clause (vii), would be eligible for a covered loan under clause (vii) shall be eligible to receive a covered loan if the entity or organization employs not more than 300 employees per physical location of the entity or organization."; and

(ii) by adding at the end the following:

"(ix) ELIGIBILITY OF ADDITIONAL COVERED NONPROFIT ENTITIES.—An additional covered nonprofit entity shall be eligible to receive a covered loan if—

"(I) the additional covered nonprofit entity does not receive more than 15 percent of its receipts from lobbying activities;

"(II) the lobbying activities of the additional covered nonprofit entity do not comprise more than 15 percent of the total activities of the organization;

"(III) the cost of the lobbying activities of the additional covered nonprofit entity did not exceed $1,000,000 during the most recent tax year of the additional covered nonprofit entity that ended prior to February 15, 2020; and

"(IV) the additional covered nonprofit entity employs not more than 300 employees.".

(2) ELIGIBILITY FOR SECOND DRAW LOANS.—Paragraph (37)(A)(i) of section 7(a) of the Small Business Act (15 U.S.C. 636(a)), as added by the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (title III of division N of Public Law 116–260), is amended by inserting " 'additional covered nonprofit entity'," after "the terms".

ARPA, § 5001(a)(1)(A)-(B) & (a)(2).

## GENERAL ALLEGATIONS

### Camelot Banquet Rooms, Inc. ("Camelot Banquet")

112.  Camelot Banquet is an alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live scantily clad female performance dance entertainment. All of the entertainment presented at Camelot Banquet is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

113.  Camelot Banquet has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Camelot Banquet's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Camelot Banquet.

114.  Camelot Banquet is categorized as a North American Industry Classification System ("NAICS") code 72 entity.

115. Camelot Banquet presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to:

a.  A Public Entertainment Permit issued by the City of Milwaukee pursuant to Milwaukee City Ordinance Ch. 108; and

b.  A Liquor License issued by the City of Milwaukee pursuant to Milwaukee City Ordinance Ch. 90.

34

116.   Camelot Banquet is, as of the filing of this action, currently open for business. As was required by the City of Milwaukee Covid-19 Pubic Health Plan Orders, Camelot Banquet closed for business on March 16, 2020. Pursuant to evolving orders from the City of Milwaukee it reopened after twelve weeks of closure at 25% capacity on June 5, 2020; it then was permitted to resume 100% capacity on September 15, 2020, but on October 29, 2020, capacity was again reduced to 50%. Eleven weeks later, on January 15, 2021, it was permitted to resume 100% capacity although the social distancing requirements in the Public Health Order continue to limit the actual capacity to approximately 50%. As a direct and proximate result of such municipal pandemic-related closures and limitations, Camelot Banquet has suffered significant business and financial losses.

117.   In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase Personal Protective Equipment ("PPE") and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Camelot Banquet applied for a Second Draw PPP.

118.   Camelot Banquet has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

119.   Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Camelot Banquet's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Camelot Banquet.

120.   Camelot Banquet is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

121.   Camelot Banquet received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by this Honorable Court.

122.   Camelot Banquet's lender has informed it that its Second Draw PPP application has been placed on "Hold" by the SBA. Further, the SBA, through correspondence of legal counsel, has invited Camelot Banquet to submit to a "prurience review as part of the process of resolving the holds" on Camelot Banquet's application (as well as the applications of others-- including the other Plaintiffs here), thereby confirming that the "Hold" on Camelot Banquet's Second Draw PPP application is solely predicated on the Regulation, the SOP, the Incorporating Statute, and/or the SBA's interpretation and/or application thereof.

123.   Camelot Banquet is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

124.   Camelot Banquet is also, through its legal counsel, aware that, irrespective of the above, some other similar "strip clubs" have nevertheless received Second Draw PPP loans.

125.   Camelot Banquet reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

36

126. In the event that Camelot Banquet is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

### *Downtown Juneau Investments, LLC ("Juneau")*

127. Juneau is an alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live scantily clad female performance dance entertainment. All of the entertainment presented at Juneau is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

128. Juneau has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Juneau's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Juneau.

129. Juneau is categorized as a NAICS code 72 entity.

130. Juneau presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to:

    a. A Public Entertainment Permit issued by the City of Milwaukee pursuant to Milwaukee City Ordinance Ch. 108; and

    b. A Liquor License issued by the City of Milwaukee pursuant to Milwaukee City Ordinance Ch. 90.

37

131.    Juneau is, as of the filing of this action, currently open for business. As was required by the City of Milwaukee Covid-19 Pubic Health Plan Orders, Juneau closed for business on March 16, 2020. Pursuant to evolving orders from the City of Milwaukee, it reopened after twelve weeks of closure at 25% capacity on June 5, 2020; it then was permitted to resume 100% capacity on September 15, 2020, but on October 29, 2020, capacity was again reduced to 50%. Eleven weeks later, on January 15, 2021, it was permitted to resume 100% capacity although the social distancing requirements in the Public Health Order continue to limit the actual capacity to approximately 50%. As a direct and proximate result of such municipal pandemic-related closures and limitations, Juneau has suffered significant business and financial losses.

132.    In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Juneau applied for a Second Draw PPP.

133.    Juneau has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

134.    Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Juneau's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Juneau.

135.    Juneau is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

136.    Juneau received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by this Honorable Court.

137.    Juneau's lender has informed it that its Second Draw PPP application has been placed on "Hold" by the SBA. Further, the SBA, through correspondence of legal counsel, has invited Juneau to submit to a "prurience review as part of the process of resolving the holds" on Juneau's application (as well as the applications of others-- including the other Plaintiffs here), thereby confirming that the "Hold" on Juneau's Second Draw PPP application is solely predicated on the Regulation, the SOP, the Incorporating Statute, and/or the SBA's interpretation and/or application thereof.

138.    Juneau is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

139.    Juneau is also, through its legal counsel, aware that, irrespective of the above, some other similar "strip clubs" have nevertheless received Second Draw PPP loans.

140.    Juneau reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

141.    In the event that Juneau is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well

39

result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

***Midrad, LLC ("Midrad")***

142. Midrad is an alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment that is, at times, fully clothed, topless, and/or fully nude. All of the entertainment presented at Midrad is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

143. Midrad has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Midrad's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Midrad.

144. Midrad is categorized as a NAICS code 72 entity.

145. Midrad presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to:

        a. A Liquor License issued by the Town of Middleton; and

        b. A Dance Hall Permit issued by the Town of Middleton.

146. Midrad is, as of the filing of this action, currently open for business. As was required by Dane County and the City of Madison Covid-19 Pubic Health Plan Orders, Midrad closed for business on March 16, 2020; pursuant to evolving orders from the City of Madison it reopened after eleven weeks of closure at 25% capacity on May 29, 2020. After over nine months of being restricted to 25% capacity, Midrad was permitted to resume 50% capacity on March 10, 2021. As a direct and proximate

40

result of such municipal pandemic-related closures and limitations, Midrad has suffered significant business and financial losses.

147.    In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Midrad applied for a Second Draw PPP.

148.    Midrad has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

149.    Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Midrad's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Midrad.

150.    Midrad is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

151.    Midrad received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by this Honorable Court.

152.    Midrad's lender has informed it that its Second Draw PPP application has been placed on "Hold" by the SBA. Further, the SBA, through correspondence of legal counsel, has invited Midrad to submit to a "prurience review as part of the process of resolving the holds" on Midrad's application (as well as the applications of others-- including the other Plaintiffs here), thereby confirming that the "Hold" on Midrad's Second Draw PPP application is solely predicated on the Regulation, the SOP, the Incorporating Statute, and/or the SBA's interpretation and/or application thereof.

153. Midrad is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

154. Midrad is also, through its legal counsel, aware that, irrespective of the above, some other similar "strip clubs" have nevertheless received Second Draw PPP loans.

155. Midrad reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

156. In the event that Midrad is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

**PPH Properties I, LLC ("PPH")**

157. PPH is an alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live scantily clad female performance dance entertainment. All

42

of the entertainment presented at PPH is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

158. PPH has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on PPH's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at PPH.

159. PPH is categorized as a NAICS code 72 entity.

160. PPH presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to:

a. A Public Entertainment Permit issued by the City of Milwaukee pursuant to Milwaukee City Ordinance Ch. 108; and

b. A Liquor License issued by the City of Milwaukee pursuant to Milwaukee City Ordinance Ch. 90.

161. PPH is, as of the filing of this action, currently open for business. As was required by and the City of Milwaukee Covid-19 Pubic Health Plan Orders, PPH closed for business on March 16, 2020. Pursuant to evolving orders from the City of Milwaukee it reopened after twelve weeks of closure at 25% capacity on June 5, 2020; it then was permitted to resume 100% capacity on September 15, 2020, but on October 29, 2020, capacity was again reduced to 50%. Eleven weeks later, on January 15, 2021, it was permitted to resume 100% capacity although the social distancing requirements in the Public Health Order continue to limit the actual to approximately 50%. As a direct and proximate result of such municipal pandemic-related closures and limitations, PPH has suffered significant business and financial losses.

43

162.     In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), PPH applied for a Second Draw PPP.

163.     PPH has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

164.     Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), PPH's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by PPH.

165.     PPH is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

166.     PPH received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by this Honorable Court.

167.     PPH's lender has informed it that its Second Draw PPP application has been placed on "Hold" by the SBA. Further, the SBA, through correspondence of legal counsel, has invited PPH to submit to a "prurience review as part of the process of resolving the holds" on PPH's application (as well as the applications of others-- including the other Plaintiffs here), thereby confirming that the "Hold" on PPH's Second Draw PPP application is solely predicated on the Regulation, the SOP, the Incorporating Statute, and/or the SBA's interpretation and/or application thereof.

168.     PPH is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

44

169.     PPH is also, through its legal counsel, aware that, irrespective of the above, some other similar "strip clubs" have nevertheless received Second Draw PPP loans.

170.     PPH reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

171.     In the event that PPH is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

***Heritage Management Services, Inc. ("Heritage")***

172.     Heritage is a non-alcohol serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed, topless, and/or fully nude. All of the entertainment presented at Heritage is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

45

173. Heritage has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Heritage's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Heritage.

174. Heritage is categorized as a NAICS code 71 entity; however, Heritage mistakenly put a 53 code on its Second Draw PPP application.

175. Heritage presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to its Place of Public Assembly Permit issued by the City and County of San Francisco.

176. Heritage is, as of the filing of this action, currently open for business. As was required by and the state and local Public Health Orders, Heritage closed for business on March 16, 2020; pursuant to evolving state and local Public Health Orders it reopened on November 14, 2020; it then closed again on November 28, 2020. Heritage recently reopened on March 5, 2021. As a direct and proximate result of such municipal pandemic-related closures and limitations, Heritage has suffered significant business and financial losses.

177. In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Heritage applied for a Second Draw PPP.

178. Heritage has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

179. Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Heritage's lender has operated and will operate as a

delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Heritage.

180.   Heritage is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

181.   Heritage received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

182.   Heritage's lender has informed it that its Second Draw PPP application is "pending" by the SBA.

183.   Heritage is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

184.   Heritage is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

185.   Heritage reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

186.    In the event that Heritage is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

*Vonch, LLC ("Vonch")*

187.    Vonch d/b/a Polekatz Gentlemen's Club, LLC is the paymaster for Polekatz Gentlemen's Club, LLC d/b/a Polekatz Gentlemen's Club. Vonch is an alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed, topless, and/or fully nude. All of the entertainment presented at Vonch is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

188.    Vonch has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Vonch's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Vonch.

189.    Vonch is categorized as a NAICS code 71 entity.

190.    Vonch presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to:

    a.    A Liquor License issued by the State of Illinois;

    b.    A Liquor License issued by the Village of Bridgeview, Illinois;

48

> c. A Restaurant License issued by the Village of Bridgeview, Illinois; and

> d. A Business License issued by the Village of Bridgeview, Illinois.

191. Vonch is, as of the filing of this action, currently open for business. As was required by local and/or state Public Health Orders, Vonch closed for business on March 16, 2020; it reopened on June 23, 2020, but on October 28, 2020 closed again, and reopened again on January 23, 2021. As a direct and proximate result of such municipal pandemic-related closures and limitations, Vonch has suffered significant business and financial losses.

192. In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Vonch applied for a Second Draw PPP.

193. Vonch has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

194. Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Vonch's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Vonch.

195. Vonch is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

196. Vonch received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

49

197.    Vonch's lender has informed it that the SBA has placed "an internal SBA hold" its Second Draw PPP.

198.    Vonch is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

199.    Vonch is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

200.    Vonch reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

201.    In the event that Vonch is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

*East Coast Restaurant & Night Clubs, LLC ("East Coast")*

202.    East Coast is a food and alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue

50

to present in the future, fully-clothed (in the form of pasties) live female performance dance entertainment. All of the entertainment presented at East Coast is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

203.   East Coast has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on East Coast's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at East Coast.

204.   East Coast is categorized as a NAICS code 72 entity.

205.   East Coast presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to:

      a.      A Live Entertainment Permit issued by the Town of Bedford;

      b.      An Alcohol Permit issued by the State of New Hampshire; and

      c.      A Food License issued by the Town of Bedford.

206.    East Coast is, as of the filing of this action, currently open for business. As was required by local and/or state Public Health Orders, East Coast closed for business on March 16, 2020; pursuant to the evolving local and/or state Public Health Orders, reopened and reclosed several times, including partially reopening in June of 2020 in a limited capacity and closing for five days before Thanksgiving; it most recently reopened on November 24, 2020. As a direct and proximate result of such municipal pandemic-related closures and limitations, East Coast has suffered significant business and financial losses.

207.   In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make

Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), East Coast applied for a Second Draw PPP.

208. East Coast has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

209. Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), East Coast's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by East Coast.

210. East Coast is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

211. East Coast received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

212. East Coast's lender has informed it that its Second Draw PPP application requires an "SBA Endorsement" before it will submit East Coast's Second Draw PPP application to the SBA. East Coast believes this is solely predicated on the Regulation, the SOP, the Incorporating Statute, and/or the SBA's interpretation and/or application thereof.

213. East Coast is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

214. East Coast is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

52

215. East Coast reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

216. In the event that East Coast is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

### Benelux Corporation ("Benelux")

217. Benelux is a food and alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed or topless. All of the entertainment presented at Benelux is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

218. Benelux has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Benelux's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Benelux.

53

219. Benelux is categorized as a NAICS code 72 entity.

220. Benelux presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to:

      a. A Liquor License issued by the State of Texas;

      b. A Texas Sales & Use Tax Permit issued by the State of Texas;

      c. An Occupant Load Card issued by the City of Austin;

      d. A Food Permit issued by the City of Austin; and

      e. A Public Assembly Permit issued by the City of Austin Fire Department.

221. Benelux is, as of the filing of this action, currently open for business. As was required by local and/or state Public Health Orders, Benelux closed for business on March 17, 2020; it reopened on May 22, 2020, but on June 26, 2020 closed again; it most recently reopened on August 14, 2020. As a direct and proximate result of such municipal pandemic-related closures and limitations, Benelux has suffered significant business and financial losses.

222. In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Benelux applied for a Second Draw PPP.

223. Benelux has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

224. Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Benelux's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Benelux.

54

225. Benelux is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

226. Benelux received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

227. Benelux's lender has informed it that its Second Draw PPP application has been placed on "Hold" by the SBA.

228. Benelux is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

229. Benelux is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

230. Benelux reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

231. In the event that Benelux is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected

55

First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

### *Filosadelfia, LLC ("Filosadelfia")*

232.   Filosadelfia is an alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed and/or topless. All of the entertainment presented at Filosadelfia is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

233.   Filosadelfia has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Filosadelfia's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Filosadelfia.

234.   Filosadelfia is categorized as a NAICS code 72 entity.

235.   Filosadelfia presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to:

   a.   A PCLB-Liquor License issued by the State of Pennsylvania;

   b.   A Special Assembly Occupancy Permit issued by the City of Philadelphia;

   c.   A Food Preparing and Serving License issued by the City of Philadelphia; and

   d.   An Amusement License issued by the City of Philadelphia.

236.    Filosadelfia is, as of the filing of this action, currently open for business. As was required by local and/or state Public Health Orders, Filosadelfia closed for business on March 16, 2020; pursuant to the evolving local and/or state Public Health

56

Orders, reopened and reclosed several times culminating with its most recent reopening on January 16, 2021. As a direct and proximate result of such municipal pandemic-related closures and limitations, Filosadelfia has suffered significant business and financial losses.

237. In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Filosadelfia applied for a Second Draw PPP.

238. Filosadelfia has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

239. Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Filosadelfia's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Filosadelfia.

240. Filosadelfia is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

241. Filosadelfia received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

242. Filosadelfia's lender received a reply from the SBA that it cannot move forward on Filosadelfia's Second Draw PPP application, but did not state a reason why. Filosadelfia believes the SBA's reply is solely predicated on the Regulation, the SOP, the Incorporating Statute, and/or the SBA's interpretation and/or application thereof

243.    Filosadelfia is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

244.    Filosadelfia is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

245.    Filosadelfia reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

246.    In the event that Filosadelfia is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

*MAG Pitt, LP ("MAG Pitt")*

247.    MAG Pitt is an alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at

58

times, fully-clothed or topless. All of the entertainment presented at MAG Pitt is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

248. MAG Pitt has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on MAG Pitt's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at MAG Pitt.

249. MAG Pitt is categorized as a NAICS code 72 entity.

250. MAG Pitt presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to a Liquor License issued by the Pennsylvania Liquor Control Board with Amusement Permit, Extended Hours Permit, and Sunday Sales Permit.

251. MAG Pitt is, as of the filing of this action, currently open for business. As was required by local and/or state Public Health Orders, MAG Pitt closed for business on March 16, 2020. Pursuant to evolving local and/or state Public Health Orders, MAG Pitt closed and reopened three times culminating with its most recent reopening on December 26, 2020. As a direct and proximate result of such municipal pandemic-related closures and limitations, MAG Pitt has suffered significant business and financial losses.

252. In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), MAG Pitt applied for a Second Draw PPP.

253. MAG Pitt has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

254.    Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), MAG Pitt's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by MAG Pitt.

255.    MAG Pitt is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

256.    MAG Pitt received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

257.    MAG Pitt's lender has informed it that its Second Draw PPP application is denied "because you [MAG Pitt] do not meet the eligibility criteria established by the SBA. *See* 13 CFR 120.110."

258.    MAG Pitt is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

259.    MAG Pitt is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

260.    MAG Pitt reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application has been rejected

60

and/or will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

261.    In the event that MAG Pitt is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

*MAG Enterprises, Inc. ("MAG Enterprises")*

262.    MAG Enterprises is an alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed or topless. All of the entertainment presented at MAG Enterprises is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

263.    MAG Enterprises has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on MAG Enterprises' premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at MAG Enterprises.

264.    MAG Enterprises is categorized as a NAICS code 72 entity.

265.    MAG Enterprises presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to:

        a.    A Liquor License from the Pennsylvania Liquor Control Board with permits for Amusement, Extended Hours Food, and Sunday Sales;

        b.    An Amusement License issued by the City of Philadelphia; and

61

c.     A temporary Extension of Premises in order to operate outdoors issued by the City of Philadelphia.

266.    MAG Enterprises is, as of the filing of this action, currently open for business. As was required by local and/or state Public Health Orders, MAG Enterprises closed for business on March 16, 2020. Pursuant to evolving local and/or state Public Health Orders, MAG Enterprises closed and reopened once culminating with its most recent reopening on August 28, 2020. As a direct and proximate result of such municipal pandemic-related closures and limitations, MAG Enterprises has suffered significant business and financial losses.

267.    In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), MAG Enterprises applied for a Second Draw PPP.

268.    MAG Enterprises has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

269.    Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), MAG Enterprises' lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by MAG Enterprises.

270.    MAG Enterprises is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

271.    MAG Enterprises received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

62

272. MAG Enterprises' lender has informed it that its Second Draw PPP application is on hold.

273. MAG Enterprises is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

274. MAG Enterprises is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

275. MAG Enterprises reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

276. In the event that MAG Enterprises is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

*2740 Corporation*

63

277. 2740 Corporation is a non-alcohol serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed or topless. All of the entertainment presented at 2740 Corporation is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

278. 2740 Corporation has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on 2740 Corporation's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at 2740 Corporation.

279. 2740 Corporation is categorized as a NAICS code 72 entity.

280. 2740 Corporation presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to:

      a.      A Business Privilege License issued by the City of Philadelphia; and

      b.      A Certificate of Use and Occupancy from the City of Philadelphia.

281. 2740 Corporation is, as of the filing of this action, currently open for business. As was required by local and/or state Public Health Orders, 2740 Corporation closed for business on March 16, 2020. Pursuant to evolving local and/or state Public Health Orders, 2740 Corporation closed and reopened once culminating with its most recent reopening on August 28, 2020. As a direct and proximate result of such municipal pandemic-related closures and limitations, 2740 Corporation has suffered significant business and financial losses.

282. In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make

64

Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), 2740 Corporation applied for a Second Draw PPP.

283. 2740 Corporation has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

284. Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), 2740 Corporation's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by 2740 Corporation.

285. 2740 Corporation is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

286. 2740 Corporation received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

287. 2740 Corporation's lender has informed it that its Second Draw PPP application is on hold.

288. 2740 Corporation is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

289. 2740 Corporation is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

290. 2740 Corporation reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already

65

taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application has been rejected and/or will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

291.    In the event that 2740 Corporation is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

**MAG Entertainment, LLC ("MAG Entertainment")**

292.    MAG Entertainment is an alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed or topless. All of the entertainment presented at MAG Entertainment is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

293.    MAG Entertainment has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on MAG Entertainment's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at MAG Entertainment.

294.    MAG Entertainment is categorized as a NAICS code 72 entity.

295.    MAG Entertainment presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government

66

approvals, including but not limited to a Liquor License issued by the New Jersey Division of Alcoholic Beverage Control.

296. MAG Entertainment is, as of the filing of this action, currently open for business. As was required by local and/or state Public Health Orders, MAG Entertainment closed for business on March 16, 2020. Pursuant to evolving local and/or state Public Health Orders, MAG Entertainment closed and reopened once culminating with its most recent reopening on June 15, 2020. As a direct and proximate result of such municipal pandemic-related closures and limitations, MAG Entertainment has suffered significant business and financial losses.

297. In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), MAG Entertainment applied for a Second Draw PPP.

298. MAG Entertainment has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

299. Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), MAG Entertainment's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by MAG Entertainment.

300. MAG Entertainment is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

301. MAG Entertainment received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

302. MAG Entertainment's lender has informed it that its Second Draw PPP application is on hold.

303. MAG Entertainment is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

304. MAG Entertainment is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

305. MAG Entertainment reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application has been rejected and/or will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

306. In the event that MAG Entertainment is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and

68

customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

### *Oasis on Essington, LLC ("Oasis")*

307.    Oasis is an alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed or topless. All of the entertainment presented at Oasis is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

308.    Oasis has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Oasis's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Oasis.

309.    Oasis is categorized as a NAICS code 72 entity.

310.    Oasis presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to:

        a.    Amusement Licenses issued by the City of Philadelphia;

        b.    A Liquor License issued by the Commonwealth of Pennsylvania; and

        c.    A Food Preparing and Serving License issued by the City of Philadelphia.

311.    Oasis is, as of the filing of this action, currently open for business. As was required by local and/or state Public Health Orders, Oasis closed for business on March 16, 2020. Pursuant to evolving local and/or state Public Health Orders, Oasis closed and reopened twice culminating with its most recent reopening on January 16,

69

2021. As a direct and proximate result of such municipal pandemic-related closures and limitations, Oasis has suffered significant business and financial losses.

312.    In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Oasis applied for a Second Draw PPP.

313.    Oasis has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

314.    Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Oasis's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Oasis.

315.    Oasis is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

316.    Oasis received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

317.    Oasis's lender has informed it that its Second Draw PPP application is on hold.

318.    Oasis is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

319.    Oasis is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

70

320. Oasis reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application has been rejected and/or will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

321. In the event that Oasis is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

### *Burch Management Company, Inc. ("BMC")*

322. BMC is a business services company that provides a range of services to businesses including, *inter alia*: accounting, payroll, advertising services, consulting, and bulk goods purchasing.

323. BMC provides services to a number of establishments that provide live female performance dance entertainment, including several Plaintiffs in this action.

324. All of the entertainment presented at the businesses BMC services is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires. None of the businesses BMC services has ever been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed at the businesses BMC

71

services have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at the businesses BMC services.

325.    A number of entities BMC services have been, pursuant to local and/or State Pandemic orders, closed and then reopened in limited capacities as a result of the Pandemic. As a direct and proximate result of such state-ordered closures, BMC has suffered significant business losses, was forced to layoff some staff and reduce hours on others. BMC plans to return to full operations when its clients are able to do so.

326.    In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), BMC applied for a Second Draw PPP.

327.    BMC has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

328.    Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), BMC's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by BMC.

329.    BMC is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

330.    BMC received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

331.    BMC's Second Draw PPP application is inexplicably held or delayed and BMC's lender has informed it that its application is under review.

72

332. BMC is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

333. BMC is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

334. BMC reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

335. In the event that BMC is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

***BDS Restaurant Group, Inc. ("BDS")***

336. BDS is a food and alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed or topless. All of the entertainment presented at BDS is

73

expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

337. BDS has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on BDS's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at BDS.

338. BDS is categorized as a NAICS code 72 entity.

339. BDS presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to:

      a.    A Sexually Oriented Business Permit issued by the City of Dallas;

      b.    A Mixed Beverage Permit issued by the Texas Alcohol Beverage Commission;

      c.    A Late Hours Permit issued by the Texas Alcohol Beverage Commission;

      d.    A Catering Permit issued by the Texas Alcohol Beverage Commission;

      e.    A Cartage Permit issued by the Texas Alcohol Beverage Commission;

      f.    A Food and Beverage Certificate issued by the Texas Alcohol Beverage Commission;

      g.    An Alcohol Permit issued by the City of Dallas; and

      h.    An Alcohol Permit issued by Dallas County.

340. BDS is, as of the filing of this action, currently open for business; however, in order to open, BDS changed its operations and obtained a Food and Beverage Certificate from the Texas Alcohol Beverage Commission, which requires alcohol sales to be less than 51% of total sales. As was required by local and/or state

74

Public Health Orders, BDS closed for business on March 16, 2020; it reopened on May 22, 2020, but on June 26, 2020 closed again, and reopened again on July 20, 2020. As a direct and proximate result of such municipal pandemic-related closures and limitations, BDS has suffered significant business and financial losses.

341. In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), BDS applied for a Second Draw PPP.

342. BDS has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

343. Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), BDS's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by BDS.

344. BDS is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

345. BDS received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

346. BDS's lender has informed it that its Second Draw PPP application requires "further research" for continued processing.

347. BDS is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

75

348. BDS is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

349. BDS reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

350. In the event that BDS is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

**DB Entertainment, Inc. ("DB")**

351. DB is a food and alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed or topless. All of the entertainment presented at DB is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

352. DB has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on DB's premises

76

have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at DB.

353. DB is categorized as a NAICS code 72 entity.

354. DB presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to:

      a. A Certificate of Occupancy Permit issued by the City of Fort Worth;

      b. A Mixed Beverage Permit issued by the Texas Alcohol Beverage Commission;

      c. A Late Hours Permit issued by the Texas Alcohol Beverage Commission;

      d. A Catering Permit issued by the Texas Alcohol Beverage Commission;

      e. A Cartage Permit issued by the Texas Alcohol Beverage Commission;

      f. A Food and Beverage Certificate issued by the Texas Alcohol Beverage Commission;

      g. An Alcohol Permit issued by the City of Fort Worth; and

      h. An Alcohol Permit issued by Tarrant County.

355. DB is, as of the filing of this action, currently open for business. As was required by local and/or state Public Health Orders, DB closed for business on March 18, 2020; it reopened on May 22, 2020, but on June 26, 2020 closed again, and has not been permitted to reopen. As a direct and proximate result of such municipal pandemic-related closures and limitations, DB has suffered significant business and financial losses.

77

356. In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), DB applied for a Second Draw PPP.

357. DB has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

358. Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), DB's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by DB.

359. DB is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

360. DB received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

361. DB's lender has informed it that its Second Draw PPP application requires "further research" for continued processing.

362. DB is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

363. DB is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

364. DB reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in

78

the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

365.  In the event that DB is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

### *T and N Incorporated ("T and N")*

366.  T and N is a food and alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed or topless. All of the entertainment presented at T and N is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

367.  T and N has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on T and N's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at T and N.

368.  T and N is categorized as a NAICS code 72 entity.

369. T and N presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to:

a. A Certificate of Occupancy Permit issued by the City of Arlington;

b. A Mixed Beverage Permit issued by the Texas Alcohol Beverage Commission;

c. A Late Hours Permit issued by the Texas Alcohol Beverage Commission;

d. A Catering Permit issued by the Texas Alcohol Beverage Commission;

e. A Cartage Permit issued by the Texas Alcohol Beverage Commission;

f. A Food and Beverage Certificate issued by the Texas Alcohol Beverage Commission;

g. An Alcohol Permit issued by the City of Arlington; and

h. An Alcohol Permit issued by Tarrant County.

370. T and N is, as of the filing of this action, currently open for business. As was required by local and/or state Public Health Orders, T and N closed for business on March 18, 2020. Pursuant to evolving local and/or state Public Health Orders, T and N closed and reopened several times culminating with its most recent reopening on July 18, 2020. As a direct and proximate result of such municipal pandemic-related closures and limitations, T and N has suffered significant business and financial losses.

371. In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make

80

Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), T and N applied for a Second Draw PPP.

372. T and N has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

373. Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), T and N's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by T and N.

374. T and N is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

375. T and N received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

376. T and N's lender has informed it that its Second Draw PPP application requires "further research" for continued processing.

377. T and N is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

378. T and N is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

379. T and N reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other

81

similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

380.    In the event that T and N is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

### *Millennium Restaurant Group, Inc. ("Millennium")*

381.    Millennium is a food and alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed or topless. All of the entertainment presented at Millennium is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

382.    Millennium has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Millennium's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Millennium.

383.    Millennium is categorized as a NAICS code 72 entity.

384.    Millennium presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to:

    a.    A Sexually Oriented Business Permit issued by the City of Dallas;

82

b.     A Mixed Beverage Permit issued by the Texas Alcohol Beverage Commission;

c.     A Late Hours Permit issued by the Texas Alcohol Beverage Commission;

d.     A Catering Permit issued by the Texas Alcohol Beverage Commission;

e.     A Cartage Permit issued by the Texas Alcohol Beverage Commission;

f.     A Food and Beverage Certificate issued by the Texas Alcohol Beverage Commission;

g.     An Alcohol Permit issued by the City of Dallas; and

h.     An Alcohol Permit issued by Dallas County.

385.    Millennium is, as of the filing of this action, currently open for business; however, in order to open, Millennium changed its operations and obtained a Food and Beverage Certificate from the Texas Alcohol Beverage Commission, which requires alcohol sales to be less than 51% of total sales. As was required by local and/or state Public Health Orders, Millennium closed for business on March 16, 2020; it reopened on May 22, 2020, but on June 26, 2020 closed again, and reopened again on July 18, 2020. As a direct and proximate result of such municipal pandemic-related closures and limitations, Millennium has suffered significant business and financial losses.

386.    In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Millennium applied for a Second Draw PPP.

83

387.    Millennium has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

388.    Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Millennium's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Millennium.

389.    Millennium is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

390.    Millennium received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

391.    Millennium's lender has informed it that its Second Draw PPP application requires "further research" for continued processing.

392.    Millennium is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

393.    Millennium is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

394.    Millennium reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of

84

the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

395.    In the event that Millennium is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

### Club Sinrock LLC ("Sinrock Alaska")

396.    Sinrock Alaska is a non-alcohol serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed, topless, and/or fully nude. All of the entertainment presented at Sinrock Alaska is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

397.    Sinrock Alaska has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Sinrock Alaska's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Sinrock Alaska.

398.    Sinrock Alaska is categorized as a NAICS code 72 entity.

399.    Sinrock    Alaska    presents    lawful,    constitutionally    protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to its Adult Oriented Establishment License issued by the City of Anchorage.

85

400. Sinrock Alaska is, as of the filing of this action, currently open for business at 50% capacity. As was required by local and/or state Public Health Orders, Sinrock Alaska closed for business on March 15, 2020. Pursuant to evolving local and/or state Public Health Orders, Sinrock Alaska reopened on May 13, 2020; closed again from August 1, 2020, through September 1, 2020; and closed again from December 1, 2020, through December 31, 2020. As a direct and proximate result of such municipal pandemic-related closures and limitations, Sinrock Alaska has suffered significant business and financial losses.

401. In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Sinrock Alaska applied for a Second Draw PPP.

402. Sinrock Alaska has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

403. Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Sinrock Alaska's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Sinrock Alaska.

404. Sinrock Alaska is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

405. Sinrock Alaska received a First Draw PPP loan under the CARES Act without litigation.

406. Sinrock Alaska's lender received an e-mail from an SBA representative at the Seattle District Office who stated "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)"; thereby, confirming that any denial and/or delay on

Sinrock Alaska's application is solely predicated on the Regulation, the SOP, the Incorporating Statute, and/or the SBA's interpretation and/or application thereof.

407. Sinrock Alaska is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

408. Sinrock Alaska reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

409. In the event that Sinrock Alaska is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

### Club Sinrock LLC ("Sinrock Washington")

410. Sinrock Washington is a non-alcohol serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed, topless, and/or fully nude. All of the entertainment presented at Sinrock Washington is expression presumptively protected under the

87

First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

411. Sinrock Washington has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Sinrock Washington's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Sinrock Washington.

412. Sinrock Washington is categorized as a NAICS code 71 entity.

413. Sinrock Washington presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to its Adult Oriented Establishment License issued by the City of Renton.

414. Sinrock Washington is, as of the filing of this action, currently open for business at 50% capacity. As was required by local and/or state Public Health Orders, Sinrock Washington closed for business on March 15, 2020. Pursuant to evolving local and/or state Public Health Orders, Sinrock Washington reopened on October 22, 2020 and closed again from November 15, 2020, through February 19, 2021. As a direct and proximate result of such municipal pandemic-related closures and limitations, Sinrock Washington has suffered significant business and financial losses.

415. In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Sinrock Washington applied for a Second Draw PPP.

416. Sinrock Washington has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

88

417. Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Sinrock Washington's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Sinrock Washington.

418. Sinrock Washington is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

419. Sinrock Washington received a First Draw PPP loan under the CARES Act without litigation.

420. Sinrock Washington's lender received an e-mail from an SBA representative at the Seattle District Office who stated "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)"; thereby, confirming that any denial and/or delay on Sinrock Washington's application is solely predicated on the Regulation, the SOP, the Incorporating Statute, and/or the SBA's interpretation and/or application thereof.

421. Sinrock Washington is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

422. Sinrock Washington reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application

89

will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

423.    In the event that Sinrock Washington is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

*Club Sinrock LLC ("Sinrock Oregon")*

424.    Sinrock Oregon is a food and alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed, topless, and/or fully nude. All of the entertainment presented at Sinrock Oregon is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

425.    Sinrock Oregon has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Sinrock Oregon's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Sinrock Oregon.

426.    Sinrock Oregon is categorized as a NAICS code 72 entity.

427.    Sinrock    Oregon    presents    lawful,    constitutionally    protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to:

  a.    A Full Retain Dispensary Liquor License issued by the Oregon Liquor Control Commission;

90

b. A Restaurant Food Service License Permit issued by the City of Portland; and

c. A Gaming License/Lottery issued by the Oregon State Lottery.

428. Sinrock Oregon is, as of the filing of this action, currently open for business at 50% capacity with limited operating hours. As was required by local and/or state Public Health Orders, Sinrock Oregon closed for business on March 15, 2020. Pursuant to evolving local and/or state Public Health Orders, Sinrock Oregon reopened on September 11, 2020 and closed again from November 15, 2020, through February 19, 2021. As a direct and proximate result of such municipal pandemic-related closures and limitations, Sinrock Oregon has suffered significant business and financial losses.

429. In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Sinrock Oregon applied for a Second Draw PPP.

430. Sinrock Oregon has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

431. Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Sinrock Oregon's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Sinrock Oregon.

432. Sinrock Oregon is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

433. Sinrock Oregon received a First Draw PPP loan under the CARES Act without litigation.

434. Sinrock Oregon's lender received an e-mail from an SBA representative at the Seattle District Office who stated "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)"; thereby, confirming that any denial and/or delay on Sinrock Oregon's application is solely predicated on the Regulation, the SOP, the Incorporating Statute, and/or the SBA's interpretation and/or application thereof.

435. Sinrock Oregon is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

436. Sinrock Oregon reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

437. In the event that Sinrock Oregon is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

### Club Sinrock DT LLC ("Sinrock DT")

438. Sinrock DT is a non-alcohol serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to

92

present in the future, live female performance dance entertainment which is, at times, fully-clothed, topless, and/or fully nude. All of the entertainment presented at Sinrock DT is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

439.   Sinrock DT has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Sinrock DT's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Sinrock DT.

440.   Sinrock DT is categorized as a NAICS code 72 entity.

441.   Sinrock DT presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to:

     a.     A Full Retain Dispensary Liquor License issued by the DT Liquor Control Commission; and

     b.     A Restaurant Food Service License Permit issued by the City of Portland.

442.   Sinrock DT is, as of the filing of this action, currently not open for business as a result of the local Public Health Orders. As was required by local and/or state Public Health Orders, Sinrock DT closed for business on March 15, 2020. Local Public Health Orders have not permitted Sinrock DT to reopen. As a direct and proximate result of such municipal pandemic-related closures and limitations, Sinrock DT has suffered significant business and financial losses.

443.   In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Sinrock DT applied for a Second Draw PPP.

93

444. Sinrock DT has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

445. Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Sinrock DT's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Sinrock DT.

446. Sinrock DT is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

447. Sinrock DT received a First Draw PPP loan under the CARES Act without litigation.

448. Sinrock DT's lender received an e-mail from an SBA representative at the Seattle District Office who stated "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)"; thereby, confirming that any denial and/or delay on Sinrock DT's application is solely predicated on the Regulation, the SOP, the Incorporating Statute, and/or the SBA's interpretation and/or application thereof.

449. Sinrock DT is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

450. Sinrock DT reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or

94

fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

451.    In the event that Sinrock DT is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to reopen when given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

*Kimmico, Inc. ("Kimmico")*

452.    Kimmico is an alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed, topless, and/or fully nude. All of the entertainment presented at Kimmico is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

453.    Kimmico has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Kimmico's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Kimmico.

454.    Kimmico is categorized as a NAICS code 72 entity.

455.    Kimmico presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to its liquor license issued by the State of Maryland.

456.    Kimmico is, as of the filing of this action, currently open for business at 50% capacity. As was required by local and/or state Public Health Orders, Kimmico closed for business on or about March 15, 2020. Pursuant to the evolving state and/or

95

local Public Health Orders, Kimmico reopened and closed four times culminating with its most recent reopening on or about March 15, 2021 after being closed since December 11, 2020. As a direct and proximate result of such municipal pandemic-related closures and limitations, Kimmico has suffered significant business and financial losses.

457.   In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Kimmico applied for a Second Draw PPP.

458.   Kimmico has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

459.   Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Kimmico's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Kimmico.

460.   Kimmico is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

461.   Kimmico received a First Draw PPP loan under the CARES Act without litigation.

462.   Kimmico's has not received any correspondence in regard to its Second Draw PPP application.

463.   Kimmico is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

96

464. Kimmico is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

465. Kimmico reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

466. In the event that Kimmico is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

*Polmour, Inc. ("Polmour")*

467. Polmour is a food and alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed or topless. All of the entertainment presented at Polmour is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

97

468. Polmour has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Polmour's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Polmour.

469. Polmour is categorized as a NAICS code 72 entity.

470. Polmour presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to a Liquor License issued by the State of Texas.

471. Polmour is, as of the filing of this action, currently open for business. As was required by local and/or state Public Health Orders, Polmour closed for business on March 17, 2020. Pursuant to the evolving state and local Public Health Orders, Polmour closed and reopened several times culminating with its most recent reopening on October 14, 2020. As a direct and proximate result of such municipal pandemic-related closures and limitations, Polmour has suffered significant business and financial losses.

472. In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Polmour applied for a Second Draw PPP.

473. Polmour has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

474. Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Polmour's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Polmour.

475.	Polmour is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

476.	Polmour received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

477.	Polmour's lender has not provided Polmour an update on the status of its Second Draw PPP application.

478.	Polmour is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

479.	Polmour is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

480.	Polmour reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

481.	In the event that Polmour is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in

99

protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

**Sisyphian, LLC ("Sisyphian")**

482.    Sisyphian is a non-alcohol serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed, topless, and/or fully nude. All of the entertainment presented at Sisyphian is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

483.    Sisyphian has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Sisyphian's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Sisyphian.

484.    Sisyphian is categorized as a NAICS code 72 entity.

485.    Sisyphian presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to:

> a.    A Cafe Entertainment/Shows-Adult Permit issued by the City of Las Angeles; and
>
> b.    A Retail Sales Certificate issued by the State of California.

486.    Sisyphian is, as of the filing of this action, currently not open for business. As was required by local and/or state Public Health Orders, Sisyphian closed for business on or about March 16, 2020. State and/or local Public Health Orders have not permitted Sisyphian to reopen. As a direct and proximate result of such municipal pandemic-related closures and limitations, Sisyphian has suffered significant business and financial losses.

487. In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Sisyphian applied for a Second Draw PPP.

488. Sisyphian has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

489. Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Sisyphian's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Sisyphian.

490. Sisyphian is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

491. Sisyphian received a First Draw PPP loan under the CARES Act without litigation.

492. Sisyphian's has not received any correspondence from its lender regarding the status of its Second Draw PPP application.

493. Sisyphian is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

494. Sisyphian is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

495. Sisyphian reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that

101

resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

496. In the event that Sisyphian is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to reopen when given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

### 689 Eatery, LLC ("689 Eatery")

497. 689 Eatery is an alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment that is, at times, fully-clothed or topless. All of the entertainment presented at 689 Eatery is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

498. 689 Eatery has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on 689 Eatery's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at 689 Eatery.

499. 689 Eatery is categorized as a NAICS code 72 entity.

500.   689 Eatery presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to, a Liquor License issued by the State of New York.

501.   689 Eatery is, as of the filing of this action, currently not open for business. As was required by state and/or local Public Health Orders, 689 Eatery closed for business on March 15, 2020. State and/or local Public Health Orders have not permitted 689 Eatery to reopen. As a direct and proximate result of such municipal pandemic-related closures and limitations, 689 Eatery has suffered significant business and financial losses.

502.   In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), 689 Eatery applied for a Second Draw PPP.

503.   689 Eatery has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

504.   Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), 689 Eatery's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by 689 Eatery.

505.   689 Eatery is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

506.   689 Eatery received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

507. 689 Eatery's lender denied its Second Draw PPP application stating "[i]nformation supplied by the SBA indicates that applicant is not eligible for a Paycheck Protection Program loan." Given that 689 Eatery received a First Draw PPP loan, 689 Eatery believes this denial is solely predicated on the Regulation, the SOP, the Incorporating Statute, and/or the SBA's interpretation and/or application thereof.

508. 689 Eatery is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

509. 689 Eatery is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

510. 689 Eatery reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application has been rejected by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

511. In the event that 689 Eatery is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to reopen given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to

104

continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

*Syzygy, LLC ("Syzygy")*

512.  Syzygy is an alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, fully-clothed (bikini) live female performance dance entertainment. All of the entertainment presented at Syzygy is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

513.  Syzygy has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Syzygy's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Syzygy.

514.  Syzygy is categorized as a NAICS code 72 entity.

515.  Syzygy presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to:

      a.  An On Sale General Public Premises Alcohol License issued by the California Department of Alcohol Beverage Control;

      b.  A Tobacco Retailer Permit issued by the City of Los Angeles; and

      c.  A Cafe Entertainment/Shows – Adult Permit issued by the City of Los Angeles.

516.  Syzygy is, as of the filing of this action, currently not open for business. As was required by local and/or state Public Health Orders, Syzygy closed for business on March 16, 2020. Except for a four day period, state and/or local Public Health Orders have not permitted Syzygy to reopen. As a direct and proximate result

of such municipal pandemic-related closures and limitations, Syzygy has suffered significant business and financial losses.

517. In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Syzygy applied for a Second Draw PPP.

518. Syzygy has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

519. Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Syzygy's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Syzygy.

520. Syzygy is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

521. Syzygy received a First Draw PPP loan under the CARES Act without litigation.

522. Syzygy's has not received any correspondence from its lender regarding the status of its Second Draw PPP application.

523. Syzygy is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

524. Syzygy is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

106

525. Syzygy reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

526. In the event that Syzygy is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to reopen when given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

### Brookhurst Venture, LLC ("Brookhurst")

527. Brookhurst is an alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed or topless. All of the entertainment presented at Brookhurst is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

528. Brookhurst has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Brookhurst's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Brookhurst.

529. Brookhurst is categorized as a NAICS code 72 entity.

530. Brookhurst presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to: an Alcohol License from the State of California and Restaurant License issued by the County of Orange.

531. Brookhurst is, as of the filing of this action, open for business. As was required by local and/or state Public Health Orders, Brookhurst closed for business on March 17, 2020. Pursuant to the evolving local and/or state Public Health Orders, Brookhurst reopened on October 1, 2020. As a direct and proximate result of such municipal pandemic-related closures and limitations, Brookhurst has suffered significant business and financial losses.

532. In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Brookhurst applied for a Second Draw PPP.

533. Brookhurst has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

534. Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Brookhurst's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Brookhurst.

535. Brookhurst is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

108

536. Brookhurst received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

537. Brookhurst's lender has informed it that its Second Draw PPP application has been placed on an internal hold by the SBA.

538. Brookhurst is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

539. Brookhurst is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

540. Brookhurst reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

541. In the event that Brookhurst is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and

109

customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

### *City of Industry Hospitality Venture, Inc. ("Industry Venture")*

542.    Industry Venture is a non-alcohol serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed, topless and/or fully nude. All of the entertainment presented at Industry Venture is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

543.    Industry Venture has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Industry Venture's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Industry Venture.

544.    Industry Venture is categorized as a NAICS code 72 entity.

545.    Industry Venture presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to:

a.    A Health Permit issued by the County of Los Angeles; and

b.    A Restaurant License issued by the County of Los Angeles.

546.    Industry Venture is, as of the filing of this action, closed for business. As was required by local and/or state Public Health Orders, Industry Venture closed for business on March 18, 2020. Pursuant to the evolving local and/or state Public Health Orders, Industry Venture reopened on October 1, 2020, but on October 3, 2020 closed again. Industry Venture reopened again on October 8, 2020, for two days, and reopened again on October 15, 2020, for one day before closing again pursuant to local and/or state Public Health Orders. As a direct and proximate result of such municipal

110

pandemic-related closures and limitations, Industry Venture has suffered significant business and financial losses.

547.    In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Industry Venture applied for a Second Draw PPP.

548.    Industry Venture has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

549.    Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Industry Venture's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Industry Venture.

550.    Industry Venture is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

551.    Industry Venture received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

552.    Industry Venture's lender has informed it that its Second Draw PPP application has been placed on an internal hold by the SBA.

553.    Industry Venture is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

554. Industry Venture is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

555. Industry Venture reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

556. In the event that Industry Venture is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to reopen given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

*Farmdale Hospitality Services, Inc. ("Farmdale")*

557. Farmdale is a non-alcohol serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed, topless, and/or fully nude. All of the entertainment presented at Farmdale is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

112

558.   Farmdale has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Farmdale's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Farmdale.

559.   Farmdale is categorized as a NAICS code 72 entity.

560.   Farmdale presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to a Los Angeles Café Entertainment Permit and Restaurant License by the County of Los Angeles.

561.   Farmdale is, as of the filing of this action, currently closed for business. As was required by local and/or state Public Health Orders, Farmdale closed for business on March 16, 2020. Pursuant to the evolving local and/or state Public Health Orders, Farmdale has not reopened. As a direct and proximate result of such municipal pandemic-related closures and limitations, Farmdale has suffered significant business and financial losses.

562.   In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Farmdale applied for a Second Draw PPP.

563.   Farmdale has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

564.   Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Farmdale's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Farmdale.

113

565. Farmdale is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

566. Farmdale received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

567. Farmdale's lender has informed it that its Second Draw PPP application has been placed on an internal hold by the SBA.

568. Farmdale is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

569. Farmdale is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

570. Farmdale reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

571. In the event that Farmdale is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to reopen given the local Pandemic-related capacity restrictions, which may well result

114

in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

### *High Expectations Hospitality, LLC ("Expectations")*

572. Expectations is an alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed or topless. All of the entertainment presented at Expectations is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

573. Expectations has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Expectations's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Expectations.

574. Expectations is categorized as a NAICS code 72 entity.

575. Expectations presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to Liquor Licenses issued by the City and County of Dallas and the State of Texas, Restaurant License issued by the City of Dallas and Sexually Oriented Business License issued by the City of Dallas.

576. Expectations is, as of the filing of this action, currently open for business. As was required by local and/or state Public Health Orders, Expectations closed for business on March 17, 2020. Pursuant to the evolving local and/or state Public Health Orders, Expectations reopened on May 22, 2020, but on June 25, 2020 closed again, and reopened again on October 1, 2020. As a direct and proximate result

of such municipal pandemic-related closures and limitations, Expectations has suffered significant business and financial losses.

577.   In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Expectations applied for a Second Draw PPP.

578.   Expectations has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

579.   Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Expectations's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Expectations.

580.   Expectations is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

581.   Expectations received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

582.   Expectations's lender has informed it that its Second Draw PPP application has been placed on an internal hold by the SBA.

583.   Expectations is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

584. Expectations is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

585. Expectations reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

586. In the event that Expectations is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

### Inland Restaurant Venture, Inc. ("Inland")

587. Inland is a non-alcohol serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed or topless. All of the entertainment presented at Inland is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

117

588. Inland has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Inland's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Inland.

589. Inland is categorized as a NAICS code 72 entity.

590. Inland presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to a Los Angeles Café Entertainment Permit and Restaurant License issued by the County of Los Angeles.

591. Inland is, as of the filing of this action, currently closed for business. As was required by local and/or state Public Health Orders, Inland closed for business on March 16, 2020. Pursuant to the evolving local and/or state Public Health Orders, Inland has not reopened. As a direct and proximate result of such municipal pandemic-related closures and limitations, Inland has suffered significant business and financial losses.

592. In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Inland applied for a Second Draw PPP.

593. Inland has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

594. Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Inland's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Inland.

595. Inland is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

596. Inland received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

597. Inland's lender has informed it that its Second Draw PPP application has been placed on an internal hold by the SBA.

598. Inland is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

599. Inland is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

600. Inland reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

601. In the event that Inland is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to reopen given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First

119

Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

*Kentucky Hospitality Restaurant Venture, LLC ("Kentucky Hospitality")*

602. Kentucky Hospitality is an alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed, topless and/or fully nude. All of the entertainment presented at Kentucky Hospitality is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

603. Kentucky Hospitality has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Kentucky Hospitality's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Kentucky Hospitality.

604. Kentucky Hospitality is categorized as a NAICS code 72 entity.

605. Kentucky Hospitality presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to: an Alcohol License from the State of Kentucky and Lexington-Fayette County an Adult Entertainment License from Lexington-Fayette County and Restaurant License issued by the State of Kentucky.

606. Kentucky Hospitality is, as of the filing of this action, currently open for business. As was required by local and/or state Public Health Orders, Kentucky Hospitality closed for business on March 16, 2020. Pursuant to the evolving local and/or state Public Health Orders, Kentucky Hospitality reopened on June 2, 2020, but on July 31, 2020 closed again. Kentucky Hospitality reopened again on August 21, 2020. As a direct and proximate result of such municipal pandemic-related

120

closures and limitations, Kentucky Hospitality has suffered significant business and financial losses.

607.    In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Kentucky Hospitality applied for a Second Draw PPP.

608.    Kentucky Hospitality has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

609.    Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Kentucky Hospitality's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Kentucky Hospitality.

610.    Kentucky Hospitality is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

611.    Kentucky Hospitality received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

612.    Kentucky Hospitality's lender has informed it that its Second Draw PPP application has been placed on an internal hold by the SBA.

613.    Kentucky Hospitality is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

121

614. Kentucky Hospitality is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

615. Kentucky Hospitality reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

616. In the event that Kentucky Hospitality is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

**L.C.M., LLC ("LCM")**

617. LCM is an alcohol serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, fully-clothed (in the form of pasties) live female performance dance entertainment which is. All of the entertainment presented at LCM is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

618. LCM has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on LCM's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at LCM.

619. LCM is categorized as a NAICS code 72 entity.

620. LCM presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to Liquor Licenses issued by the City, County and State of Boise and a Restaurant License issued by the County and City of Boise.

621. LCM is, as of the filing of this action, currently open for business. As was required by local and/or state Public Health Orders, LCM closed for business on March 19, 2020. Pursuant to the evolving local and/or state Public Health Orders, LCM reopened on June 18, 2020, but on June 22, 2020 closed again, and reopened again on July 23, 2020. As a direct and proximate result of such municipal pandemic-related closures and limitations, LCM has suffered significant business and financial losses.

622. In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), LCM applied for a Second Draw PPP.

623. LCM has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

624. Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), LCM's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by LCM.

123

625. LCM is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

626. LCM received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

627. LCM's lender has informed it that its Second Draw PPP application has been placed on an internal hold by the SBA.

628. LCM is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

629. LCM is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

630. LCM reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

631. In the event that LCM is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected

First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

***Midnight Sun Enterprises, Inc. ("Midnight")***

632.    Midnight is an alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed or topless. All of the entertainment presented at Midnight is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

633.    Midnight has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Midnight's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Midnight.

634.    Midnight is categorized as a NAICS code 72 entity.

635.    Midnight presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to: an Alcohol License from the State of California and a Restaurant License issued by the County of Los Angeles, a Public Eating License issued by the County of Los Angeles and an Adult Cabaret License issued by the County of Los Angeles.

636.    Midnight is, as of the filing of this action, currently closed for business. As was required by local and/or state Public Health Orders, Midnight closed for business on March 16, 2020. Pursuant to the evolving local and/or state Public Health Orders, Midnight has not reopened. As a direct and proximate result of such municipal pandemic-related closures and limitations, Midnight has suffered significant business and financial losses.

125

637.   In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Midnight applied for a Second Draw PPP.

638.   Midnight has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

639.   Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Midnight's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Midnight.

640.   Midnight is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

641.   Midnight received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

642.   Midnight's lender has informed it that its Second Draw PPP application has been placed on an internal hold by the SBA.

643.   Midnight is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

644.   Midnight is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

126

645. Midnight reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

646. In the event that Midnight is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to reopen given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

*Nitelife, Inc. ("Nitelife")*

647. Nitelife is an alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed or topless. All of the entertainment presented at Nitelife is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

648. Nitelife has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Nitelife's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Nitelife.

649. Nitelife is categorized as a NAICS code 72 entity.

650. Nitelife presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to: a Liquor Permit issued by the City of Minneapolis and State of Minnesota, a Restaurant License issued by the City of Minneapolis and Adult Entertainment License from the City of Minneapolis.

651. Nitelife is, as of the filing of this action, currently open for business. As was required by local and/or state Public Health Orders, Nitelife closed for business on March 17, 2020. Pursuant to the evolving local and/or state Public Health Orders, Nitelife reopened on June 10, 2020, closed again on November 12, 2020, and recently reopened again on March 3, 2021. As a direct and proximate result of such municipal pandemic-related closures and limitations, Nitelife has suffered significant business and financial losses.

652. In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Nitelife applied for a Second Draw PPP.

653. Nitelife has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

654. Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Nitelife's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Nitelife.

655. Nitelife is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

128

656. Nitelife received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

657. Nitelife's lender has informed it that its Second Draw PPP application has been placed on an internal hold by the SBA.

658. Nitelife is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

659. Nitelife is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

660. Nitelife reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

661. In the event that Nitelife is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

129

*Olympic Avenue Venture, Inc. ("Olympic")*

662.   Olympic is a non-alcohol serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed, topless, and/or fully nude. All of the entertainment presented at Olympic is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

663.   Olympic has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Olympic's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Olympic.

664.   Olympic is categorized as a NAICS code 72 entity.

665.   Olympic presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to a Restaurant License issued by the County of Los Angeles and Café Entertainment License issued by the City of Los Angeles.

666.   Olympic is, as of the filing of this action, currently closed for business. As was required by local and/or state Public Health Orders, Olympic closed for business on March 16, 2020. Pursuant to the evolving local and/or state Public Health Orders, Olympic has not reopened. As a direct and proximate result of such municipal pandemic-related closures and limitations, Olympic has suffered significant business and financial losses.

667.   In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Olympic applied for a Second Draw PPP.

668.    Olympic has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

669.    Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Olympic's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Olympic.

670.    Olympic is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

671.    Olympic received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

672.    Olympic's lender has informed it that its Second Draw PPP application has been placed on an internal hold by the SBA.

673.    Olympic is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

674.    Olympic is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

675.    Olympic reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or

131

fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

676. In the event that Olympic is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to reopen given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

### The Oxnard Hospitality Services, Inc. ("Oxnard")

677. Oxnard is a non-alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed, topless, and/or fully nude. All of the entertainment presented at Oxnard is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

678. Oxnard has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Oxnard's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Oxnard.

679. Oxnard is categorized as a NAICS code 72 entity.

680. Oxnard presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to a Restaurant License issued by the County of Oxnard and Adult Business License issued by the City of Oxnard.

681. Oxnard is, as of the filing of this action, currently closed for business. As was required by local and/or state Public Health Orders, Oxnard closed for business

132

on March 16, 2020. Pursuant to the evolving local and/or state Public Health Orders, Oxnard has not reopened. As a direct and proximate result of such municipal pandemic-related closures and limitations, Oxnard has suffered significant business and financial losses.

682.    In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Oxnard applied for a Second Draw PPP.

683.    Oxnard has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

684.    Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Oxnard's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Oxnard.

685.    Oxnard is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

686.    Oxnard received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

687.    Oxnard's lender has informed it that its Second Draw PPP application has been placed on an internal hold by the SBA.

688.    Oxnard is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

133

689. Oxnard is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

690. Oxnard reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

691. In the event that Oxnard is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to reopen given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

*Penn Ave Hospitality, LLC ("Penn Ave")*

692. Penn Ave is an alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed, topless, and/or fully nude. All of the entertainment presented at Penn Ave is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

693. Penn Ave has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Penn Ave's

134

premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Penn Ave.

694. Penn Ave is categorized as a NAICS code 72 entity.

695. Penn Ave presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to: Alcohol and Liquor Licenses issued by the State of Pennsylvania and Restaurant License issued by the County of Allegheny.

696. Penn Ave is, as of the filing of this action, currently closed for business. As was required by local and/or state Public Health Orders, Penn Ave closed for business on March 16, 2020. Pursuant to the evolving local and/or state Public Health Orders, Penn Ave briefly reopened from June 5, 2020 to June 27, 2020 and again from October 1, 2020 to December 25, 2020. Penn Ave has not been permitted to reopen since December 25, 2020. As a direct and proximate result of such municipal pandemic-related closures and limitations, Penn Ave has suffered significant business and financial losses.

697. In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Penn Ave applied for a Second Draw PPP.

698. Penn Ave has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

699. Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Penn Ave's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Penn Ave.

135

700. Penn Ave is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

701. Penn Ave received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

702. Penn Ave's lender has informed it that its Second Draw PPP application has been placed on an internal hold by the SBA.

703. Penn Ave is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

704. Penn Ave is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

705. Penn Ave reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

706. In the event that Penn Ave is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to reopen given the local Pandemic-related capacity restrictions, which may well result

136

in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

### *Platinum SJ Enterprise ("SJ")*

707.  SJ is an alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, fully-clothed (in the form of pasties) live female performance dance entertainment. All of the entertainment presented at SJ is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

708.  SJ has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on SJ's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at SJ.

709.  SJ is categorized as a NAICS code 72 entity.

710.  SJ presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to: an Alcohol License from the State of California and a Restaurant License issued by the County of Santa Clara and Public Entertainment License issued by the City of San Jose.

711.  SJ is, as of the filing of this action, currently closed for business. As was required by local and/or state Public Health Orders, SJ closed for business on March 13, 2020. Pursuant to the evolving local and/or state Public Health Orders, SJ has not reopened. As a direct and proximate result of such municipal pandemic-related closures and limitations, SJ has suffered significant business and financial losses.

137

712.    In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), SJ applied for a Second Draw PPP.

713.    SJ has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

714.    Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), SJ's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by SJ.

715.    SJ is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

716.    SJ received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

717.    SJ's lender has informed it that its Second Draw PPP application has been placed on an internal hold by the SBA.

718.    SJ is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

719.    SJ is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

720.    SJ reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in

138

the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

721. In the event that SJ is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to reopen given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

### PNM Enterprises, Inc. ("PNM")

722. PNM is a non-alcohol serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed, topless, and/or fully-nude. All of the entertainment presented at PNM is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

723. PNM has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on PNM's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at PNM.

724. PNM is categorized as a NAICS code 72 entity.

725. PNM presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to a Restaurant License issued by the County of Orange.

726. PNM is, as of the filing of this action, currently open for business. As was required by local and/or state Public Health Orders, PNM closed for business on March 17, 2020. Pursuant to the evolving local and/or state Public Health Orders, PNM reopened on October 1, 2020. As a direct and proximate result of such municipal pandemic-related closures and limitations, PNM has suffered significant business and financial losses.

727. In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), PNM applied for a Second Draw PPP.

728. PNM has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

729. Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), PNM's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by PNM.

730. PNM is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

731. PNM received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

140

732. PNM's lender has informed it that its Second Draw PPP application has been placed on an internal hold by the SBA.

733. PNM is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

734. PNM is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

735. PNM reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

736. In the event that PNM is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

*Rialto Pockets, Inc. ("Rialto")*

737. Rialto is a non-alcohol serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to

141

present in the future, live female performance dance entertainment which is, at times, fully-clothed, topless, and/or fully nude. All of the entertainment presented at Rialto is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

738. Rialto has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Rialto's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Rialto.

739. Rialto is categorized as a NAICS code 72 entity.

740. Rialto presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to Restaurant License issued by the County of San Bernardino.

741. Rialto is, as of the filing of this action, currently closed for business. As was required by local and/or state Public Health Orders, Rialto closed for business on March 17, 2020. Pursuant to the evolving local and/or state Public Health Orders, Rialto has not reopened. As a direct and proximate result of such municipal pandemic-related closures and limitations, Rialto has suffered significant business and financial losses.

742. In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Rialto applied for a Second Draw PPP.

743. Rialto has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

744. Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Rialto's lender has operated and will operate as a

142

delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Rialto.

745. Rialto is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

746. Rialto received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

747. Rialto's lender has informed it that its Second Draw PPP application has been placed on an internal hold by the SBA.

748. Rialto is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

749. Rialto is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

750. Rialto reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

751. In the event that Rialto is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to reopen

143

given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

### *Rouge Gentlemen's Club, Inc. ("Rouge")*

752.   Rouge is an alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed or topless. All of the entertainment presented at Rouge is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

753.   Rouge has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Rouge's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Rouge.

754.   Rouge is categorized as a NAICS code 72 entity.

755.   Rouge presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to an Alcohol License from the State of California, Café Entertainment License issued by the City of Los Angeles and a Restaurant License issued by the County of Los Angeles.

756.   Rouge is, as of the filing of this action, currently closed for business. As was required by local and/or state Public Health Orders, Rouge closed for business on March 16, 2020. Pursuant to the evolving local and/or state Public Health Orders, Rouge has not reopened. As a direct and proximate result of such municipal

144

pandemic-related closures and limitations, Rouge has suffered significant business and financial losses.

757.   In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Rouge applied for a Second Draw PPP.

758.   Rouge has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

759.   Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Rouge's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Rouge.

760.   Rouge is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

761.   Rouge received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

762.   Rouge's lender has informed it that its Second Draw PPP application has been placed on an internal hold by the SBA.

763.   Rouge is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

764.   Rouge is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

145

765. Rouge reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

766. In the event that Rouge is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to reopen given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

### Santa Barbara Hospitality Services, Inc. ("Santa Barbara")

767. Santa Barbara is a non-alcohol serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed, topless, and/or fully nude. All of the entertainment presented at Santa Barbara is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

768. Santa Barbara has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Santa Barbara's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Santa Barbara.

146

769. Santa Barbara is categorized as a NAICS code 72 entity.

770. Santa Barbara presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals including but not limited to a Restaurant License issued by the County of Santa Barbara.

771. Santa Barbara is, as of the filing of this action, currently closed for business. As was required by local and/or state Public Health Orders, Santa Barbara closed for business on March 15, 2020. Pursuant to the evolving local and/or state Public Health Orders, Santa Barbara has not reopened .As a direct and proximate result of such municipal pandemic-related closures and limitations, Santa Barbara has suffered significant business and financial losses.

772. In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Santa Barbara applied for a Second Draw PPP.

773. Santa Barbara has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

774. Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Santa Barbara's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Santa Barbara.

775. Santa Barbara is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

147

776. Santa Barbara received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

777. Santa Barbara's lender has informed it that its Second Draw PPP application has been placed on an internal hold by the SBA.

778. Santa Barbara is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

779. Santa Barbara is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

780. Santa Barbara reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

781. In the event that Santa Barbara is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to reopen given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to

148

continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

### *Santa Maria Restaurant Enterprises, Inc. ("Santa Maria")*

782. Santa Maria is a non-alcohol serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed, topless, and/or fully nude. All of the entertainment presented at Santa Maria is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

783. Santa Maria has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Santa Maria's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Santa Maria.

784. Santa Maria is categorized as a NAICS code 72 entity.

785. Santa Maria presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals including but not limited to a Restaurant License issued by the County of Santa Barbara.

786. Santa Maria is, as of the filing of this action, currently closed for business. As was required by local and/or state Public Health Orders, Santa Maria closed for business on March 16, 2020. Pursuant to the evolving local and/or state Public Health Orders, Santa Maria has not reopened. As a direct and proximate result of such municipal pandemic-related closures and limitations, Santa Maria has suffered significant business and financial losses.

787. In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make

149

Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Santa Maria applied for a Second Draw PPP.

788. Santa Maria has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

789. Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Santa Maria's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Santa Maria.

790. Santa Maria is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

791. Santa Maria received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

792. Santa Maria's lender has informed it that its Second Draw PPP application has been placed on an internal hold by the SBA.

793. Santa Maria is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

794. Santa Maria is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

795. Santa Maria reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA

150

with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

796.    In the event that Santa Maria is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to reopen given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

### Saries Lounge, LLC ("Saries")

797.    Saries is an alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed or topless. All of the entertainment presented at Saries is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

798.    Saries has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Saries's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Saries.

799.    Saries is categorized as a NAICS code 72 entity.

800.    Saries presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals including

151

but not limited to an Alcohol License issued by the State of Iowa and a Restaurant License issued by the State of Iowa.

801. Saries is, as of the filing of this action, currently open for business. As was required by local and/or state Public Health Orders, Saries closed for business on March 17, 2020. Pursuant to the evolving local and/or state Public Health Orders, Saries reopened on May 28, 2020. As a direct and proximate result of such municipal pandemic-related closures and limitations, Saries has suffered significant business and financial losses.

802. In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Saries applied for a Second Draw PPP.

803. Saries has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

804. Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Saries's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Saries.

805. Saries is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

806. Saries received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

807. Saries's lender has informed it that its Second Draw PPP application has been placed on an internal hold by the SBA.

152

808. Saries is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

809. Saries is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

810. Saries reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

811. In the event that Saries is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

### Spearmint Rhino Companies Worldwide, Inc. ("Worldwide")

812. Worldwide is an intellectual property licensing company that provides intellectual property licenses.

813. Worldwide provides services to a number of establishments that provide life female performance dance entertainment, including, all Spearmint Rhino

153

Gentlemen's Clubs, California Girls, Dames N' Games, and Blue Zebra establishments.

814. All of the entertainment presented at the businesses Worldwide services is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires. None of the businesses Worldwide services has ever been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed at the businesses Worldwide services have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at the businesses Worldwide services

815. A number of entities Worldwide services have been, pursuant to local and/or state Pandemic orders, closed and have not been permitted to reopen or closed and then reopened in limited capacities as a result of the Pandemic. As was required by local and/or state Public Health Orders, Worldwide closed on March 20, 2020, and did not reopen permitted to do so on July 27, 2020, with heavily reduced staff. As a direct and proximate result of such state-ordered closures, Worldwide has suffered significant business losses and was forced to layoff significant numbers of its staff. Worldwide plans to return to full operations when its clients are able to do so.

816. In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Worldwide applied for a Second Draw PPP.

817. Worldwide has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

818. Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Worldwide's lender has operated and will operate as

154

a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Worldwide.

819.   Worldwide is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

820.   Worldwide received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

821.   Worldwide's lender has informed it that its Second Draw PPP application has been placed on an internal hold by the SBA.

822.   Worldwide is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

823.   Worldwide is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

824.   Worldwide reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

825. In the event that Worldwide is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

### Spearmint Rhino Consulting Worldwide, Inc. ("Consulting")

826. Consulting is a business services company that provides a range of services to businesses including, *inter alia*: marketing and consulting.

827. Consulting provides services to a number of establishments that provide life female performance dance entertainment, including, all Spearmint Rhino Gentlemen's Clubs, California Girls, Dames N' Games, and Blue Zebra establishments.

828. All of the entertainment presented at the businesses Consulting services is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires. None of the businesses Consulting services has ever been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed at the businesses Consulting services have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at the businesses Consulting services

829. A number of entities Consulting services have been, pursuant to local and/or state Pandemic orders, closed and have not been permitted to reopen or closed and then reopened in limited capacities as a result of the Pandemic. As was required by local and/or state Public Health Orders, Consulting closed on March 20, 2020, and did not reopen permitted to do so on July 27, 2020, with heavily reduced staff. As a

156

direct and proximate result of such state-ordered closures, Consulting has suffered significant business losses and was forced to layoff significant numbers of its staff. Consulting plans to return to full operations when its clients are able to do so.

830. In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Consulting applied for a Second Draw PPP.

831. Consulting has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

832. Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Consulting's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Consulting.

833. Consulting is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

834. Consulting received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

835. Consulting's lender has informed it that its Second Draw PPP application has been placed on an internal hold by the SBA.

836. Consulting is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

837. Consulting is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

838. Consulting reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

839. In the event that Consulting is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

### Washington Management, LLC ("Washington Mgmt")

840. Washington Mgmt is an alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed or topless. All of the entertainment presented at Washington Mgmt is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

158

841. Washington Mgmt has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on Washington Mgmt's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at Washington Mgmt.

842. Washington Mgmt is categorized as a NAICS code 72 entity.

843. Washington Mgmt presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to an Alcohol License from the State of California, Café Entertainment License issued by the City of Los Angeles and a Restaurant License issued by the County of Los Angeles.

844. Washington Mgmt is, as of the filing of this action, currently closed for business. As was required by local and/or state Public Health Orders, Washington Mgmt closed for business on March 16, 2020. Pursuant to the evolving local and/or state Public Health Orders, Washington Mgmt has not reopened. As a direct and proximate result of such municipal pandemic-related closures and limitations, Washington Mgmt has suffered significant business and financial losses.

845. In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), Washington Mgmt applied for a Second Draw PPP.

846. Washington Mgmt has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

847. Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), Washington Mgmt's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by Washington Mgmt.

159

848. Washington Mgmt is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

849. Washington Mgmt received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

850. Washington Mgmt's lender has informed it that its Second Draw PPP application has been placed on an internal hold by the SBA.

851. Washington Mgmt is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

852. Washington Mgmt is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

853. Washington Mgmt reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

854. In the event that Washington Mgmt is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able

160

to reopen given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

### W.P.B. Hospitality, LLC ("WPB")

855. WPB is an alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed, topless, and/or fully nude. All of the entertainment presented at WPB is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

856. WPB has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on WPB's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at WPB.

857. WPB is categorized as a NAICS code 72 entity.

858. WPB presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to a Liquor License issued by the State of Florida, Adult Dancing License issued by the State of Florida, Restaurant License issued by the State of Florida and Live Entertainment License issued by the State of Florida.

859. WPB is, as of the filing of this action, currently open for business. As was required by local and/or state Public Health Orders, WPB closed for business on March 17, 2020. Pursuant to the evolving local and/or state Public Health Orders, WPB reopened on June 4, 2020, but closed the same day and could not reopen again until September 30, 2020. As a direct and proximate result of such municipal

161

pandemic-related closures and limitations, WPB has suffered significant business and financial losses.

860. In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), WPB applied for a Second Draw PPP.

861. WPB has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

862. Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), WPB's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by WPB.

863. WPB is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

864. WPB received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

865. WPB's lender has informed it that its Second Draw PPP application has been placed on an internal hold by the SBA.

866. WPB is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

867. WPB is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

162

868.   WPB reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

869.   In the event that WPB is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

*K-Kel, Inc. ("K-Kel")*

870.   K-Kel is an alcohol-serving commercial establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed or topless. All of the entertainment presented at K-Kel is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

871.   K-Kel has never been charged, let alone convicted, of any crimes of obscenity. Similarly, none of the entertainers who have performed on K-Kel's premises have ever been charged, let alone convicted, of any crimes of obscenity related to their performances at K-Kel.

163

872.    K-Kel is categorized as a NAICS code 72 entity.

873.    K-Kel presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals, including but not limited to a Liquor License issued by the State of Nevada, Adult Entertainment Cabaret License issued by Clark County and a Restaurant License issued by the State of Nevada.

874.    K-Kel is, as of the filing of this action, currently open for business. As was required by local and/or state Public Health Orders, K-Kel closed for business on March 17, 2020. Pursuant to the evolving local and/or state Public Health Orders, K-Kel briefly reopened from November 13, 2020, through November 14, 2020, and again from November 20, 2020, through November 21, 2020. K-Kel then, when permitted, reopened on December 4, 2020. As a direct and proximate result of such municipal pandemic-related closures and limitations, K-Kel has suffered significant business and financial losses.

875.    In order to mitigate its business losses, to provide monetary relief to its employees (since a controlling percentage of Second Draw PPP loans must be used for employee wages and salaries), and to be able to purchase PPE and make Pandemic-related repairs and/or upgrades to its facility (since the Second Draw PPP expanded the loan's eligible uses), K-Kel applied for a Second Draw PPP.

876.    K-Kel has submitted an application for a Second Draw PPP through its lender, which is an approved SBA lender.

877.    Pursuant to 15 U.S.C. § 636(a)(36)(F)(ii)(I), 15 U.S.C. § 636(a)(37)(K), and/or 15 U.S.C. § 636(a)(F)(iii), K-Kel's lender has operated and will operate as a delegate of the SBA in the processing and approval or disapproval of the Second Draw PPP sought by K-Kel.

164

878. K-Kel is fully qualified—but for the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of all of the same—to receive a Second Draw PPP loan under all other relevant statutes, regulations, and procedures.

879. K-Kel received a First Draw PPP loan under the CARES Act pursuant to an injunction and ruling by the United States District Court for the Eastern District of Michigan.

880. K-Kel's lender has informed it that its Second Draw PPP application has been placed on an internal hold by the SBA.

881. K-Kel is, through its legal counsel, aware that other similar businesses have received correspondence from the SBA in regard to Second Draw PPP loan applications wherein the SBA has stated: "Strip clubs remain ineligible for PPP loans. See 13 CFR § 120.110(p)."

882. K-Kel is also, through its legal counsel, aware that, irrespective of the above, other similar "strip clubs" have nevertheless received Second Draw PPP loans.

883. K-Kel reasonably believes, based on the information that it has received, the information disclosed and presented in the previous proceedings that resulted in the Regulation and SOP being enjoined and/or barred from enforcement (much of which is detailed verbatim below), and the actions already taken by the SBA with regard to its Second Draw PPP loan application and the applications of other similar businesses as described both above and below (including the applications of the other Plaintiffs here), that its Second Draw PPP application will be rejected or fatally delayed by the SBA due to the Regulation, the SOP, the Incorporating Statute, and/or the SBA's application of the same.

884. In the event that K-Kel is unable to obtain a Second Draw PPP, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the local Pandemic-related capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected

165

First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, and/or view, protected First Amendment activities.

*All Plaintiffs*

885.    Camelot Banquet, Juneau, Midrad, PPH, Heritage, Vonch, East Coast, Benelux, Filosadelfia, MAG Pitt, MAG Enterprises, 2740 Corporation, MAG Entertainment, Oasis, BMC, BDS, DB, T and N, Millennium, Sinrock Alaska, Sinrock Washington, Sinrock Oregon, Sinrock DT, Kimmico, Polmour, Sisyphian, 689 Eatery, Syzygy, Brookhurst, Industry Venture, Farmdale, Expectations, Inland, Kentucky Hospitality, LCM, Midnight, Nitelife, Olympic, Oxnard, Penn Ave, SJ, PNM, Rialto, Rouge, Santa Barbara, Santa Maria, Saries, Worldwide, Consulting, Washington Mgmt, WPB, and K-Kel are collectively referred to herein as "Plaintiffs."

886.    As more specifically alleged above, a number of the Plaintiffs, which were otherwise eligible for Second Draw PPP loans but for the provisions of the Regulation, the SOP, and the Incorporating Statute, had their Second Draw PPP applications specifically denied by the SBA. Because of this, and for the other reasons discussed above, the remaining Plaintiffs reasonably believe that their Second Draw PPP applications will also be denied for the same reasons and/or delayed.

887.    This is not the first time the SBA has been brought to court by entities that present live constitutionally protected female performance dance entertainment presented to the consenting adult public, for denying, delaying, or equivocating on such entities' PPP loan applications and/or the ability of such businesses to obtain loan forgiveness as a result of the Regulation in the SOP.

888.    In three of these such lawsuits, one taking place in the Eastern District of Michigan in an action captioned as <u>DV Diamond Club of Flint, LLC v. United States Small Business Administration</u>, another in this Court captioned as <u>Camelot Banquet Rooms, Inc. v. United States Small Business Administration</u>, and the other

166

in the Southern District of Texas in an action captioned as <u>D. Houston Inc. v. United States Small Bus. Admin.</u>, the plaintiffs in those actions (including, as referenced above, a number of the Plaintiffs here) were successful in obtaining injunctions and/or rulings prohibiting the SBA from utilizing the Regulation and SOP as eligibility criteria for PPP loans. Specifically,

a.      The Eastern District of Michigan's injunction stated: "By 12:00 p.m. Eastern time on Thursday, May 14, 2020, the SBA shall notify the identified lender representatives in writing that (a) the applications by Plaintiffs and Intervenors for PPP loans shall not be denied based on the 'prurient sexual nature' provisions of the Original SBA Ineligibility Rule, the 2019 SOP, and/or the PPP Ineligibility Rule[.]" <u>DV Diamond Club</u>, 459 F. Supp. 3d 943, 965 (E.D. Mich. 2020). The court defined the phrase "Original SBA Ineligibility Rule" as being "codified at 13 C.F.R. § 120.110," <u>id.</u>, at 947, and defined the phrase "PPP Ineligibility Rule" as the SBA's "rule excluding from PPP loan guarantee eligibility a wide range of businesses . . . and sexually oriented businesses that present entertainment or sell products of a 'prurient' (but not unlawful) nature[.]" <u>Id.</u> at 946. The SBA's motion in the Sixth Circuit to stay that injunction was denied. DV <u>Diamond Club of Flint, LLC v. Small Bus. Admin.</u> ("<u>DV Diamond</u>"), 960 F.3d 743 (6th Cir. 2020);

b.      This Court's order stated:

The Administrator of the U.S. Small Business Administration and the Secretary of the Treasury, as well as their employees, agents and representatives, including the SBA's lending banks, are preliminarily enjoined from using 13 C.F.R. § 120.110(p) and the associated SBA Standard Operating Procedure (SOP 50 10 5(K) § III.A.15) in making eligibility determinations for loans under 15 U.S.C. § 636(a)(36). By **Monday, May 4, 2020, at 12:00 p.m.**, the Administrator of the U.S. Small Business Administration and the Secretary of the Treasury shall transmit guarantee authority to the plaintiffs' lenders so that those lenders may finish processing the plaintiffs' applications for PPP loans and immediately fund the loans.

Camelot Banquet Rooms, Inc. v. U.S. Small Business Admin. (sometimes, "Camelot Banquet Case"), 458 F. Supp. 3d 1044, 1065 (E.D. Wis. 2020) (emphasis in original); and

        c.      In the Southern District of Texas, "exotic dance clubs" similar to those of the Plaintiffs here, sought "loans under the Paycheck Protection Program[.]" D. Houston Inc. v. United States Small Bus. Admin., No. CV H-20-2308, 2020 WL 6268528, at *1 (S.D. Tex. Oct. 20, 2020). The D. Houston court, similar to the DV Diamond court and this court, prohibited the SBA from enforcing the Regulation against those plaintiffs as eligibility criteria for PPP loans. Specifically, that court's ruling stated:

> The Court further ORDERS that Defendants notify approved lenders participating in the Paycheck Protection Program to whom Plaintiffs submitted loan applications on or before the August 8, 2020, deadline they are to reevaluate D. Houston, Inc., A.H.D. Houston, Inc., D. WG FM, Inc., D. Cam, LLC, W.L. York, Inc., and Westwood, Inc.'s applications for loans without regard to 13 C.F.R. § 120.110 (p). Notification to the lenders should be made within seven days of the signing of this Order to avoid any delay in processing these loan applications.

D. Houston Inc., 2020 WL 6268528, at *8.

889.    Despite the three court orders referenced in the paragraphs immediately above, the SBA is taking the position that those rulings do not apply to the loan applications at issue in this action, irrespective of the fact that many of the Plaintiffs here were also plaintiffs in the DV Diamond and Camelot Banquet Case and are subject to the protections afforded by those courts, saying that those orders applied only to First Draw PPP loans which are enabled by in Paragraph 36 of 15 U.S.C. § 636(a), whereas Second Draw PPP loans are enabled by Paragraph 37 of 15 U.S.C. § 636(a).

890.    The rulings of the courts in DV Diamond, Camelot Banquet Case, and D. Houston, make no reference as to which chapter or chapters of the SBA enabling

act they apply. Rather, those orders prohibit the Regulation and the SOP being used by the SBA as a basis to deny PPP loans.

891. Nowhere in the Regulation, the SOP, or any other documentation promulgated by the SBA, is there any definition as to what the phrase "prurient sexual nature," as used in the Regulation and SOP, means.

892. In response to the three suits referenced above, the SBA and its Administrator have attempted, when challenged by the various courts, to articulate the meaning of the phrases "prurient sexual nature" or "live performances of a prurient sexual nature" as found in the Regulation and the SOP.

893. In DV Diamond, at an April 30, 2020, hearing, the SBA took the position that "prurient" meant "tending to arouse a 'lustful' or, you know 'lascivious' interest in sex." "The SBA's interpretation of 'prurient,' simply refers to, you know, invoking an avert [*sic*] strong sexual interest." Transcript of Motion for TRO and/or Preliminary Injunction, DV Diamond, 20-cv-10899 (E.D. Mich. Apr. 30, 2020), ECF 54, at 8:18-19; 58:5-6 (excerpt are attached hereto as **Exhibit S** and are hereby incorporated by reference as though fully set forth herein).

894. Also in DV Diamond, at a later hearing, on May 5, 2020, the DV Diamond court noted the SBA had changed its position as it had argued before this Court that the term "prurient" meant "erotic." Transcript of Continued Hearing for Motion for TRO and/or Preliminary Injunction, DV Diamond, 20-cv-10899 (E.D. Mich. May 12, 2020), ECF 55, at 41:18-25 - 42:1-13 (excerpts are attached hereto as **Exhibit T** and are hereby incorporated by reference as though fully set forth herein). In response to the court pointing out this inconsistency and also noting that such operationalization would render the Regulation and SOP unconstitutionally overbroad, the SBA retreated to its previous position that "prurient" means "lascivious or lustful." Id. at 42:14-25 – 43:1-7.

895. In the Camelot Banquet Case, the SBA took the position that:

169

Businesses that feature live dancing explicitly intended to be "erotic" undoubtedly falls within the plain language of the regulation.

\*       \*       \*

The SBA has restricted government-backed small-business loans to businesses engaged in live erotic performances for nearly twenty-five years.

Government Motion for Emergency Stay, Camelot Banquet, 2:20-cv-00601 (E.D. Wis. May 4, 2020), ECF 30, at pp. 4, 8 (excerpts are attached hereto as **Exhibit U** and are hereby incorporated by reference as though fully set forth herein).

896.   The SBA maintained, in its pleadings on appeal from the Camelot Banquet Case to the Seventh Circuit, its position that the term "prurient" as it appears in the Regulation and SOP means "erotic."  For example, the SBA stated:

The SBA's restriction on providing Section 7(a) loans to businesses that present live erotic performances dates back to 1996. *See* 61 Fed. Reg. 3226, 3240 (Jan. 31, 1996) (final rule); 60 Fed. Reg. 64356, 64360 (Dec. 15, 1995) (proposed rule).

\*       \*       \*

Businesses that feature live dancing explicitly intended to be "erotic" undoubtedly fall within the plain language of the regulation.

\*       \*       \*

The SBA has restricted government-backed small-business loans to businesses engaged in live erotic performances for nearly twenty-five years.

Government's Emergency Motion for Stay Pending Appeal, Camelot Banquet Rooms, Inc. v. U.S. Small Business Admin., 20-1729 (7th Cir. May 4, 2020), ECF 4, at p. 4, 13, 17 (excerpts are attached as **Exhibit V** and are hereby incorporated by reference as though fully set forth herein).

897.   In its reply brief in the Seventh Circuit, the SBA took the following position with regard to the meaning of the term "prurient" as used in the Regulation and the SOP:

Plaintiffs' businesses— "Gentlemen's Clubs" which present live nude and semi-nude dance performances that are explicitly intended to be erotic—thus fall within the heart of the regulation's scope.

\*       \*       \*

And although Congress explicitly lifted some of those restrictions in creating the Paycheck Protection Program, Congress did not lift or alter the SBA's longstanding restriction on loans to businesses that present live erotic performances.

\*       \*       \*

The SBA could reasonably determine that, since Congress has expressly barred it from providing financial assistance to businesses that provide "obscene" products and services, the agency's limited resources are best directed to subsidizing businesses other than those that, although not "obscene" in the legal sense, are nonetheless "sexually oriented" and explicitly intended to be erotic.

Government's Reply In Support of Its Motion for Stay Pending Appeal, Camelot Banquet Rooms, Inc. v. U.S. Small Business Admin., 20-1729 (7th Cir. May 11, 2020), ECF 14, at pp. 5, 7, 8 (excerpts are attached as **Exhibit W** and are hereby incorporated by reference as though fully set forth herein).

898. In D. Houston, at the September 11, 2020, Preliminary Injunction Hearing, the SBA specifically acknowledged, for the first time in these lawsuits, that the term "prurient" is in fact vague:

THE COURT: Who's to determine what's a prurient interest? You know, there's the famous, what is it, Potter Stewart opinion, you know, the pornography opinion that came out, what, in the '50s? I think Stewart was on the Court at that time. He said he can't define it but he knows it when he sees it? Are we in an area like that?

MR. KINCHELOE [Assistant United States Attorney; Attorney for the SBA]: It's vague, your Honor.

Transcript of Preliminary Injunction Hearing, D. Houston, 4:20-cv-02308 (S.D. Tex. Sept. 11, 2020), ECF 27, at pp. 29:23-25 – 30:1-4 (clarification added) (excerpts are attached as **Exhibit X** and are hereby incorporated by reference as though fully set forth herein).

899. The SBA is arbitrarily applying the Regulation, the SOP, and/or the Incorporating Statute to prohibit some adult entertainment establishments from receiving Second Draw PPP loans, when those same establishments received First Draw PPP loans.

900. Placing some Plaintiffs' Second Draw PPP applications on "hold" or other similar status, or denying other Plaintiffs' Second Draw PPP applications, constitutes a final agency action for which there is no other adequate remedy in court.

901. Plaintiffs do not here identify, respectfully, the identities of the lending banks at issue because of legitimate concerns that if they do so their relationships with such financial institutions (which they use, and which are needed for, critical banking requirements of the businesses, such as maintaining depository accounts, acting as merchant accounts for debit and credit card transactions, issuing checks for the payment of payroll and other business expenses, etc.) may be irrevocably severed. Part of these concerns involve pressure that the SBA may place on such lending banks as a result of their relationship with these Plaintiffs. For example, and only by way of illustration, the Department of Justice ("DOJ") and the Treasury Department have a long-established antipathy towards businesses of Plaintiffs' kind exemplified by their adoption and application of a program known as "Operation Chokepoint" to many "adult" businesses. Through Operation Chokepoint, which purportedly was created as a way to address money laundering in "cash" businesses, the DOJ and the Treasury Department have intentionally pressured banks to terminate, with little to no notice, all of their accounts with "adult" businesses just because they are of an "adult" nature, even though such accounts may have existed for years and even decades without any evidence whatsoever, or even allegations, of any forms of money laundering having occurred. The termination of such accounts (including payroll accounts) as a result of Operation Chokepoint, again with little to no warning, has occurred to many of the Plaintiffs here, leaving them unable to operate their

172

businesses and requiring them to scurry to find alternative banking sources (which, as a result of the pressure brought by the DOJ and the Treasury Department, are becoming extremely scarce to "adult" businesses such as these Plaintiffs). If required to do so by this Court, Plaintiffs will disclose the identities of the banks where they applied for Second Draw PPP loans for in camera review.

902. Pursuant to the CARES Act and the 2021 Appropriations Act, if loan proceeds are used for specific purposes, the loan can ultimately be forgiven by the SBA. The purpose of such loan forgiveness is to assist small businesses in being able to financially weather the significant drop in trade and income that is presumed to result from the lasting impact of the Pandemic, even when the economy more fully "reopens," and to provide necessary funding for PPE and COVID-related repairs and/or upgrades to keep employees, other workers, and patrons safe from the effects of Covid-19.

903. As a result of the experiences of many of the Plaintiffs in the earlier First Draw PPP lawsuits referenced above, the Plaintiffs understand that the SBA has, in some instances where "adult" businesses have received PPP loans, indicated that it would later apply the Regulation and the SOP as grounds to decline loan forgiveness. Like all other affected businesses, the Plaintiffs need loan forgiveness in order to be able to financially survive the continuing impact of the Pandemic even as the economy begins to "reopen," albeit in a limited capacity. As a result, Plaintiffs require relief from this Honorable Court prohibiting the SBA from applying the Regulation, the SOP, and the Incorporating Statute to Second Draw PPP loan forgiveness.

904. By denying Plaintiffs access to the Second Draw PPP benefits, the SBA is preventing Plaintiffs from receiving monies that can be used to, among other things: Pay wages and other benefits to their employees; a rent to landlord's; pay interest to mortgage holders; pay utility bills; purchase PPE; facilitate the adaption

173

of their businesses to comply with local, state, and federal Pandemic-related health orders; upgrade their facilities' filtration systems; and install physical barriers to reduce COVID transmission—thus, placing Plaintiffs, their employees, the entertainers who perform on their premises, and their patrons at greater risk to COVID-19 than those entities which the SBA is not denying benefits under the Second draw PPP.

905. Upon information and belief, the SBA has determined Plaintiffs' businesses present live performances of a prurient sexual nature without having ever visited Plaintiffs' establishments or viewed the live performances at Plaintiffs' establishments. Plaintiffs do not present live performances of a prurient sexual nature on their premises. All of the performances on Plaintiffs' premises appeal to normal, healthy, sexual desires.

906. A national Preliminary and Permanent Injunction enjoining the Defendants from utilizing the Regulation, the SOP, and/or the Incorporating Statute as eligibility criteria for PPP, Second Draw PPP, and any future form of the Paycheck Protection Program because it remains unknown how much longer this Pandemic will last and if Congress will refund the PPP, the Second Draw PPP, or some type of future PPP. Given their purposes, Plaintiffs should not have to continue to litigate to have access to these Pandemic-related benefit programs; especially, considering NAICS 72 businesses have been some of the most hard-hit businesses in the nation by the Pandemic and in the absence of a national injunction, Plaintiffs may lack the funds to continue to litigate to receive the benefits available to them under these programs.

907. As set forth more fully below, the Regulation, the SOP, and the Incorporating Statute are invalid and unenforceable for numerous and various reasons under administrative law and the First and Fifth Amendments to the United States Constitution. The Defendants' position that the Regulation, the SOP, and the Incorporating Statute are valid and may be enforced against these Plaintiffs here for

174

Second Draw PPP loans is not substantially justified; thereby entitling the Plaintiffs to an award of attorney fees pursuant to 28 USC § 2412.

**COUNT I**

**THE REGULATION, SOP, AND INCORPORATING STATUTE VIOLATE THE FIRST AMENDMENT**

908.    In raising their First Amendment challenges to the Regulation, the SOP, and the Incorporating Statute here, Plaintiffs assert not only their own rights but also the rights of their owners and employees, the entertainers who perform on their premises, and the customers who have in the past frequented, and intend in the future to frequent, Plaintiffs' premises in order to be able to observe First Amendment protected entertainment and otherwise engage in First Amendment-protected activities.

909.    The Regulation, the SOP, and the Incorporating Statute violate, and are contrary to, the First Amendment to the United States Constitution, both on their face and as applied by the SBA to Plaintiffs, for numerous and various reasons including but not limited to the fact that:

    a.    They are impermissible viewpoint-based restrictions on speech and expression that are not necessary to any compelling governmental interest and are not sufficiently narrowly tailored;

    b.    They are impermissible content-based restrictions on speech and expression that are not necessary to any compelling governmental interest and are not sufficiently narrowly tailored;

    c.    They invidiously and impermissibly discriminate against disfavored speech and expression;

    d.    They violate, as applied to the First Amendment, the doctrine of unconstitutional conditions by conditioning the receipt of Second Draw PPP loans upon the discontinuance of entertainment that the SBA opines,

175

determines, or assumes without any analysis whatsoever, to be of a "prurient sexual nature" (whatever that may mean);

      e.     They effectuate, in order to obtain second draw PPP loans, an impermissible prior restraint on speech and expression;

      f.     Even if deemed to be content-neutral (which they cannot under any existing precedent), they do not further any permissible and important governmental interest;

      g.     They fail to conform to the constitutional standards regarding obscenity;

      h.     They impermissibly single out, and are being applied to single out, First Amendment-protected businesses for denial of Second Draw PPP benefits without justification;

      i.     They are unconstitutionally vague on their face and as applied, under the enhanced vagueness standards applied to laws that impact upon speech and expression; and

      j.     They are impermissibly and substantially overbroad in relation to their plain legitimate sweep.

910.    As a direct and proximate result of the unconstitutional aspects of the Regulation, the SOP, and the Incorporating Statute, as well as the Defendants', and their delegates', application of them against Plaintiffs and Plaintiffs' interests, all as referenced above, Plaintiffs, as well as their owners and employees, the entertainers who perform on Plaintiffs' premises and the customers who frequent their establishments, have suffered and will continue to suffer irreparable injuries, including but not limited to financial ruin, business ruination, and the inability to present, view, and/or engage in First Amendment-protected speech, expression, and entertainment.

176

911. Because of the First Amendment rights being infringed upon by Defendants' application of the Regulation, the SOP, and the Incorporating Statute, all as referenced above, this Court has the authority to declare the rights and the legality of actions of the various parties and should do so here.

912. Plaintiffs do not have adequate remedies at law because, among other reasons, they cannot recover damages against the Defendants as a result of governmental immunity. In addition, Plaintiffs have a reasonable likelihood of success on the merits in regard to their claims asserted herein. Consequently, and because of the irreparable harm that is being suffered by these Plaintiffs, and which will continue to be suffered by these Plaintiffs if this Court does not grant preliminary relief, Plaintiffs are entitled to a preliminary injunction in order to protect their fundamental rights at issue here.

913. For the reasons set forth above, Plaintiffs are entitled to judicial review with regard to the actions and inactions of the Defendants pursuant to 5 U.S.C. § 702.

## COUNT II

### THE REGULATION, SOP, AND INCORPORATING STATUTE VIOLATE THE FIFTH AMENDMENT

914. Plaintiffs incorporate herein by reference each and every paragraph above as though fully set forth herein.

915. The Regulation, the SOP, and the Incorporating Statute violate, and are contrary to, the Fifth Amendment to the United States Constitution, both on their face and as applied by the SBA to Plaintiffs, for numerous and various reasons including but not limited to the fact that:

    a.    They treat establishments presenting certain forms of live performance dance entertainment, such as Plaintiffs, differently from establishments presenting other forms of entertainment or no entertainment at all, for no compelling, important, or rational reason;

177

b.      They treat workers at establishments presenting certain forms of live performance dance entertainment, such as Plaintiffs, unequally and differently from workers at establishments presenting other forms of entertainment or no entertainment at all, for no compelling, important, or rational reason;

c.      They violate the occupational liberty rights of the Plaintiffs, their employees, and the entertainers who perform on their premises;

d.      They violate the substantive and procedural Due Process rights of the Plaintiffs, their employees, and the entertainers who perform on their premises;

e.      They treat, have been used to treat, and could continue to treat in the future, similarly situated persons and businesses differently without justification;

f.      They treat First Amendment-protected businesses differently by, for example, waiving the exclusion from eligibility to the Second Draw PPP for faith-based organizations and certain lobbying organizations, while denying Plaintiffs access to the Second Draw PPP benefits;

g.      There being arbitrarily applied by the Defendants; and

h.      They are impermissibly vague on their face and as applied to these Plaintiffs.

916.    As a direct and proximate result of the unconstitutional aspects of the Regulation, the SOP, and the Incorporating Statute, as well as the Defendants', and their delegates', application of them against Plaintiffs and Plaintiffs' interests, all as referenced above, Plaintiffs, as well as their owners and employees, the entertainers who perform on Plaintiffs' premises and the customers who frequent their establishments, have suffered and will continue to suffer irreparable injuries, including but not limited to financial ruin, business ruination, and the inability to

178

present, view, and/or engage in First Amendment-protected speech, expression, and entertainment.

917.    Because of the Fifth Amendment rights being infringed upon by Defendants' application of the Regulation, the SOP, and the Incorporating Statute, all as referenced above, this Court has the authority to declare the rights and the legality of actions of the various parties and should do so here.

918.    Plaintiffs do not have adequate remedies at law because, among other reasons, they cannot recover damages against the Defendants as a result of governmental immunity. In addition, Plaintiffs have a reasonable likelihood of success on the merits in regard to their claims asserted herein. Consequently, and because of the irreparable harm that is being suffered by these Plaintiffs, and which will continue to be suffered by these Plaintiffs if this Court does not grant preliminary relief, Plaintiffs are entitled to a preliminary injunction in order to protect their fundamental rights at issue here.

919.    For the reasons set forth above, Plaintiffs are entitled to judicial review with regard to the actions and inactions of the Defendants pursuant to 5 U.S.C. § 702.

## COUNT III

## THE SBA'S INTERPRETATION(S) OF THE REGULATION, THE SOP, AND THE INCORPORATING STATUTE ARE INVALID

920.    Plaintiffs incorporate herein by reference each and every paragraph above as though fully set forth herein.

921.    The SBA or its Administrator's defining of "prurient" as "lustful," "lascivious," and/or "erotic" is not a legitimate or lawful exercise of the SBA's or its Administrator's authority, and is otherwise invalid under the Administrative Procedures Act, 5 U.S.C. § 551 *et seq.* and applicable law because, among other reasons:

179

a.     As applied, the SBA's construction of the term "prurient" is inconsistent with its enabling act and the legal definition of "prurient" as articulated by the United States Supreme Court;

b.     As applied, the SBA's construction of the term "prurient" is not a reasonable interpretation of the term;

c.     As applied, the SBA's construction of the term "prurient" is arbitrary, capricious, an abuse of discretion in light of, and is directly contrary to, the SBA's enabling act, and in particular 15 U.S.C. § 633(e);

d.     As applied, the SBA's construction of the term "prurient" would render 15 U.S.C. § 633(e) of the SBA's enabling act meaningless and of no effect;

e.     As applied, the SBA's construction of the term "prurient" is not supported by the Regulation's findings because in promulgating the Regulation the SBA specifically acknowledged the <u>Miller v. California</u>, 413 U.S. 15 (1983) test of obscenity, with which the Regulation does not comply;

f.     As applied, the SBA's construction of the term "prurient" is not supported by current constitutional standards of obscenity which, as articulated by the United States Supreme Court, defines and operationalizes "prurient" as a "shameful or morbid" and "unhealthy" interest in sex, as opposed to "normal, healthy sexual desires";

g.     As applied, the SBA's construction of the term "prurient" is not supported by current constitutional standards of obscenity which, as articulated by the United States Supreme Court, rejects "lustful" as satisfying the constitutional standard for prurient appeal; and

h.     The SBA's construction of the term "prurient" is inconsistent with Congress's goals under the CARES Act and the 2021 Appropriations Act.

922. Because the Regulation, the SOP, and the Incorporating Statute, are inconsistent with the SBA enabling act, as well as the broad form of relief provided by the CARES Act and the 2021 Appropriations Act, all as referenced above, this Court has the authority to declare the rights and the legality of actions of the various parties and should do so here.

923. Plaintiffs do not have adequate remedies at law because, among other reasons, they cannot recover damages against the Defendants as a result of governmental immunity. In addition, Plaintiffs have a reasonable likelihood of success on the merits in regard to their claims asserted herein. Consequently, and because of the irreparable harm that is being suffered by these Plaintiffs, and which will continue to be suffered by these Plaintiffs if this Court does not grant preliminary relief, Plaintiffs are entitled to a preliminary injunction in order to protect their fundamental rights at issue here and enjoin the improper and unlawful actions of the Defendants here.

924. For the reasons set forth above, Plaintiffs are entitled to judicial review with regard to the actions and inactions of the Defendants pursuant to 5 U.S.C. § 702.

**COUNT IV**

**OTHER INVALIDITY OF THE REGULATION**

925. Plaintiffs incorporate herein by reference each and every paragraph above as though fully set forth herein.

926. The Regulation is not a legitimate or lawful exercise of the SBA's or its Administrator's rulemaking authority as applied to the Second Draw PPP, and is otherwise invalid under the Administrative Procedure, 5 U.S.C. § 551 *et seq.* and applicable law because, among other reasons:

    a.    It fails to serve any lawful or legitimate regulatory purpose for the SBA or its Administrator as to the Second Draw PPP or otherwise;

181

b. The SBA and/or its Administrator failed to make a sufficient record or to otherwise articulate a satisfactory explanation as to why the Regulation is a rational or reasonable response to a problem that the agency was charged with solving under the CARES Act, the 2021 Appropriations Act, and in particular the Second Draw PPP; and

c. The SBA and/or its Administrator failed to make a sufficient record or otherwise examine relevant data to establish that the Regulation is a rational or reasonable response to a problem that the agency was charged with solving.

927. Because the Regulation, the SOP, and the Incorporating Statute, are inconsistent with the SBA enabling act, as well as the broad form of relief provided by the CARES Act and the 2021 Appropriations Act, all as referenced above, and because they do not represent a rational and reasonable response to a problem that the agency was charged with solving, this Court has the authority to declare the rights and the legality of actions of the various parties and should do so here.

928. Plaintiffs do not have adequate remedies at law because, among other reasons, they cannot recover damages against the Defendants as a result of governmental immunity. In addition, Plaintiffs have a reasonable likelihood of success on the merits in regard to their claims asserted herein. Consequently, and because of the irreparable harm that is being suffered by these Plaintiffs, and which will continue to be suffered by these Plaintiffs if this Court does not grant preliminary relief, Plaintiffs are entitled to a preliminary injunction in order to protect their fundamental rights at issue here.

929. For the reasons set forth above, Plaintiffs are entitled to judicial review with regard to the actions and inactions of the Defendants pursuant to 5 U.S.C. § 702.

## **PRAYER FOR RELIEF**

A. Issue orders granting a national Preliminary and Permanent Injunction enjoining the Defendants, as well as their employees, agents, and representatives, including the SBA's lending banks, from enforcing or utilizing in any fashion or manner whatsoever, 13 C.F.R. § 120.110(p), SBA SOP 50 10 5(K), Ch. 2 (III)(15), and 15 U.S.C. § 636(37)(A)(iv)(III)(aa), in regard to loan applications and/or applications for loan forgiveness made pursuant to the Paycheck Protection Program Second Draw Loan program of the Consolidated Appropriations Act, 2021. As part of these orders, Plaintiffs further request this Honorable Court to:

1) Order Defendants, as well as their employees, agents, and representatives, to notify, as expeditiously as possible, all SBA lending banks to immediately discontinue utilizing 13 C.F.R. § 120.110(p), SBA SOP 50 10 5(K), Ch. 2(III)(A)(15), and/or 15 U.S.C. § 636(37)(A)(iv)(III)(aa) in their Second Draw Paycheck Protection Program loan applications and in applications for loan forgiveness, and as criteria for determining Second Draw Paycheck Protection Program loan application eligibility and loan forgiveness, and to fully process all Second Draw Paycheck Protection Program loan applications and loan forgiveness applications without reference to such regulations, procedures and statutes; and

2) Order the Defendants, as well as their employees, agents, and representatives, including their lending banks, to grant Plaintiffs' Second Draw Paycheck Protection Program loan applications and loan forgiveness applications if they otherwise qualify for such loans and loan forgiveness but for the provisions of 13 C.F.R. § 120.110(p), SBA SOP 50 10 5(K), Ch. 2(III)(A)(15), and/or 15 U.S.C. § 636(37)(A)(iv)(III)(aa);

B. Enter an award of attorneys' fees and costs against the Defendants and in favor of the Plaintiffs pursuant to 28 U.S.C. § 2412 and otherwise; and

183

C.    Enter such other and further relief as this Court may find to be just and proper in these circumstances.

Dated: April 7, 2021                        Respectfully submitted,

    */s/ Jeff Scott Olson*                    */s/ Bradley J. Shafer*
Jeff Scott Olson (WI 1016284)           BRADLEY J. SHAFER (MI P36604)**
**THE JEFF SCOTT OLSON**            Brad@BradShaferLaw.com
**LAW FIRM, S.C.**                       ZACHARY M. YOUNGSMA (MI
131 West Wilson St., Ste. 1200         P84148)**
Madison, WI 53703                   Zack@BradShaferLaw.com
T: 608-283-6001                    **SHAFER & ASSOCIATES, P.C.**
F: 608-283-0945                    3800 Capital City Boulevard, Suite 2
                                  Lansing, Michigan 48906
                                  T: 517-886-6560
                                  F: 517-886-6565

*Local Counsel for All Plaintiffs*       *Attorneys for All Plaintiffs*

                  */s/ Jennifer M. Kinsley*
                  Jennifer M. Kinsley (OH 71629)**
                  **KINSLEY LAW OFFICE**
                  P.O. Box 19478
                  Cincinnati, OH 45219
                  T: 513-708-2595
                  kinsleylawoffice@gmail.com

                  *Co-Counsel for 689 Eatery Corp.*

                  Peter E. Garrell (CA 155177)**
                  **FORTIS, LLP**
                  650 Town Ctr. Dr., Ste. 1530
                  Costa Mesa, CA 92626
                  T: 714-839-3800
                  F: 714-795-2995
                  pgarrell@fortislaw.com

*Co-Counsel for Brookhurst Venture, LLC; City of Industry Hospitality Venture, Inc.; Farmdale Hospitality Services, Inc.; High Expectations Hospitality, LLC; Inland Restaurant Venture I, Inc.; Kentucky Hospitality Venture, LLC; L.C.M., LLC; Midnight Sun Enterprises, Inc.; Nitelife, Inc.; Olympic Ave Venture, Inc.; The Oxnard Hospitality Services, Inc.; Penn Ave Hospitality, LLC; Platinum SJ Enterprise; PNM Enterprises, Inc.; Rialto Pockets, Inc.; Rouge Gentlemen's Club, Inc.; Santa Barbra Hospitality Services, Inc.; Santa Maria Restaurant Enterprises, Inc.; Saries Lounge, LLC; Spearmint Rhino Companies Worldwide, Inc.; Spearmint Rhino Consulting Worldwide, Inc.; Washington Management, LLC; W.P.B. Hospitality, LLC; and K-Kel, Inc.*

*Admission Request Forthcoming

<b>VERIFICATION OF COMPLAINT AS TO:<br>
Camelot Banquet Rooms, Inc.; Downtown Juneau Investments, LLC;<br>
Midrad, LLC; and PPH Properties I, LLC</b>

1.      I, Joe Modl, am an officer of Camelot Banquet Rooms, Inc. I am a Managing Member of Downtown Juneau Investments, LLC; Midrad, LLC; and PPH Properties I, LLC.

2.      I make this verification upon my personal knowledge, unless specifically stated to the contrary.

3.      I have reviewed the foregoing *PLAINTIFFS' VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF* (the "Complaint") in its entirety.

4.      The factual statements in the Complaint, as they pertain to Camelot Banquet Rooms, Inc.; Downtown Juneau Investments, LLC; Midrad, LLC; and PPH Properties I, LLC, are true and accurate to the best of my information, knowledge and belief.

5.      Except, any matters stated to be upon "information and belief," I verily believe to be true.

**I VERIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on: Apr. 2, 2021          */s/ Joe Modl*
                                   By:    Joe Modl

## VERIFICATION OF COMPLAINT AS TO:
## Heritage Management Services, Inc.

1.     I, David Sovey, am the Director of Operations of Heritage Management Services, Inc.

2.     I make this verification upon my personal knowledge, unless specifically stated to the contrary.

3.     I have reviewed the foregoing *PLAINTIFFS' VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF* (the "Complaint") in its entirety.

4.     The factual statements in the Complaint, as they pertain to Heritage Management Services, Inc., are true and accurate to the best of my information, knowledge and belief.

5.     Except, any matters stated to be upon "information and belief," I verily believe to be true.

**I VERIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on: April 2, 2021                          */s/ David Sovey*
                                                    By:    David Sovey

## VERIFICATION OF COMPLAINT AS TO:
## Vonch, LLC

1.     I, Stephen H. Dabrowski, am the Managing Member of Vonch, LLC.

2.     I make this verification upon my personal knowledge, unless specifically stated to the contrary.

3.     I have reviewed the foregoing *PLAINTIFFS' VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF* (the "Complaint") in its entirety.

4.     The factual statements in the Complaint, as they pertain to Vonch LLC, are true and accurate to the best of my information, knowledge and belief.

5.     Except, any matters stated to be upon "information and belief," I verily believe to be true.

6.     To be clear, I note that Vonch, LLC is the holder of the liquor license and sole member of Polekatz Gentlemen's Club, LLC, which directly operates the club. Because Vonch, LLC applied for both the PPP and Second Draw PPP, it is believed that Vonch, LLC is the proper Plaintiff in this suit.

**I VERIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on: Apr. 5, 2021              */s/ Stephen H. Dabrowski*
                                       By:     Stephen H. Dabrowski

## VERIFICATION OF COMPLAINT AS TO:
## East Coast Restaurant & Nightclubs, LLC

1. I, Matthew Rose, am an authorized member of East Coast Restaurant & Nightclubs, LLC.

2. I make this verification upon my personal knowledge, unless specifically stated to the contrary.

3. I have reviewed the foregoing *PLAINTIFFS' VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF* (the "Complaint") in its entirety.

4. The factual statements in the Complaint, as they pertain to East Coast Restaurant & Nightclubs, LLC, are true and accurate to the best of my information, knowledge and belief.

5. Except, any matters stated to be upon "information and belief," I verily believe to be true.

**I VERIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on: Apr. 5, 2021          */s/ Matthew Rose*
                                   By:    Matthew Rose

## VERIFICATION OF COMPLAINT AS TO:
### Benelux Corporation

1.     I, Athanases Stamatopoulos, am the President of Benelux Corporation.

2.     I make this verification upon my personal knowledge, unless specifically stated to the contrary.

3.     I have reviewed the foregoing *PLAINTIFFS' VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF* (the "Complaint") in its entirety.

4.     The factual statements in the Complaint, as they pertain to Benelux Corporation, are true and accurate to the best of my information, knowledge and belief.

5.     Except, any matters stated to be upon "information and belief," I verily believe to be true.

**I VERIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on: April 2, 2021                    */s/ Anthanases Stamatopoulos*
                                     By:     Anthanases Stamatopoulos

## VERIFICATION OF COMPLAINT AS TO:
## Filosadelfia, LLC

1.      I, Konstantine Drakopoulos, am an authorized member of Filosadelfia, LLC.

2.      I make this verification upon my personal knowledge, unless specifically stated to the contrary.

3.      I have reviewed the foregoing *PLAINTIFFS' VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF* (the "Complaint") in its entirety.

4.      The factual statements in the Complaint, as they pertain to Filosadelfia, LLC, are true and accurate to the best of my information, knowledge and belief.

5.      Except, any matters stated to be upon "information and belief," I verily believe to be true.

**I VERIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on: April 2, 2021          *    /s/ Konstantine Drakopoulos    *
                                                     By:      Konstantine Drakopoulos

**VERIFICATION OF COMPLAINT AS TO:**
**MAG Pitt LP; MAG Enterprises Inc.; 2740 Corporation; MAG**
**Entertainment LLC; and Oasis On Essington LLC**

1.     I, John Meehan, am the President, Manager, or authorized Partner, as appropriate, of MAG Pitt LP; MAG Enterprises Inc.; 2740 Corporation; MAG Entertainment LLC; and Oasis On Essington LLC.

2.     I make this verification upon my personal knowledge, unless specifically stated to the contrary.

3.     I have reviewed the foregoing *PLAINTIFFS' VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF* (the "Complaint") in its entirety.

4.     The factual statements in the Complaint, as they pertain to MAG Pitt LP; MAG Enterprises Inc.; 2740 Corporation; MAG Entertainment LLC; and Oasis On Essington LLC, are true and accurate to the best of my information, knowledge and belief.

5.     Except, any matters stated to be upon "information and belief," I verily believe to be true.

**I VERIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on: Apr. 2, 2021          /s/     *John Meehan*
                                             By:     John Meehan

## VERIFICATION OF COMPLAINT AS TO:
## Burch Management Company, Inc.; BDS Restaurant, Inc.; DB Entertainment, Inc.; T and N Inc.; and Millennium Restaurants Group, Inc.

1.     I, Steve Craft, am the President of Burch Management Company, Inc.; BDS Restaurant, Inc.; DB Entertainment, Inc.; T and N Inc.; and Millennium Restaurants Group, Inc.

2.     I make this verification upon my personal knowledge, unless specifically stated to the contrary.

3.     I have reviewed the foregoing *PLAINTIFFS' VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF* (the "Complaint") in its entirety.

4.     The factual statements in the Complaint, as they pertain to Burch Management Company, Inc.; BDS Restaurant, Inc.; DB Entertainment, Inc.; T and N Inc.; and Millennium Restaurants Group, Inc., are true and accurate to the best of my information, knowledge and belief.

5.     Except, any matters stated to be upon "information and belief," I verily believe to be true.

**I VERIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on: Apr. 4, 2021

*/s/ Steve Craft*
By:    Steve Craft

**VERIFICATION OF COMPLAINT AS TO:**
**Club Sinrock, LLC (Alaska); Club Sinrock, LLC (Washington); Club Sinrock, LLC (Oregon); and Club Sinrock DT, LLC**

1.     I, Tim Lyons, am the Managing Member of Club Sinrock, LLC (Alaska); Club Sinrock, LLC (Washington); Club Sinrock, LLC (Oregon); and Club Sinrock DT, LLC.

2.     I make this verification upon my personal knowledge, unless specifically stated to the contrary.

3.     I have reviewed the foregoing *PLAINTIFFS' VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF* (the "Complaint") in its entirety.

4.     The factual statements in the Complaint, as they pertain to Club Sinrock, LLC (Alaska); Club Sinrock, LLC (Washington); Club Sinrock, LLC (Oregon); and Club Sinrock DT, LLC, are true and accurate to the best of my information, knowledge and belief.

5.     Except, any matters stated to be upon "information and belief," I verily believe to be true.

**I VERIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on: Apr. 3, 2021          */s/ Tim Lyons*
                                   By:     Tim Lyons

## VERIFICATION OF COMPLAINT AS TO:
### Kimmico, Inc.

1.      I, Calvin Brockdorff, am the President of Kimmico, Inc.

2.      I make this verification upon my personal knowledge, unless specifically stated to the contrary.

3.      I have reviewed the foregoing *PLAINTIFFS' VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF* (the "Complaint") in its entirety.

4.      The factual statements in the Complaint, as they pertain to Kimmico, Inc., are true and accurate to the best of my information, knowledge and belief.

5.      Except, any matters stated to be upon "information and belief," I verily believe to be true.

**I VERIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on: Apr. 4, 2021                    */s/ Calvin Brockdorff*
                                        By:    Calvin Brockdorff

**VERIFICATION OF COMPLAINT AS TO:**
**Polmour, Inc.**

1.    I, Lampros Moumouris, am the President of Polmour, Inc.

2.    I make this verification upon my personal knowledge, unless specifically stated to the contrary.

3.    I have reviewed the foregoing *PLAINTIFFS' VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF* (the "Complaint") in its entirety.

4.    The factual statements in the Complaint, as they pertain to Polmour, Inc., are true and accurate to the best of my information, knowledge and belief.

5.    Except, any matters stated to be upon "information and belief," I verily believe to be true.

**I VERIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on: Apr. 6, 2021          */s/ Lampros Moumouris*
                                   By:    Lampros Moumouris

## VERIFICATION OF COMPLAINT AS TO:
## Sisyphian, LLC and Syzygy, LLC

1.     I, Bradley Barnes, am the Managing Member of Sisyphian, LLC and Syzygy, LLC.

2.     I make this verification upon my personal knowledge, unless specifically stated to the contrary.

3.     I have reviewed the foregoing *PLAINTIFFS' VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF* (the "Complaint") in its entirety.

4.     The factual statements in the Complaint, as they pertain to Sisyphian, LLC and Syzygy, LLC, are true and accurate to the best of my information, knowledge and belief.

5.     Except, any matters stated to be upon "information and belief," I verily believe to be true.

**I VERIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on: Apr. 3, 2021                    */s/ Bradley Barnes*
                                        By:    Bradley Barnes

**VERIFICATION OF COMPLAINT AS TO:**

**Brookhurst Venture, LLC; City of Industry Hospitality Venture, Inc.; Farmdale Hospitality Services, Inc.; High Expectations Hospitality, LLC; Inland Restaurant Venture I, Inc.; Kentucky Hospitality Venture, LLC; L.C.M., LLC; Midnight Sun Enterprises, Inc.; Nitelife, Inc.; Olympic Ave Venture, Inc.; The Oxnard Hospitality Services, Inc.; Penn Ave Hospitality, LLC; Platinum SJ Enterprise; PNM Enterprises, Inc.; Rialto Pockets, Inc.; Rouge Gentlemen's Club, Inc.; Santa Barbra Hospitality Services, Inc.; Santa Maria Restaurant Enterprises, Inc.; Saries Lounge, LLC; Spearmint Rhino Companies Worldwide, Inc.; Spearmint Rhino Consulting Worldwide, Inc.; Washington Management, LLC; and W.P.B. Hospitality, LLC**

1.     I, Kathy Vercher, am the President or Manager, as appropriate, of Brookhurst Venture, LLC; City of Industry Hospitality Venture, Inc.; Farmdale Hospitality Services, Inc.; High Expectations Hospitality, LLC; Inland Restaurant Venture I, Inc.; Kentucky Hospitality Venture, LLC; L.C.M., LLC; Midnight Sun Enterprises, Inc.; Nitelife, Inc.; Olympic Ave Venture, Inc.; The Oxnard Hospitality Services, Inc.; Penn Ave Hospitality, LLC; Platinum SJ Enterprise; PNM Enterprises, Inc.; Rialto Pockets, Inc.; Rouge Gentlemen's Club, Inc.; Santa Barbra Hospitality Services, Inc.; Santa Maria Restaurant Enterprises, Inc.; Saries Lounge, LLC; Spearmint Rhino Companies Worldwide, Inc.; Spearmint Rhino Consulting Worldwide, Inc.; Washington Management, LLC; and W.P.B. Hospitality, LLC (collectively, the "Listed Entities").

2.     I make this verification upon my personal knowledge, unless specifically stated to the contrary.

3.     I have reviewed the foregoing *PLAINTIFFS' VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF* (the "Complaint") in its entirety.

4.     The factual statements in the Complaint, as they pertain to the Listed Entities, are true and accurate to the best of my information, knowledge and belief.

\\

\\

\\

5.      Except, any matters stated to be upon "information and belief," I verily

believe to be true.

**I VERIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on: Apr. 5, 2021          */s/ Kathy Vercher*
                                   By:    Kathy Vercher

## VERIFICATION OF COMPLAINT AS TO:
## K-Kel, Inc.

1.    I, Kevin M. Kelly, am the President of K-Kel, Inc.

2.    I make this verification upon my personal knowledge, unless specifically stated to the contrary.

3.    I have reviewed the foregoing *PLAINTIFFS' VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF* (the "Complaint") in its entirety.

4.    The factual statements in the Complaint, as they pertain to K-Kel, Inc., are true and accurate to the best of my information, knowledge and belief.

5.    Except, any matters stated to be upon "information and belief," I verily believe to be true.

**I VERIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on: Apr. 5, 2021          */s/ Kevin M. Kelly*
                           By:    Kevin M. Kelly