# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

**CAMELOT BANQUET ROOMS,**
**INC., et al.,**
        **Plaintiffs,**

     **v.**                            **Case No. 21-C-0447**

**UNITED STATES SMALL BUSINESS**
**ADMINISTRATION, et al.,**
        **Defendants.**

_____

## DECISION AND ORDER

I am asked to revisit the question of whether the U.S. Small Business Administration ("SBA") may exclude strip clubs from the Paycheck Protection Program ("PPP"), a small-business loan program that Congress enacted as part of its response to the COVID-19 pandemic. In a previous case, *see Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.*, 458 F. Supp. 3d 1044 (E.D. Wis. 2020), I granted a preliminary injunction to five Wisconsin strip clubs that the SBA had deemed ineligible for PPP loans based on a decades-old regulation that denied eligibility to businesses that "[p]resent live performances of a prurient sexual nature." 13 C.F.R. § 120.110(p). I reasoned that Congress had not authorized the SBA to apply this regulation to the PPP and that, even if it had, denying the plaintiffs access to the PPP because they offered a form of entertainment protected by the First Amendment would be unconstitutional. After I issued the injunction, the *Camelot* plaintiffs received loans under the PPP on the same terms as other eligible small businesses.

In the present case, forty-nine entities that operate strip clubs (plus three entities that provide support services to strip clubs) join as plaintiffs to prevent the SBA from

applying the regulation to their applications for "second draw" PPP loans. Under legislation that Congress passed since I issued the preliminary injunction in *Camelot Banquet*, second-draw PPP loans are available to small businesses that received loans under the original PPP. *See* 15 U.S.C. § 636(a)(37). Each plaintiff in this case received an original PPP loan and applied for a second-draw loan. Based on an initial review of the plaintiffs' business activities, the SBA determined that none of them are eligible for second-draw loans because they present live performances of a prurient sexual nature. After learning of the SBA's position regarding second-draw loans, the plaintiffs commenced this action and filed a motion for a preliminary injunction to prevent the SBA from using the regulation to deny their applications for second-draw loans. I address the motion in this order.

## I. BACKGROUND

All fifty-two plaintiffs are participants in the adult entertainment industry. Forty-nine of them operate night clubs that could fairly be described as strip clubs, and the remaining three offer support services to such clubs. Each club presents live dance entertainment that the plaintiffs describe using one or more of the following terms: "scantily clad," "topless," "fully nude," "fully clothed (in the form of pasties)," "fully clothed (bikini)." *See* Compl. ¶¶ 112–884. The plaintiffs allege that all the dance entertainment at their clubs, although intended to be sexually arousing, "appeals to normal, healthy sexual desires." *See, e.g., id.* ¶ 112.

On March 27, 2020, in response to the COVID-19 pandemic and the public-health measures taken to reduce spread of the virus, the United States enacted the Coronavirus Aid, Relief, and Economic Security Act, which is generally known as the "CARES Act."

2

Pub. L. No. 116-136, 134 Stat. 281. Among other things, the CARES Act created the Paycheck Protection Program ("PPP"), *see* CARES Act § 1102, a loan program designed to assist small businesses experiencing financial distress caused by the pandemic. *See* 85 Fed. Reg. 20811, 20811–12 (April 15, 2020). The CARES Act created the PPP by adding new provisions to Section 7(a) of the Small Business Act, 15 U.S.C. § 636(a), which confers authority on the SBA to provide financial assistance to small businesses. Specifically, the CARES Act added paragraph 36 to Section 7(a). *See* CARES Act § 1102(a)(2). The provisions of this paragraph authorized the SBA to guarantee PPP loans under the same terms, conditions, and processes as ordinary Section 7(a) loans but specified ways in which PPP loans would differ from ordinary loans. *See* 15 U.S.C. § 636(a)(36)(B), (D)–(R). The differences from ordinary loans generally made PPP loans more favorable to borrowers. Among other things, Congress capped the rate of interest at four percent, *id.* § 636(a)(36)(L), and waived various fees and borrower requirements, *id.* § 636(a)(36)(H)–(J). The Act also contained a provision forgiving the indebtedness on a covered loan up to the full principal amount to the extent the borrower paid certain expenses, such as payroll, during the months following the loan's origination. *See* CARES Act § 1106.

Congress initially authorized the SBA to guarantee up to $349 billion in PPP loans. *See* CARES Act § 1102(b)(1). In April 2020, Congress increased this authorization to $659 billion. *See* Paycheck Protection Program and Health Care Enhancement Act, Pub. L. No. 116-139, 134 Stat. 620, § 101(a)(1).

In administering the CARES Act, the SBA determined that businesses deemed ineligible to receive ordinary Section 7(a) loans under an existing SBA regulation, 13

3

C.F.R. § 120.110, should also be deemed ineligible for PPP loans. *See* 85 Fed. Reg. at 20812. The regulation identifies 18 types of businesses that are ineligible for Section 7(a) loans. They include, among others, nonprofits, legal gambling establishments, government-owned entities, faith-based concerns, businesses owned or managed by persons with criminal histories, and businesses engaged in political activities or lobbying. Most relevant to this action is 13 C.F.R. 120.110(p), which excludes from Section 7(a) eligibility "businesses which (1) [p]resent live performances of a prurient sexual nature; or (2) [d]erive directly or indirectly more than de minimis gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature."

When the SBA decided to apply § 120.110 to PPP loans, it immediately made an exception for nonprofit concerns, to which the CARES Act expressly extended eligibility. *See* 85 Fed. Reg. at 20812. Further, during the months after the CARES Act's passage, the SBA waived or modified three other eligibility exclusions under § 120.110. First, the SBA waived § 120.110(g)'s exclusion of legal gaming businesses. *See* 85 Fed. Reg. 23450, 23451 (April 28, 2020). When the SBA waived this part of the rule, it stated that "[o]n further consideration," it believed that the waiver was "more consistent with the policy aim of making PPP loans available to a broad segment of U.S. businesses." *Id.* Second, the SBA modified § 120.110(j)'s exclusion of government-owned entities to allow PPP loans to certain government-owned hospitals. *Id.* The SBA determined that this exception was "appropriate to effectuate the purposes of the CARES Act." *Id.* Third, the SBA relaxed § 120.110(n)'s exclusion of businesses owned or operated by persons with criminal histories. *See* 85 Fed. Reg. 38301, 38302–03 (June 26, 2020).

4

In April 2020, four of the plaintiffs here that operate strip clubs in Wisconsin, plus a fifth Wisconsin strip club that is not a plaintiff in this action, brought suit in this court and moved for preliminary injunctive relief on the grounds that denying strip clubs PPP loans based on the nature of their entertainment exceeded SBA's authority under the CARES Act and violated the Free Speech Clause of the First Amendment and the equal-protection component of the Fifth Amendment's due-process clause. In an order issued on May 1, 2020, I agreed with the plaintiffs on these matters and enjoined the SBA from using 13 C.F.R. § 120.110(p) to make eligibility determinations for PPP loans under 15 U.S.C. § 636(a)(36). *See Camelot Banquet*, 458 F. Supp. 3d at 1065. The government appealed my order to the United States Court of Appeals for the Seventh Circuit. After the court of appeals denied the government's motion for a stay pending appeal, the government dismissed its appeal and guaranteed the Wisconsin plaintiffs' PPP loans. Following further proceedings in this court during which the government agreed to process the plaintiffs' applications for loan forgiveness without regard to § 120.110(p), the cases relating to 15 U.S.C. § 636(a)(36) were closed.

At approximately the same time that the Wisconsin plaintiffs filed suit here, forty-one other plaintiffs filed a similar suit in the Eastern District of Michigan and sought a preliminary injunction against the SBA's excluding them from the PPP based on 13 C.F.R. § 120.110(p). The Eastern District of Michigan granted the motion for a preliminary injunction, concluding that the CARES Act did not permit the SBA to apply § 120.110(p) to PPP loans. *See DV Diamond Club of Flint, LLC v. SBA*, 459 F. Supp. 3d 943 (E.D.

Mich. 2020).[1] After the Sixth Circuit denied the government's motion for a stay pending appeal, the SBA guaranteed the plaintiffs' PPP loans.

The remaining seven plaintiffs in this action obtained PPP loans under the CARES Act without filing suit against the SBA. According to the SBA, when it guaranteed PPP loans to these plaintiffs, it was unaware that they operated strip clubs. *See* Resp. to Pls.' Stmt. of Facts (ECF No. 26) ¶ 23.

Under the CARES Act, each borrower could receive only one PPP loan. *See* 15 U.S.C. § 636(a)(36)(G)(i)(IV). But as the COVID-19 pandemic continued, Congress passed additional relief legislation that authorized "second draw" PPP loans for small businesses and other entities. As part of the Consolidated Appropriations Act, 2021, Congress passed the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (the "Economic Aid Act"). *See* Title III of Div. N of Pub. L. No. 116-260, 134 Stat. 1182 (2020). This Act authorized second-draw PPP loans by adding paragraph 37 to Section 7(a) of the Small Business Act. *See* Economic Aid Act § 311(a) (adding 15 U.S.C. § 636(a)(37)). Under paragraph 37, the SBA is generally authorized to guarantee second-draw PPP loans to first-draw recipients under the same terms that appear in paragraph 36. *See* 15 U.S.C. § 636(a)(37)(B), (O). However, in creating the second-draw program, Congress made several revisions and clarifications to the list of businesses and other entities eligible to receive PPP loans. As is relevant to this case, Congress specified that business concerns described in 13 C.F.R. § 120.110, except for nonprofit entities

---

[1] The Eastern District of Michigan did not reach the constitutional questions I addressed in *Camelot Banquet*.

and religious organizations, are not eligible for second-draw PPP loans. *See* 15 U.S.C. § 636(a)(37)(A)(iv)(III)(aa). In interpreting the Economic Aid Act, the SBA also determined that, although establishments receiving legal gaming revenues are ineligible for Section 7(a) loans under 13 C.F.R. § 120.110(g), such establishments are eligible to receive second-draw loans. *See* 86 Fed. Reg. 3692, 3696 (Jan. 14, 2021) ("A business that is otherwise eligible for a PPP Loan is not rendered ineligible due to its receipt of legal gaming revenues, and 13 CFR 120.110(g) is inapplicable to PPP loans."); *id.* at 3698 (confirming that, under the Economic Aid Act, "Paragraphs (a), (g), and (k), of 13 CFR 120.110 do not apply to PPP loans"); *see also* Resp. to Pls.' Stmt. of Facts (ECF No. 26) ¶ 14 (government admits that waiver for legal gambling businesses applies to second-draw program).

The Economic Aid Act, together with the subsequently enacted American Rescue Plan Act ("ARPA"), Pub. L. 117-2, 135 Stat. 4 (2021), increased the SBA's guarantee authority under the PPP by $154.7 billion. *See* Economic Aid Act § 323(a); ARPA § 5001(d)(1). All told, the SBA's guarantee authority for first- and second-draw PPP loans amounted to nearly $814 billion.

All plaintiffs in this case have submitted applications for second-draw PPP loans to their lending banks. Several of them have received correspondence from their banks stating that strip clubs remain ineligible for PPP loans. Compl. ¶¶ 406, 420, 434 & 448. Others have been told that the SBA has placed their applications on "hold" pending a "prurience review." *Id.* ¶¶ 122, 137, 152, 167 & 227. In early March of this year, plaintiffs' counsel wrote to counsel for the defendants inquiring whether plaintiffs' applications for second-draw loans were being delayed or denied based on 13 C.F.R. § 120.110(p). *See*

7

Gilligan Decl. ¶ 73 & Exs. 52–53. In their responses, defendants' counsel stated that the plaintiffs' banks had not yet contacted the SBA and had likely made their own determinations that the plaintiffs were ineligible for second-draw loans under § 120.110(p). *Id.* Exs. 54 & 55. However, counsel confirmed that, if the plaintiffs' offered live performances of a prurient sexual nature, then the SBA would require the banks to deny their applications for second-draw loans. *Id.* Counsel added that if any plaintiff believed that its bank had made a mistake in thinking that its entertainment was prurient within the meaning of § 120.110(p), then that plaintiff could ask the SBA to conduct an eligibility review in accordance with its standard operating procedures.

No plaintiff asked the SBA to conduct an eligibility review. Instead, the plaintiffs commenced this suit on April 7, 2021, alleging that the SBA lacks authority to apply § 120.110(p) to second-draw loans and that doing so would violate the First and Fifth Amendments. The plaintiffs now move for a preliminary injunction requiring the SBA to process their applications for second-draw PPP loans without applying 13 C.F.R. § 120.110(p).[2]

## II. DISCUSSION

To obtain a preliminary injunction, a plaintiff must first show that: (1) without such relief, it will suffer irreparable harm before final resolution of its claims; (2) traditional legal remedies would be inadequate; and (3) it has some likelihood of success on the merits.

---

[2] In response to this suit, the SBA agreed to set aside, pending resolution of the motion for preliminary injunction, guaranteed funds for all plaintiffs in an amount equal to the second-draw loans applied for. *See* Compl. ¶ 2; Gilligan Decl. ¶ 74 Ex. 54 at 4–5, Ex. 55 at 2–3. Thus, although PPP funds may be exhausted as to other borrowers, the plaintiffs' request for a preliminary injunction is not moot.

8

*E.g., Courthouse News Service v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018). If a plaintiff makes such a showing, the court must weigh the harm the plaintiff will suffer without an injunction against the harm the defendant will suffer with one. *Id.* This assessment is made on a sliding scale: The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor. *Id.* Finally, the court must ask whether the preliminary injunction is in the public interest, which means considering what effect an injunction will have on non-parties. *Id.* Ultimately, the moving party bears the burden of showing that a preliminary injunction is warranted. *Id.*

## A.    Likelihood of Success

The plaintiffs advance several arguments in support of their claim that the SBA may not deny their applications for PPP loans based on 13 C.F.R. § 120.110(p). Some of the arguments involve questions of statutory interpretation, and some involve questions of constitutional interpretation. I will first address the questions of statutory interpretation and then turn to the constitutional issues.

### 1.    Statutory questions

#### a.    Statutory authority

Initially, I note that because the legislation authorizing second-draw PPP loans expressly excludes nearly all businesses described in 13 C.F.R. § 120.110 from eligibility, including those that offer entertainment of a prurient sexual nature, *see* 15 U.S.C. § 636(a)(37)(A)(iv)(III)(aa), one of the grounds on which I enjoined the SBA from applying the regulation to first-draw PPP applications—lack of statutory authority, *see Camelot Banquet*, 458 F. Supp. 3d at 1055–57—does not apply here. In light of Congress's

9

express incorporation of the regulation, it is clear that Congress intended to allow the SBA to exclude businesses that offer live performances of a prurient sexual nature from the second-draw program.

### b. Meaning of "prurient sexual nature"

The parties dispute the meaning of "prurient sexual nature" as that phrase is used in 13 C.F.R. § 120.110(p). The plaintiffs contend that the phrase must be interpreted consistently with the Supreme Court's obscenity jurisprudence, under which "prurient" means "that which appeals to a shameful or morbid interest in sex." *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985). Under this interpretation, the plaintiffs contend, their live performances would not be prurient because they appeal to "normal" and "healthy" sexual desires. *See, e.g.,* Compl. ¶ 112. The government, in contrast, contends that the regulation uses "prurient" in a broader sense—as being akin to "lustful," "lascivious," or "erotic"—and thus encompasses sexually explicit entertainment, such as the plaintiffs', that appeals to normal and healthy interests in sex or nudity.[3]

The plaintiffs contend that "prurient" must be interpreted consistently with obscenity jurisprudence because the term has no legal meaning outside of that context. It is true that, in legal contexts, "prurient" generally is defined as involving an unhealthy or abnormal interest in sex or nudity. *See Prurient*, *Black's Law Dictionary* (11th ed. 2019) ("Characterized by, exhibiting, or arousing inappropriate, inordinate, or unusual sexual desire; having or showing too much interest in sex"); https://www.merriam-

---

[3] Notably, when I last considered § 120.110(p), the government did not offer an interpretation of "prurient sexual nature." *See Camelot Banquet*, 458 F. Supp. 3d at 1054–55. Thus, I have not previously interpreted this phrase.

webster.com/dictionary/prurient (giving legal definition as "marked by or arousing an unwholesome sexual interest or desire") (last viewed Aug. 10, 2021). But, outside of legal contexts, the term has a broader sense that encompasses sexually explicit content that is not shameful or morbid. Merriam-Webster's online dictionary, for example, gives the non-legal definition of "prurient" as "marked by or arousing an immoderate or unwholesome interest or desire[;] *especially*: marked by, arousing, or appealing to sexual desire." *See also* www.dictionary.com/browse/prurient ("having, inclined to have, or characterized by lascivious or lustful thoughts, desires, etc."). Indeed, when the Supreme Court began using "prurience" in the obscenity context, it initially defined "material which deals with sex in a manner appealing to prurient interest" as "material having a tendency to excite lustful thoughts." *Roth v. United States*, 354 U.S. 476, 487 n.20 (1957).[4] Thus, the government's interpretation of "prurient" is consistent with an ordinary meaning of that word and cannot be dismissed as unreasonable or contrary to the plain language of the regulation.

Still, nothing in the regulation itself tells us whether "prurient" is being used in its strict legal sense or in its broader sense. The government thus turns to the SBA's longstanding interpretation of the regulation, under which "prurient" is not limited to materials that appeal to a shameful or morbid interest in sex. When the SBA first proposed the regulation in 1995, it explained that it had "determined that it may exclude small

---

[4] In *Roth*, the Court later cited *legal* definitions of "prurient" that use the terms "shameful" and "morbid," 354 U.S. at 487 n.20, and in a subsequent case it confirmed that "prurience" in the obscenity context includes those terms, *see Brockett*, 472 U.S. at 493–504. But this limitation does not imply that "prurience" does not have a broader meaning outside of obscenity law.

businesses engaging in lawful activities of an obscene, pornographic, or prurient sexual nature." 60 Fed. Reg. 64356, 64360 (Dec. 15, 1995). After describing the proposed regulation, the SBA explained that, under it, "*an establishment featuring nude dancing*, or a book, magazine or video store containing merchandise of a prurient sexual nature would not be eligible for SBA financial assistance if the obscene, pornographic, or prurient activity contributed to the generation of a significant portion of the gross revenue of the business." *Id.* (emphasis added). Since the regulation was adopted, the SBA officials who make final eligibility determinations for Section 7(a) loans have consistently interpreted "prurient" to mean "lustful, lascivious, or arousing of sexual interest or desire" and "erotic." Decl. of Eric S. Benderson, ¶¶ 6, 10; ECF No. 21-7. Applying this definition, the SBA has denied Section 7(a) loans to the following applicants: (1) a restaurant chain identifying itself as part of the "breastaurant" industry," (2) a coffee bar featuring female baristas wearing skimpy bikinis, lingerie, and bras and panties serving clients in physically suggestive ways; (3) a club featuring male dance performers stripped down to thong underwear or bikini briefs who touched and kissed customers; and (4) an adult-themed store offering a variety of products including adult sex toys, adult games, adult costumes, and lubricants. *Id.* ¶ 12.

Under what is known as "*Auer* deference" (after *Auer v. Robbins*, 519 U.S. 452 (1997)), a court will generally follow an agency's interpretation of its own regulation. *See Kisor v. Wilkie*, __ U.S. __, 139 S. Ct. 2400, 2410–18. Here, the plaintiffs contend that, for various reasons, *see* Br. in Supp. at 33–35, *Auer* deference should not apply, and therefore I should not adopt the SBA's interpretation of its regulation. Importantly, however, the regulation, as applied to the second-draw PPP, has been elevated to the

12

level of a federal statute. As noted, Congress expressly incorporated parts of 13 C.F.R. § 120.110 into the eligibility criteria for second-draw PPP loans, including its prohibition on extending loans to business that offer live performances of a prurient sexual nature. 15 U.S.C. § 636(a)(37)(A)(iv)(III)(aa). Moreover, courts generally presume that Congress is aware of an existing judicial or administrative interpretation of a statute and that it intends to adopt that interpretation when it creates a new law incorporating parts of a prior law. *Lorillard v. Pons*, 434 U.S. 575, 580–81 (1978). Based on this interpretive principle, I must presume that Congress was aware of the SBA's longstanding interpretation of § 120.110(p) and intended to adopt it when it incorporated that part of the regulation into the eligibility criteria for second-draw PPP loans.

The plaintiffs attempt to rebut this presumption by pointing to the canon of statutory interpretation providing that when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to the term in the body of learning from which it was taken. *Air Wis. Airlines Corp. v. Hoeper*, 571 U.S. 237, 248 (2014). Here, the plaintiffs contend that "prurient" is a legal term of art used in the obscenity context and that therefore we must presume that Congress meant to adopt the meaning from that context. However, as I have already discussed, "prurient" is not exclusively a legal term of art, in that it has a meaning outside the obscenity context under which it refers to sexually explicit materials that appeal to healthy sexual desires. The question of statutory interpretation at issue is whether Congress intended to adopt the legal meaning or the broader, less technical meaning adopted by the SBA. The canon that the plaintiffs invoke does not apply to this prefatory question because the canon assumes that the disputed term is a term of art.

13

Based on the canon that Congress is presumed to know and adopt an existing interpretation of language it reenacts, I conclude that I am bound by the SBA's interpretation of "prurient sexual nature" regardless of whether *Auer* deference is appropriate. But I also note that I am not persuaded by the reasons the plaintiffs give for denying *Auer* deference to the SBA's interpretation. The plaintiffs note that *Auer* deference is denied to an agency interpretation when "the agency's interpretation conflicts with a prior interpretation, or when it appears the interpretation is nothing more than a convenient litigating position, or a *post hoc* rationalization advanced by an agency seeking to defend past agency action against an attack." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012). They then contend that the SBA has taken inconsistent litigation positions by offering different definitions of the term "prurient" in the several court cases that have arisen out of the PPP. But the litigation positions cited by the plaintiff are consistent with the interpretation the SBA has offered here. In prior cases, the government argued that "prurient" meant things such as "lustful," "lewd," "lascivious," "erotic," or invoking a "strong sexual interest." Br. in Supp. at 20. The interpretations are materially identical to the SBA's position in this case, which is that "prurient" must be understood as "being akin to 'lustful,' 'lascivious,' or 'erotic.'" Br. in Opp. at 20. Moreover, the SBA's comments in the Federal Register, *see* 60 Fed. Reg. at 64360, and its history of consistently denying applications for Section 7(a) loans to businesses that offer sexually oriented but not obscene entertainment, products, or services, *see* Benderson Decl. ¶¶ 10–12, demonstrates that its interpretation is more than just a convenient litigating position.

14

The plaintiffs also attempt to show that the SBA has not been consistent in its interpretation of "prurient" by claiming that some strip clubs have had their applications for PPP loans approved, Br. in Supp. at 20, by claiming that a brothel in Nevada obtained a PPP loan, *id.* at 28, and by noting that the SBA has agreed not to use § 120.110(p) as a reason to deny loan forgiveness to those strip clubs that obtained first-draw PPP loans through successful litigation, Reply Br. at 1. But none of these examples shows that the SBA has been inconsistent. First, the SBA has submitted a declaration stating that the SBA has never knowingly and voluntarily approved a loan for any establishment featuring nude or semi-nude dancing. *See* Benderson Decl. ¶ 18. The SBA states that, to the extent any such establishment obtained a PPP loan, that was likely because either the establishment's lender approved the loan without the SBA's involvement or the borrower did not disclose the sexually oriented nature of its business. *See id.* ¶¶ 18–19. Second, the SBA's declaration states that it did not guarantee a PPP loan to a brothel; rather, the loan in question was made to a family restaurant whose co-owner also owned a separate legal entity that operated a brothel. *Id.* ¶¶ 14–17. Third, the SBA's agreeing to grant loan forgiveness to the strip clubs who obtained PPP loans through litigation does not imply that the SBA agreed that those clubs were eligible for PPP loans in the first place. Because loan forgiveness is part of the PPP, once the SBA was ordered to extend PPP loans to sexually oriented businesses, it had no choice but to grant them loan forgiveness if they used the loan proceeds for payroll and other qualifying expenses.

The plaintiffs' remaining reason for denying *Auer* deference is based on the principle that such deference is only afforded to agency interpretations that implicate the agency's substantive expertise. *See Kisor*, 139 S. Ct. at 2417. Here, the plaintiffs contend

15

that the SBA has no expertise in identifying obscenity or defining "prurient." *See* Br. in Supp. at 34–35. But the plaintiffs misconstrue the purpose of the rule. The rule was not adopted to carry out a program of defining obscenity or prurience in general, but to identify the kinds of businesses that are eligible for small business loans. And the SBA administers the Section 7(a) loan program and thus has expertise in identifying the kinds of entities who should receive the government's financial support. So, the SBA's interpretation of the eligibility rule falls within its area of substantive expertise. And on this point, it is important to again note that Congress expressly incorporated the SBA's regulation into the statute creating the second-draw PPP. In doing so, Congress did not merely incorporate the existing regulation, it also specified that business concerns identified "in any successor regulation [to 13 C.F.R. § 120.110] or other related guidance or rule that may be issued by the Administrator" would be ineligible for second-draw loans. 15 U.S.C. § 636(a)(37)(A)(iv)(III)(aa). This language strongly supports the notion that Congress intended to defer to the SBA's expertise in defining the kinds of entities that are eligible for PPP loans. Thus, judicial deference to the SBA's interpretation is warranted.

The plaintiffs also develop a statutory argument based on a statute, 15 U.S.C. § 633(e), that prohibits the SBA from providing assistance to businesses "engaged in the production or distribution of any product or service that has been determined to be obscene by a court of competent jurisdiction." The plaintiffs argue that, if the SBA's interpretation of "prurient" were adopted, then § 120.110(p) would both "invalidate" and "reduce to a nullity" § 633(e)'s ban on assistance to businesses providing products or services that have been adjudicated obscene. *See* Br. in Supp. at 11, 35–39. In support of their invalidation argument, the plaintiffs contend that Congress intended § 633(e) to

16

be the sole provision under which the SBA could deny assistance to a business offering "sexual expression." *Id.* at 35–36. But nothing in the text of § 633(e) supports the plaintiffs' view. The statute merely prohibits the SBA from assisting businesses offering products or services that have been found to be obscene. It does not prohibit the SBA from going further and adopting regulations that deny assistance to other forms of sexually oriented businesses. In any event, even if Congress intended § 633(e) to be the sole limitation on aiding sexually oriented businesses in general, it is clear that Congress did not object to the SBA's applying additional limits to the second-draw PPP, for, as I've noted several times now, it directed the SBA to do exactly that in the legislation creating the program. 15 U.S.C. § 636(a)(37)(A)(iv)(III)(aa). Because Congress directed the SBA to apply this regulation to the program, it likely did not understand it as doing nothing more than prohibiting PPP loans to businesses that offer products or services that have been adjudicated obscene. Section 633(e) already prohibits the SBA from providing any assistance to such businesses, and thus accepting the plaintiffs' view of the statutory scheme would render Congress's express adoption of § 120.110(p) superfluous, which is something that courts try to avoid. *See NLRB v. SW General, Inc.*, __ U.S. __, 137 S. Ct. 929, 941 (2017).

The plaintiffs also contend that accepting the SBA's definition of "prurient" would render § 633(e) superfluous because the regulation will already have barred any business that offers a product or service that had been adjudicated obscene from the SBA's loan programs. *See* Br. in Supp. at 38. But the plaintiff has not cited, and I have not found, any case holding that a regulation should not be construed to duplicate a part of the statutory scheme the agency administers. Moreover, such a canon of interpretation would make

17

little sense, for, in carrying out a statutory scheme, an agency will often repeat statutory requirements in its regulations. *Cf. Gonzales v. Oregon*, 546 U.S. 243, 257 (2006) (discussing regulation that "does little more than restate the terms of the statute itself"). Thus, the regulation's incorporating the statutory prohibition on assisting businesses that sell obscene materials into a broader ban on making Section 7(a) loans to sexually oriented businesses does not create the kind of surplusage that a court must attempt to avoid. In any event, the plaintiffs' proposed solution—which is to construe the regulation to mean exactly what § 633(e) means—does not avoid the surplusage.

For these reasons, I conclude that the SBA's interpretation of "prurient sexual nature" controls and that businesses that offer live, sexually oriented dance entertainment are within the scope of 13 C.F.R. 120.110(p).

### 2. Constitutional questions

Having found that 13 C.F.R. § 120.110(p) applies to the plaintiffs, I turn to the plaintiffs' constitutional arguments. The kinds of erotic dance entertainment presented by the plaintiffs are forms of expression protected by the Free Speech Clause of the First Amendment. *See Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 56–66 (1991); *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 66 (1981). For this reason, Congress could not prohibit the plaintiffs from offering such entertainment without satisfying strict scrutiny; that is, without proving that the law in question is narrowly tailored to serve compelling governmental interests. *See, e.g., Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). But under the Spending Clause of the Constitution, Congress may sometimes place speech-related conditions on the receipt of federal funds. *See, e.g., Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013). This is so because, "[a]s a

18

general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds." *Id.* at 214. However, Congress's power to place conditions on federal funding is not limitless. The Supreme Court has held that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). "[I]f the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited." *Id.* Moreover, Congress cannot "discriminate invidiously in its subsidies in such a way as to 'aim[] at the suppression of dangerous ideas.'" *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 548 (1983).

In the present case, the government contends that Congress may exclude small businesses that present erotic dancing from eligibility for PPP loans because the exclusion does not restrict or prohibit speech; instead, it defines the scope of a government subsidy. The government cites cases supporting the idea that when Congress creates a federal spending program, it has wide latitude to define the program by setting eligibility criteria and specifying how the allotted funds may be used. *See, e.g., Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587–88 (1998). In defining the scope of a program, Congress may sometimes place certain forms of speech off limits. For example, in *Rust v. Sullivan*, 500 U.S. 173 (1991), the Supreme Court upheld Congress's prohibition on using federal funds allocated for family-planning services to provide counseling about abortion as a method of family planning. Although this prohibition amounted to a form of viewpoint discrimination, in that federal funds could be used to

counsel patients about continuing a pregnancy to term but not for counseling them about terminating the pregnancy, the Court did not find a constitutional violation. That was so because the Court deemed the restriction on abortion counseling reasonably related to the purposes of the funding program, which was to promote "family planning services which will lead to conception and childbirth." *Id.* at 192–93. In other words, the Court found that Congress, in creating a funding program with a specific purpose, could discriminate on the basis of the content and viewpoint of a potential recipient's speech in order to ensure that the funds were used to fulfill the program's purposes.

Unlike the statute in *Rust*, the second-draw paycheck protection program does not have a narrow goal that would be undermined by extending eligibility to small businesses that present erotic dance entertainment. The purpose of the program, like the original paycheck protection program, *see* 85 Fed. Reg. 20811, 20811 (April 15, 2020), is to provide economic relief to small businesses and other entities in the United States that are struggling during the pandemic. This purpose is reflected in the name of the law creating the second-draw program, the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act. The program, which increased funding for paycheck protection loans by $154.7 billion, *see* Economic Aid Act § 323(a)(1)(A)–(c); ARPA § 5001(d)(1), is vast and encompasses an extremely wide array of business activity. It is generally open to "any business concern, nonprofit organization, housing cooperative, veterans organization, Tribal business concern, eligible self-employed individual, sole proprietor, independent contractor, or small agricultural cooperative" that has fewer than 300 employees. 15 U.S.C. § 636(a)(37)(A)(iv)(I). The eligibility criteria do not require the business to operate within any particular industry or sector, and thus the program

20

subsidizes nearly every form of economic activity that occurs in the United States. Although some businesses are expressly excluded from PPP eligibility, such as the sexually oriented businesses in this case, the number of total exclusions is extremely tiny compared to the thousands of types of small businesses and other entities that are eligible for PPP loans.[5] Thus, extending loans to bars, restaurants, and small entertainment venues that present erotic dance entertainment would be entirely consistent with the purpose of the second-draw program. These businesses are just as likely as eligible businesses to experience financial distress as a result of the pandemic. They also have the same costs and expenses as other businesses, such as the payroll, mortgage, rent, and utility costs that Congress encouraged eligible businesses to pay by granting them loan forgiveness in the amount of such payments. *See* 15 U.S.C. § 636(a)(37)(J).

The government does not contend that providing a second-draw loan to the plaintiffs would be inconsistent with Economic Aid Act's general purpose of providing economic assistance to hard-hit small businesses. Instead, relying on *Regan v. Taxation with Representation of Washington,* 461 U.S. 540 (1983), it contends that Congress may exclude sexually oriented businesses from the program because Congress is not compelled to subsidize an activity that it does not wish to subsidize. In *Regan*, a nonprofit organization challenged § 501(c)(3) of the tax code to the extent that it prohibited nonprofit, tax-exempt organizations from using tax-deductible contributions to support

---

[5] In its brief, the government identifies only six exclusions from the second-draw program: sexually oriented businesses, businesses engaged in political or lobbying activities, entities affiliated with the People's Republic of China or the Special Administrative Region of Hong Kong, persons required to register under the Foreign Agents Registration Act, publicly traded companies, and entities in which certain elected officials or their spouses own a controlling interest. *See* Br. in Opp. at 8.

21

lobbying activities. The plaintiff alleged that the prohibition on lobbying violated both the First Amendment and the equal-protection component of the Fifth Amendment's due process clause. In connection with its First Amendment argument, the plaintiff argued that the ban on lobbying imposed an unconstitutional condition on the receipt of tax-deductible contributions. The Court disagreed. It described the tax deduction available to non-lobbying groups as a "subsidy" and held that Congress could constitutionally choose "not to subsidize lobbying as extensively as it chose to subsidize other activities that non-profit organizations undertake to promote the public welfare." *Id.* at 544. The Court stated that it "has never held that [Congress] must grant a benefit . . . to a person who wishes to exercise a constitutional right." *Id.* However, the Court made clear that "[t]he case would be different if Congress were to discriminate invidiously in its subsidies in such a way as to 'aim[] at the suppression of dangerous ideas.'" *Id.* at 548. The Court recognized that because Congress prohibited all lobbying (with the exception of lobbying by veterans' organizations), it had not engaged in viewpoint discrimination or tried to suppress a particular idea. The Court also found that Congress had refused to subsidize lobbying for a permissible reason, which was concern that "exempt organizations might use tax-deductible contributions to lobby to promote the private interests of their members." *Id.* at 550.

As I noted when I last considered the constitutionality of § 120.110(p), *see Camelot Banquet*, 458 F. Supp. 2d at 1060, the present case is different from *Regan* because, here, the regulation targets a much narrower form of expressive activity. Lobbying, of course, embraces a wide variety of subjects and viewpoints, and thus the ban on lobbying at issue in *Regan* clearly was not aimed at the suppression of a dangerous idea. The

22

same cannot be said of the exclusion of businesses that present erotic dance entertainment. Because dancing does not involve the written or spoken word, an exclusion of erotic dancing may not technically be viewpoint discrimination.[6] But erotic dancing is a form of expression that, unlike lobbying, conveys a specific message or idea that is analogous to a viewpoint. *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 294 (2000) (noting that nude dancing conveys an "erotic message"); *Schultz v. City of Cumberland*, 228 F.3d 831, 847 (7th Cir. 2000) ("The dominant theme of nude dance is 'an emotional one; it is one of eroticism and sensuality.'"). A law excluding erotic dancing from a broad government subsidy program for which it would otherwise be eligible raises the same First Amendment concern as a law excluding writings that adopt specific viewpoints. The law appears to be an attempt to exclude a message that the government deems controversial, offensive, or against the public interest. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011) ("The First Amendment requires heightened scrutiny whenever the government creates 'a regulation of speech because of disagreement with the message it conveys.'"). Thus, the exclusion of sexually oriented businesses from the second-draw program, even if it is not traditional viewpoint discrimination, appears to be the kind of

---

[6] However, in addition to live performances of a prurient sexual nature, the exclusion also applies to businesses that "[d]erive directly or indirectly more than de minimis gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature." 13 C.F.R. § 120.110(p)(2). Thus, adult bookstores are excluded while a bookstore dedicated to selling religious literature is not. This may be viewpoint discrimination. Because the plaintiffs are strip clubs rather than bookstores, I will not further explore this issue.

23

attempt to suppress a "dangerous idea" that the Court was on the lookout for in *Regan* and other government-subsidy cases.[7]

The government contends that Congress, in adopting the SBA regulation, should not be deemed to have targeted the erotic message of strip clubs but instead to have excluded them because of their "well established 'secondary effects,'" such as "reduced property values, increased crime, public health risks, and illegal sexual activity such as prostitution." Br. in Opp. at 31–32. This "secondary effects" rationale is ordinarily used by state and local governments as justifications for zoning ordinances and other restrictions that apply to sexually oriented businesses, such as strip clubs, adult bookstores, and adult movie theaters. *See, e.g., City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 433–34 (2002); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48–49 (1986); *G.M. Enters., Inc. v. Town of Joseph*, 350 F.3d 631, 637–38 (7th Cir. 2003). In general, if a state or local government shows that its regulation of sexually oriented businesses is an attempt to regulate the negative secondary effects of sexually explicit expression rather than the expression itself, then the regulation is not subject to strict scrutiny and is evaluated under more lenient standards. *See City of Renton*, 475 U.S. at 49; *G.M. Enters.*, 350 F.3d at 638. For example, a city may, without satisfying strict scrutiny, adopt a zoning ordinance that prevents a high concentration of sexually oriented businesses from forming in a single neighborhood if the purpose of the ordinance is to eliminate the crime

---

[7] The government contends that the exclusion of erotic dancing should not be equated to viewpoint discrimination because it does not "pick and choose . . . between prurient performances . . . that champion overt sexuality and those that oppose it." Br. in Opp. at 29. However, a prurient sexual performance will, by definition, be sexually arousing, as the definitions cited earlier in this opinion make clear. This message of sexual arousal is the "dangerous idea" at which the exclusion appears to take aim.

24

and other "undesirable externalities" that might arise from such a concentration. *See Alameda Books*, 535 U.S. at 444–47 (Kennedy, J., concurring).[8] But a city may not regulate the secondary effects of speech by suppressing the speech itself, such as by relegating adult businesses to inconvenient locations that cause reduced demand and fewer patrons. *Id.* at 450. Moreover, before a court will uphold a regulation of adult businesses on a secondary effects rationale, a city usually must "make some demonstration of an evidentiary basis for the harm it claims to flow from the expressive activity, and for the alleviation expected from the restriction imposed." *Pap's A.M.*, 529 U.S. at 313 (Souter, J., concurring in part and dissenting in part).

Here, the government contends that Congress could have decided that paycheck protection loans should not be made to small businesses that have "adverse impacts on the Nation's economic health." Br. in Opp. at 40. Initially, I note that the Supreme Court's secondary effects cases do not involve federal regulation of the national economy; instead, they allow state and local governments to regulate the health, safety, and welfare of local communities by enacting land-use and public-health regulations that eliminate or reduce the negative secondary effects associated with sexual expression. Nothing in the secondary-effects case law suggests that the mere existence of sexually oriented businesses poses a threat to the national economy. Further, the very premise of the secondary-effects doctrine is that, to the extent sexually oriented businesses generate

---

[8] Like other Supreme Court cases in this area, *Alameda Books* did not produce a majority opinion. But Justice Kennedy's concurrence is the narrowest opinion joining the judgment of the Court and is controlling authority under *Marks v. United States*, 430 U.S. 188, 193, (1977). *See G.M. Enters.*, 350 F.3d at 637. All further citations to *Alameda Books* in this opinion are to Justice Kennedy's concurrence.

adverse effects that impact the welfare of communities, they can be reduced or eliminated through state and local laws. Thus, it would be odd for Congress to concern itself with those effects in legislation designed to help small businesses pay their workers during a global pandemic. Further, nothing in the Economic Aid Act suggests that Congress had secondary effects in mind when it adopted the SBA's exclusion of businesses of a prurient sexual nature. And the SBA did not even mention secondary effects when it proposed the rule making prurient businesses ineligible for Section 7(a) loans. *See* 60 Fed. Reg. at 64360. The SBA's failure to mention the Supreme Court's secondary effects cases is particularly conspicuous given that the SBA cited the Court's obscenity jurisprudence and *Rust v. Sullivan* as legal support for the exclusion. *See id.* (identifying *Miller v. California*, 413 U.S. 15 (1973) and *Rust v. Sullivan* as the "legal precedent" that supported the exclusion of prurient businesses).

More importantly, *many* types of businesses generate negative externalities, and the government does not explain why Congress decided to focus exclusively on the negative externalities of sexually oriented businesses. *See Alameda Books*, 535 U.S. at 446 ("many enterprises other than adult businesses also cause undesirable externalities"). Even if we focused only on the negative effects cited in the government's brief as being associated with sexually oriented businesses—reduced property values, increased crime, public health risks, and illegal sexual activity such as prostitution, Br. in Opp. at 31—it is apparent that many businesses associated with those same secondary effects are eligible for second-draw loans. A factory that produces loud noises or toxic

26

fumes will reduce surrounding property values,[9] outlets that sell alcohol are associated with increased crime,[10] vaping shops pose a threat to public health,[11] and massage parlors are associated with illegal sexual activity such as prostitution.[12] Yet all these businesses are eligible for second-draw loans. Thus, Congress adopted an exclusion from PPP loan eligibility that is "wildly underinclusive when judged against its asserted justification," which "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 802 (2011). The only apparent explanation for Congress's focus on sexually oriented businesses is that such businesses engage in a specific type of controversial expression.

The government contends that even if the exclusion of sexually oriented businesses is underinclusive, that does not matter because Congress is not required to achieve a "perfect fit" between means and ends. Br. in Opp. at 30 (quoting *City of Chicago v. Shalala*, 189 F.3d 598, 607 (7th Cir. 1999)). But, as just noted, Congress did not merely

---

[9] *Alameda Books*, 535 U.S. at 446.

[10] Sam Bieler & John Roman, , District of Columbia Crime Policy Institute, *Addressing Violence and Disorder Around Alcohol Outlets*, (2013), https://www.urban.org/sites/default/files/publication/23251/412735-Addressing-Violence-and-Disorder-around-Alcohol-Outlets.PDF (last visited Aug. 19, 2021)

[11] American Medical Association, *E-cigarettes and Vaping: A Public Health Epidemic*, https://www.ama-assn.org/delivering-care/public-health/e-cigarettes-and-vaping-public-health-epidemic (last visited Aug. 19, 2021).

[12] Evan Casey, *Brookfield officials deny operating permit to new owner of massage parlor linked to prostitution*, Milwaukee Journal Sentinel, Aug. 13, 2021, https://www.jsonline.com/story/communities/west/news/wauwatosa/2021/08/13/brookfield-massage-parlor-owner-denied-permit/5547212001/.

fail to achieve a perfect fit between means and ends, it specifically targeted sexually oriented businesses among the many types of small businesses that generate adverse effects. Congress made loans available to businesses across the entire spectrum of economic activity yet singled out a narrow industry for unfavorable treatment based on the content of its expression. Further, the underinclusivity cases cited by the government involve rational-basis review under the Equal Protection Clause, which applies only when the law at issue is not alleged to implicate a fundamental right. *See Box v. Planned Parenthood of Ind. and Ky., Inc.*, __ U.S. __, 139 S. Ct. 1780, 1781 (2019). Where, as here, a law touches First Amendment activity, courts may rely on its underinclusivity as evidence the government is using a facially neutral law to target disfavored expression or conduct. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533–40 (1993) (invalidating a city's ban on ritual animal sacrifices because the city failed to regulate vast swaths of conduct that similarly implicated its asserted interests in public health and animal welfare). Thus, the exclusion's severe underinclusivity is an "indication," *see Regan*, 461 U.S. at 548, that it is not designed to further a legitimate government interest and is instead an attempt to suppress sexually explicit expression. When this underinclusivity is combined with (1) the lack of any indication that Congress and/or the SBA was actually concerned with the secondary effects of adult businesses when it passed the laws governing Section 7(a), the PPP, or the second-draw program, and (2) the lack of any rational connection between the PPP's main purpose of helping small businesses pay employees during an economic crisis and a desire to regulate the negative externalities produced by those businesses, the inference of unconstitutional targeting becomes inescapable.

28

In short, when a law that grants billions in benefits to a wide and diverse swath of businesses excludes a single industry that offers a controversial form of expression based on an unstated reason that would not further the law's general purpose and would also apply to a large percentage of eligible businesses, the exclusion is fairly characterized as being "aimed at the suppression of a dangerous idea" within the meaning of the government subsidy and benefits cases. Accordingly, the plaintiffs have a high likelihood of success on their claim that their exclusion from the second-draw PPP violates the Free Speech Clause of the First Amendment.[13]

## B.    Irreparable Harm/Lack of Adequate Remedy at Law

I also find that the plaintiffs lack an adequate remedy at law and that they would suffer irreparable harm without an injunction. Harm is irreparable if it "cannot be prevented or fully rectified by the final judgment after trial." *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1045 (7th Cir. 2017) (quoting *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.*, 549 F.3d 1079, 1089 (7th Cir. 2008)). The government does not dispute that the plaintiffs lack an adequate remedy at law. Further, no legal authority allows a court to award damages against the United States and its officials and agencies in a case such as this. *See, e.g., FDIC v. Meyer*, 510 U.S. 471, 475 (1994). Thus, an injunction is the only remedy available to the plaintiffs. Moreover, the inability to obtain damages implies that any harm the plaintiffs suffer

---

[13] Because I conclude that the plaintiffs' exclusion from the PPP likely violates the Free Speech Clause of the First Amendment because it is an attempt to suppress a dangerous idea, I do not discuss the plaintiffs' other constitutional arguments, including that the exclusion violates the equal-protection component of the Fifth Amendment's due process clause, is overbroad, constitutes a prior restraint, and is unconstitutionally vague.

29

between now and the end of the case will be irreparable. *See Smith v. City of Hammond, Ind.*, 388 F.3d 304, 307 (7th Cir. 2004) (noting that in some cases "a defendant's immunity from damages liability might constitute irreparable harm entitling the plaintiff to preliminary relief").

Without an injunction, the SBA will release the hold it has placed on the funds needed to guarantee the plaintiffs' loans pending a decision on their motion for a preliminary injunction. Once the hold has been lifted, it is unlikely that the court will be able to grant the plaintiffs any relief. The paycheck protection program has ended,[14] and the parties have reported that Congress is considering legislation that would reallocate unspent coronavirus-relief funds to other priorities, such as infrastructure, *see* ECF No. 29. Thus, it is likely that, in the absence of an injunction, all plaintiffs will suffer irreparable harm in the form of being permanently excluded from the second-draw PPP, which is a government benefit or subsidy program. And, in light of the plaintiffs' high likelihood of success on the merits, I conclude that, under the sliding scale, this possibility of permanent exclusion favors issuance of an injunction.

But even if an additional showing of irreparable harm were necessary, the plaintiffs have made it. The plaintiffs are all bars, restaurants, or entertainment venues. Such businesses have been some of the hardest hit by the pandemic, *See* Second Decl. of Zachary M. Youngsma ¶¶ 9–11. Most of the plaintiffs are severely in arrears on their rent and/or utility payments, *see* ECF Nos. 23-3, 23-4, 23-5, 23-7, 23-8 & 23-9, and five of them are currently closed due either to lack of income, *see* ECF Nos. 23-5 ¶ 6, or to

---

[14]     https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/second-draw-ppp-loan (last viewed Aug. 17, 2021).

COVID-19 related restrictions, ECF No. 23-8 ¶ 3. Although COVID-19 restrictions have loosened somewhat since my last decision involving the PPP, *see Camelot Banquet*, 458 F. Supp. 3d at 1062–63, infections are on the rise again due in large part to the Delta variant of the virus, *see* Youngsma Decl. ¶¶ 14–16. Given this state of affairs, the plaintiffs are in need of PPP assistance now. So even if the SBA could retain authority to fund the plaintiffs' loans at the end of this case, an injunction issued at that time would likely come too late to do the plaintiffs any good.

**C.    Balance of Harms/Public Interest**

Finally, I must consider where the public interest lies, which is an inquiry that merges with the inquiry into whether the injunction would harm the government. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, I conclude that these factors favor an injunction. As noted, the purpose of the PPP is to extend help to hard-hit businesses now, while they are suffering from the economic effects of the COVID-19 pandemic. Funding the plaintiffs' loans while the pandemic is ongoing furthers the public interest in helping small businesses and their employees weather the pandemic. I do not see any way in which either the government or the public interest could be harmed by the injunction. In any event, to the extent any such harm might occur, it would be outweighed by the harm the plaintiffs are likely to suffer without an injunction. And under the sliding scale, the plaintiffs' high likelihood of success on the merits adds significant weight to their side of the balance.

**D.    Bond**

Under Federal Rule of Civil Procedure 65(c), a court ordinarily must require a plaintiff to post a bond to obtain a preliminary injunction. The bond provides security for

31

any damages the defendant might sustain from being wrongfully enjoined. Here, however, the plaintiffs argue that no bond should be required because there is no danger that the government will incur damages from the injunction. *See* Br. in Supp. at 41. The government has not argued that the plaintiffs should be required to post a bond. Accordingly, I conclude that there is no danger of the defendants' incurring costs or damages from the injunction, and therefore I will not require the plaintiffs to post a bond. *See Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010).

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the plaintiffs' motion for a preliminary injunction (ECF No. 15) is **GRANTED** to the extent that the following injunction is issued: The Administrator of the U.S. Small Business Association and the Secretary of the Treasury, as well as their employees, agents and representatives, including the SBA's lending banks, are preliminarily enjoined from using 13 C.F.R. § 120.110(p) and 15 U.S.C. § 636(a)(37)(A)(iv)(III)(aa) to determine whether the plaintiffs are eligible for loans under 15 U.S.C. § 636(a)(37). By **Monday, August 23, at 5:00 p.m. CDT**, the defendants shall transmit guarantee authority to the plaintiffs' lenders and take any other action necessary for the lenders to finish processing the plaintiffs' applications for second-draw loans and immediately fund the loans if—once 13 C.F.R. § 120.110(p) and 15 U.S.C. § 636(a)(37)(A)(iv)(III)(aa) are disregarded—the plaintiffs qualify for such loans.

Dated at Milwaukee, Wisconsin, this 19th day of August, 2021.


s/Lynn Adelman_____
LYNN ADELMAN
United States District Judge

32